JUSTIN H. SANDERS (SBN 211488)
jsanders@sandersroberts.com
OLUWATOBI AGBELEMOSE (SBN 340712)
oagbelemose@sandersroberts.com
**SANDERS ROBERTS LLP**
1055 West 7th Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 426-5000
Facsimile: (213) 234-4581

Attorneys for Petitioner
**ANDREI CHERNY**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANDREI CHERNY, an individual,<br><br>Petitioner,<br><br>v.<br><br>ASPIRATION PARTNERS, INC., a Delaware Business Entity Authorized to Do Business in California,<br><br>Respondent. | **CASE NO.**<br><br>**NOTICE OF PETITION AND PETITION TO CONFIRM ARBITRATION AWARD; DECLARATION OF JUSTIN H. SANDERS**<br><br>Dept.:<br>Judge:<br><br>Petition Filed:   December 2, 2024 |

Case No.:

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

**TO RESPONDENT AND ALL OTHER RELEVANT PARTIES HEREIN:**

**PLEASE TAKE NOTICE** that on ____, 2024 at ____ a.m., or as soon thereafter as the matter may be heard in Department __ of the above-entitled Court, located at 350 W 1st St., Suite 4311, Los Angeles, CA 90012, Petitioner Andrei Cherny ("Cherny") will and does hereby petition the Court for an order confirming the arbitration award ("Petition") by Arbitrator Hon. Glenda Sanders (Ret.) of Judicial Arbitration and Mediation Services, Inc. ( "JAMS") issued on February 9, 2024 in favor of Cherny ("Final Award") in the arbitration between Cherny and Respondent Aspiration Partners, Inc. ("Respondent") and for entry of Judgment.

This Petition is made pursuant to Section 9 of the Federal Arbitration Act ("FAA") and seeks confirmation of the Final Award. This Petition is based upon this Notice, the attached Final Award, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Justin H. Sanders, all pleadings, papers and records on file in this action, and upon such further argument or evidence as may be submitted at or before the time of the hearing. This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on November 25, 2024.

Dated:  December 2, 2024          **SANDERS ROBERTS LLP**

By: _____
　　　Justin H. Sanders, Esq.
　　　Oluwatobi Agbelemose, Esq.
　　　Attorneys for Petitioner
　　　**ANDREI CHERNY**

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

## PETITION TO CONFIRM CONTRACTUAL ARBITRATION AWARD

Petitioner Andrei Cherny ("Cherny") respectfully states:

1. The facts of this case are as follows: Cherny and Respondent Aspiration Partners, Inc. ("Respondent") executed a Transition and Employment Separation Agreement ("Agreement") on October 12, 2022. *See* Ex A to Declaration of Justin H. Sanders ("Sanders Decl.").

2. Section 9 of the Agreement included a binding arbitration provision ("Arbitration Provision"). In relevant part, Section 9(b) of the Arbitration Provision read:

> [The Parties] agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to [Cherny's] employment with or termination of employment from [Respondent], including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator in accordance with the rules of JAMS … as the exclusive remedy for resolving any and all such disputes.

3. On March 28, 2023, Cherny filed a Demand for Arbitration (the "Demand") with Judicial Arbitration and Mediation Services, Inc. ("JAMS"). In the Demand, Cherny alleged Breach of Contract and Declaratory Judgment Causes of Action flowing from Respondent's failure to honor its obligations under the Agreement following Cherny's departure from his role as Respondent's Chief Executive Officer. *See* Ex. B to Sanders Decl.

4. On June 15, 2023, JAMS appointed Arbitrator Hon. Glenda Sanders (Ret.) to serve as arbitrator to address the claim raised in the Demand. *See* Ex. C to Sanders Decl.

5. On August 25, 2023, Cherny filed an Amended Demand for Arbitration which maintained his Breach of Contract claim and no longer included the Declaratory Judgment Cause of Action. *See* Ex. D to Sanders Decl.

6.      On October 31, 2023, Cherny filed a Second Amended Demand for Arbitration which still included the Breach of Contract claim. *See* Ex. E to Sanders Decl.

7.      On December 21, 2023, Arbitrator Sanders issued a ruling granting Respondent's Motion for Summary Disposition for Cherny's claim for attorneys' fees and costs in excess of $10,000.00. The Arbitrator set a hearing for January 4, 2024 to discuss certain issues outstanding that needed further adjudication. *See* Ex. F to Sanders Decl.

8.      On February 9, 2024, Arbitrator Sanders issued an order and final award ("Final Award") finding that, *inter alia*, Petitioner was "entitled to payment of the sum of $172,064.28" totaling the amounts set forth in attached Exhibit 2 to the Final Award. *See* Ex. G to Sanders Decl. Although Arbitrator Sanders declined to grant Cherny attorneys' fees incurred in connection with the enforcement of Cherny's rights under the Agreement, Arbitrator Sanders awarded Cherny $172,064.28 in compensatory damages "based upon the parties' agreement as to the [o]ther claims." *Id.* The Final Award reads that "the parties resolved all remaining claims in the Demand" after the issuance of the Arbitrator's December 21, 2023 order, so no evidentiary hearing occurred prior to the issuance of the Final Award.

9.      JAMS served Cherny's prior counsel with the Final Award on February 14, 2024. *See* Ex. H to Sanders Decl.

10.      Arbitrator Sanders' Final Award is in accordance with the terms and provisions of the Agreement and its Arbitration Provision is, in all respects, proper.

11.      JAMS served a signed copy of the Final Award on all parties, via email, on February 14, 2024.

12.      On April 17, 2024, Cherny's counsel served Respondent's counsel a formal demand letter notifying Respondent that Cherny would file this Petition and seek interest and attorneys' fees if Respondent continued to display bad faith conduct in refusing to abide by the terms of the Final Award. *See* Ex. I to Sanders Decl.

Case No.:

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

13. No party has submitted an application to the Arbitrator seeking a correction or contesting the Final Award.

14. To date, Petitioner's counsel's attorney's fees billed in preparing this Petition total $11,269.50. Petitioner's requested amount is reasonable and calculated according to the lodestar method, which includes 23.7 hours billed at associate and partner rates of $475.00 and $595.00 an hour. *See* Sanders Decl. ¶ 12.

WHEREFORE, Cherny prays for an Order confirming the Arbitrator's Final Award, for entry of Judgment in conformity therewith, for prejudgment interest, for reasonable attorney's fees, other related costs, and for such other relief as the Court may deem just and proper.

Respectfully submitted, this 2nd day of December 2024.

**SANDERS ROBERTS LLP**

Justin H. Sanders, Esq.
Oluwatobi Agbelemose, Esq.
Attorneys for Petitioner
**ANDREI CHERNY**

SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    <u>INTRODUCTION</u>**

By this Petition, Cherny seeks to confirm the Final Award signed by Arbitrator Hon. Glenda Sanders (Ret.) on February 9, 2024. Petitioner hereby seeks entry of Judgment in conformity therewith. Under the Federal Arbitration Act ("FAA"), such confirmation and entry of Judgment is mandatory unless there are grounds for correction, modification, or vacatur of the award, none of which applies here.

**II.    <u>ARGUMENT</u>**

**A. This Honorable Court Should Confirm the Final Award and Enter Judgment in Conformity Therewith.**

"Due to the strong federal policy favoring arbitration, the FAA provides a very limited scope for judicial review of arbitration awards." *White v. Mayflower Transit, LLC*, 481 F. Supp. 2d 1101, 1103 (C.D. Cal. 2007). "Under the FAA, a district court must grant a timely motion to confirm an arbitration award (1) if the parties have agreed that a court shall enter a judgment on the award and (2) if the arbitration award is not vacated, modified, or corrected." *Tutor Perini Bldg. Corp. v. S. California Dist. Council of Laborers*, 373 F. Supp. 3d 1309, 1319 (C.D. Cal. 2019) (quoting 9 U.S.C. § 9). Because the FAA "does not 'confer jurisdiction on federal district courts over actions to compel arbitration or to confirm or vacate arbitration awards, nor does it create a federal cause of action" creating "federal question jurisdiction under 28 U.S.C. § 1331 … there must be 'some other independent basis for federal jurisdiction' in an FAA case, such as diversity jurisdiction.'" *Lagstein v. Certain Underwriters at Lloyd's of London*, 725 F.3d 1050, 1055 (9th Cir. 2013) (internal citations omitted).

**1.  The Court has Independent Basis for Jurisdiction Apart from the FAA.**

As a preliminary matter, the Petition is timely. Arbitrator Sanders signed the Final Award on February 9, 2024. Petitioner's filing of this Petition less than a year

SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

from that date satisfies the FAA deadline. *See* 9 U.S.C. § 9 (Stating that a petition for an order must be granted so long as it is filed "at any time within one year after the award is made."). Likewise, the Court has independent federal jurisdiction over the case by way of diversity jurisdiction. The parties possess complete diversity citizenship under 28 U.S.C. § 1332(a)(1): Cherny is an individual who resides in Arizona and Respondent is an entity founded in Delaware with its principal place of business operating in Los Angeles, California. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) ("Section 1332 requires complete diversity of citizenship; each of the plaintiffs must be a citizen of a different state than each of the defendants.") (citation omitted). The amount in controversy here – which is, *at minimum* $172,064.28 (not including the additional interest and attorneys' fees Cherny alleges entitlement to *infra* section II.B) – far exceeds the statutory $75,000 minimum outlined in 28 U.S.C. § 1332(b). Accordingly, any attempts by Respondent to argue against confirmation of the Final Award on grounds of untimeliness or lack of independent federal jurisdiction are invalid.

### 2. Cherny's Petition Meets the Statutory Requirements Outlined by the FAA and the Ninth Circuit Caselaw.

Cherny's Petition meets the requirements outlined by 9 U.S.C. § 9 and Ninth Circuit Caselaw. "Under the FAA, a district court must grant a timely motion to confirm an arbitration award (1) if the parties have agreed that a court shall enter a judgment on the award and (2) if the arbitration award is not vacated, modified, or corrected." *Tutor Perini Bldg. Corp. v. S. California Dist. Council of Laborers*, 373 F. Supp. 3d 1309, 1319 (C.D. Cal. 2019) (quoting 9 U.S.C. § 9).

First, the parties have agreed that a court shall enter a judgment on the award. Although the Agreement does not itself explicitly consent to entering a judgment on the Final Award, the parties consent is implied based on the language in the Agreement and the parties' conduct. *See Parkridge Ltd. v. Indyzen, Inc.*, 851 F. App'x 54, 55 (9th Cir. 2021) (Affirming that a district court was correct in holding that an

arbitrator did not exceed his authority in holding that the appellant "consented to the arbitrator's jurisdiction by suing to enforce a contract that contained an arbitration clause and actively pursuing her individual claims in arbitration without raising a jurisdictional objection." (citing *Castro v. Tri Marine Fish Co. LLC*, 921 F.3d 766, 775 (9th Cir. 2019) and *Douglass v. Serenivision, Inc.*, 229 Cal. Rptr. 3d 54, 63–65 (2018))). Here, Respondent did not object to the validity of the Agreement's arbitration clause and, instead, participated in the arbitration proceedings with Cherny until the parties settled the majority of their claims and Arbitrator Sanders issued the Final Award. Respondent cannot now retroactively claim it did not consent to entry of judgment on that same award. *See Parkridge Limited*, 851 Fed.Appx. at 55 ("A claimant may not voluntarily submit [her] claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act." (quoting *Ficek v. Southern Pac. Co.*, 338 F.2d 655, 656–57 (9th Cir. 1964))).

The language in the Agreement stating that their agreement "shall be submitted to final and binding arbitration before a single neutral arbitrator in accordance with the rules of JAMS" Employment Arbitration Rules and Procedures further supports the notion that the parties implicitly consented to judicial confirmation. Notably, the JAMS Rule states that "[t]he Parties to an Arbitration under these Rules shall be deemed to have consented that judgment upon the Award may be entered in any court having jurisdiction thereof." JAMS Employment Arbitration Rules & Procedures Rule 25.

Although the Ninth Circuit has yet to directly acknowledge this thesis, it has been cited in at least one California district court case and expressly stated in other federal circuit courts. *See e.g., Snyder as Tr. for Liquidation of Consol. Inv. Servs. v. Floworks, Inc.*, No. C 04-02926 RS, 2007 WL 9812486, at *6 (N.D. Cal. Mar. 26, 2007) (block quoting an excerpt from *P & P Industries, Inc. v. Sutter Corp.*, 179 F.3d 861, 867 (10th Cir. 1999) wherein that court held that parties who agreed their arbitration should be governed by the American Arbitration Association's (AAA)

Rules implicitly consented to judicial confirmation because the language of the AAA Rule said the parties should be "deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof."); *Tube City IMS, LLC v. Anza Cap. Partners, LLC*, 25 F. Supp. 3d 486, 489 (S.D.N.Y. 2014) ("[T]he Court held that Section 9's consent-to-confirmation requirement was satisfied by the parties' 'full participation' in an arbitration process before the American Arbitration Association ('AAA') and by the contract's provision that the 'award of an arbitrator hereunder shall be final, conclusive and binding.'" (citing *Kallen v. District 1199, Nat'l Union of Hosp. and Health Care Employees*, 574 F.2d 723, 724–26 (2d Cir.1978))).

Finally, Respondent has not filed a petition to vacate or correct the Final Award, nor does Cherny believe any of the enumerated statutory grounds for vacating or correcting the Final Award apply. Accordingly, the Court should confirm the Final Award and enter judgment for Cherny in conformity therewith, in the form submitted herewith.

**B. Cherny is Entitled to Pre- and Post-Judgment Interest and Attorneys' Fees Based on Respondent's Bad Faith Refusal to Pay Cherny the Amounts Owed Under the Final Award.**

**1. Pre-Judgment Should be Granted Pursuant to Cal. Civ. Code section 3287.**

In diversity cases, "the court looks to state law to determine the rate of prejudgment interest, while federal law determines the rate of post judgment interest." *Lagstein*, 725 F.3d at 1055. "Under California law, prejudgment interest is available from the day on which the right to recover 'damages certain, or capable of being made certain by calculation,' vests in a party." *Mesa Underwriters Specialty Ins. Co. v. Allergan, Inc.*, 604 F. Supp. 3d 935, 942 (C.D. Cal. 2022), *appeal dismissed*, No. 22-55604, 2022 WL 17818644 (9th Cir. Nov. 18, 2022). "Consequently, prejudgment interest under section 3287(a) becomes available as of the day the amount at issue

SR
SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

becomes 'calculable ... mechanically, on the basis of uncontested and conceded evidence,' and it is available 'as a matter of right,' rather than at the discretion of a court." *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1329 (9th Cir. 2015). If a contract does not provide a legal rate of interest, the default rate for contracts executed after 1986 is 10 percent annum from breach. Cal. Civ. Code § 3289.

Here, Cherny's right to recover vested on February 14, 2024 after Arbitrator Sanders issued the Final Award. The Final Award notes that "the parties resolved all the remaining claims" in Cherny's Demand for Arbitration, i.e., the breach of contract claim, after Arbitrator Sanders issued its December 21, 2023 summary disposition ruling. By the date of the Final Award issuance, there was uncontested and conceded evidence showing that, "based upon the parties' agreement as to the Other Claims," Cherny was entitled to, at minimum, $172,064.28. *See* Final Award at 2; *see also* Exhibit 2 to Final Award. Accordingly, Cherny is entitled to prejudgment interest as a matter of right pursuant to section 3287(a).

Notwithstanding the fact that the chart shown on Exhibit 2 to the Final Award contemplates a daily interest accrual rate at 7 percent, that interest only accrues up to June 6, 2023. Cherny respectfully submits that Exhibit 2 itself, as well as the plain language of the Separation Agreement, do not provide a legal rate of interest that supersedes the default rate outlined in § 3289. Further, the Final Award does not explicitly preclude the award of prejudgment interest, so there is no reason to infer that a grant thereof would be inconsistent with the underlying arbitration award. *See Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc. ("Ministry of Defense")*, 665 F.3d 1091, 1103 (9th Cir. 2011) ("The district court's discretion to award prejudgment interest, of course, must be exercised in a manner consistent with the underlying arbitration award. A court may not award pre-judgment interest when the arbitration tribunal has determined that such interest is not available."). Accordingly, Cherny should be entitled to prejudgment interest – from February 14, 2024 to the date this Honorable Court confirms the Final

SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

Award – and that interest should be deemed to have accrued at the rate of 10 percent annum.

### 2. Post-Judgment Interest Should be Granted Pursuant to 28 U.S.C. § 1961.

"It is settled that even in diversity cases '[p]ost-judgment interest is determined by federal law.'" *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). "Post-judgment interest on a district court judgment is mandatory per 28 U.S.C. § 1961." *Lagstein*, 725 F.3d at 1056.  (citation omitted). Further, "[i]nterest accrues from the date of a judgment whether or not the judgment expressly includes it, because 'such interest follows as a legal incident from the statute providing for it.'" *Waggoner v. R. McGray, Inc.*, 743 F.2d 643, 644 (9th Cir. 1984) (internal citation omitted). "Post-judgment interest should be awarded on the entire amount of the judgment, including any pre-judgment interest." *Lagstein*, 725 F.3d at 1056 (citation omitted). "Typically, post-judgment interest is awarded from the date of judgment until the judgment is satisfied." *Id.* As for the rate of post-judgment interest, Section 1961(a) provides, in relevant part, that "[s]uch interest shall be calculated ... at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding ... the date of the judgment."

Here, assuming this Honorable Court confirms the Final Award and rightfully awards Cherny pre-judgment interest on the Final Award, awarding of post-judgment interest shall be mandatory pursuant to 28 U.S.C. § 1961. Cherny respectfully requests that the post-judgment interest be awarded on the entire amount of the final judgment, including pre-judgment interest, as is permitted and required under Ninth Circuit, and that the interest accrue at the applicable statutory rate. *See Lagstein*, 725 F.3d at 1056; *see also* 28 U.S.C. § 1961(a).

SANDERS ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

### 3. Attorney's Fees Should be Granted Based on Respondent's Bad Faith Conduct Following the Issuance of the Final Award.

"Ordinarily, the prevailing party in a lawsuit does not collect attorney's fees absent contractual or statutory authorization." *Sheet Metal Workers' Int'l Ass'n Loc. Union No. 359 v. Madison Indus., Inc. of Arizona ("Sheet Metal Workers")*, 84 F.3d 1186, 1192 (9th Cir. 1996). "It is well settled, however, that even absent express statutory authority, federal courts have authority to award attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Ministry of Def.*, 665 F.3d at 1104. (internal citation omitted). "'[A]n unjustified refusal to abide by an arbitrator's award,' moreover, 'may equate an act taken in bad faith, vexatiously or for oppressive reasons.'" *Id.* (citation omitted). "Engaging in frivolous dilatory tactics not only denies the individual prompt redress, it threatens the goal of industrial peace. Therefore, the deterrence aspect of an award of attorneys' fees is particularly served where a party, without justification, refuses to abide by an arbitrator's award." *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc. ("Int'l Union")*, 707 F.2d 425, 428 (9th Cir. 1983).

Here, Respondent's bad faith conduct is evidenced by its consistent refusal to pay the amount required by the Final Award, as well as its past refusal to comply with its clear contractual obligations as retaliation against Cherny in connection with his work for Respondent as CEO. At the time Cherny's prior counsel contacted Respondent, on April 17, 2024, in advance of filing this Petition, Respondent had still yet to pay the money owed and awarded to Cherny under the Final Award. Now, nearing the end of the 2024 calendar year, Respondent has still yet to comply with Arbitrator Sanders' Final Award and has still refused to pay any of the money owed. Respondent does not respect the Final Award. Such conduct by Respondent is the type of conduct that should give rise to an attorney's fees award. *See Int'l Union*, 707 F.2d at 428 (Agreeing with other circuits that "an unjustified refusal to abide by an arbitrator's award may equate an act taken in bad faith, vexatiously or for oppressive

reasons" and denying the respondent's claim that the award was invalid); *see also Screen Actors Guild-Am. Fed'n of Television & Radio Artists v. Storybook Sequels, Inc.*, No. CV 12-7074-GW(JEM), 2012 WL 12881949, at *2 (C.D. Cal. Sept. 24, 2012) (granting in full a petitioner's motion for order confirming arbitration award and for entry of judgment because the defendant had failed to timely pay the monetary portion of the arbitration award nor proffered any justification for its refusal to do so (citing *Int'l Union*, 707 F.2d at 428 – 429)). Respondent is refusing to honor the Final Award and, unfortunately, Respondent's conduct here is consistent with Respondent's conduct that gave rise to the original arbitration proceedings. Cherny respectfully submits that this Honorable Court would not abuse its discretion by ordering Respondent to pay the attorneys' fees accumulated by Cherny in efforts to enforce the Final Award since the date Arbitrator Sanders filed the Final Award and Respondent began ignoring the award. *See Sheet Metal Workers*, 84 F.3d at 1192 (declining to find a district court abused its discretion by finding bad faith of a losing party where the losing party failed "to respect the arbitration award"). Further, Petitioner respectfully submits that, even apart from the bad faith allegations made above, Respondent's failure to abide by the Final Award is without justification. Whether on "bad faith" grounds or "without justification" grounds, the binding caselaw shows that attorney's fees are an appropriate award here.

        To date, Petitioner's counsel's attorney's fees billed in preparing this Petition total $11,269.50. Petitioner's requested amount is reasonable and calculated according to the lodestar method, which includes 23.7 hours billed at associate and partner rates of $475.00 and $595.00 an hour. *See Pennsylvania v. Delaware Valley Citizens' Counsil for Clean Air*, 478 U.S. 546, 565 (1986) (approving a "strong presumption that the lodestar figure – the product of reasonable hours times a reasonable rate – represents a 'reasonable' fee"). Petitioner's counsel anticipates incurring additional attorney's fees in the event (1) Respondent opposes the Petition, (2) this Honorable Court requests additional briefing on the reasonableness of the



Case No.:

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

attorney's fees amount requested, and/or (3) Petitioner's counsel must prepare for and attend hearings on the Petition and/or a formal Motion for Attorney's Fees filed after confirmation of the Final Award and entry of judgment pursuant to Fed. R. Civ. P. 54(d)(2). For now, at minimum, the Court should confirm the Final Award and award attorney's fees to Cherny based on Respondent's bad faith conduct and award fees totaling $11,269.50, plus any additional fees accumulated, in connection with seeking to confirm the Final Award.

## III.   <u>CONCLUSION</u>

Based on the foregoing, Petitioner respectfully requests that the Court grant its Petition to Confirm Contractual Arbitration Award, award Cherny pre-and post-judgment interest, and attorney's fees, and that this Court enter Judgment. Petitioner further requests that, after entering Judgment, the court award costs other than Attorney's Fees pursuant to Fed. R. Civ. P. 54(d).



Dated:  December 2, 2024          **SANDERS ROBERTS LLP**

By: _____
Justin H. Sanders, Esq.
Oluwatobi Agbelemose, Esq.
Attorneys for Petitioner
**ANDREI CHERNY**

## **DECLARATION OF JUSTIN H. SANDERS**

I, Justin H. Sanders, declare:

1. I am an attorney for Petitioner Andrei Cherny. I was not present at the evidentiary hearing that preceded the issuance of Arbitrator Sanders' Final Award, as I was retained after the conclusion of the JAMS Arbitration proceedings. I am currently the lead attorney appearing in this matter on behalf of Cherny to argue the merits of Cherny's Petition.

2. I have read the foregoing Notice of Petition and Petition to Confirm Contractual Arbitration Award and affirm that, to the extent I am able to assert so based on my personal knowledge thereof, the facts stated therein are true.

3. A true and correct copy of the Transition and Employment Separation Agreement is attached hereto as **Exhibit A**.

4. A true and correct copy of Cherny's Demand for Arbitration is attached hereto as **Exhibit B**.

5. A true and correct copy of JAMS' Administrative Appointment Letter to all parties is attached hereto as **Exhibit C**.

6. A true and correct copy of Cherny's Amended Demand for Arbitration is attached hereto as **Exhibit D**.

7. A true and correct copy of Cherny's Second Amended Demand for Arbitration is attached hereto as **Exhibit E**.

8. A true and correct copy of Arbitrator Sanders' ruling granting Respondent's Motion for Summary Disposition is attached hereto as **Exhibit F**.

9. A true and correct copy of Arbitrator Sanders' Final Award is attached hereto as **Exhibit G**.

10. A true and correct copy of JAMS' electronic mail correspondence to Cherny's prior counsel Christopher L. McCall is attached hereto as **Exhibit H**.

11. A true and correct copy of Mr. McCall's Demand Letter to Respondent Aspiration Partners, Inc.'s counsel is attached hereto as **Exhibit I**.



SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017

Case No.:

12. To date, our firm's attorney's fees billed in preparing this Petition total $11,269.50. Our requested amount is reasonable and calculated according to the lodestar method, which includes 23.7 hours billed at associate and partner rates of $475.00 and $595.00 an hour. I am the partner on this case and have billed at the corresponding partner rate. Counsel Agbelemose is the associate on this case and his rate has been $475.00 an hour. Our firm anticipates incurring additional attorney's fees in the event (1) Respondent opposes the Petition, (2) this Honorable Court requests additional briefing on the reasonableness of the attorney's fees amount requested, and/or (3) Petitioner's counsel must prepare for and attend hearings on the Petition and/or a formal Motion for Attorney's Fees filed after confirmation of the Final Award and entry of judgment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 2nd day of December, 2024 in Los Angeles, California.

Dated:  December 2, 2024

**SANDERS ROBERTS LLP**

By: _____
Justin H. Sanders, Esq.
Oluwatobi Agbelemose, Esq.
Attorneys for Petitioner
**ANDREI CHERNY**

PETITIONER ANDREI CHERNY'S NOTICE OF PETITION AND PETITION
TO CONFIRM ARBITRATION AWARD

# EXHIBIT A

## TRANSITION AND EMPLOYMENT SEPARATION AGREEMENT

This Transition and Employment Separation Agreement (the "*Agreement*") is made and entered into by and between Andrei Cherny ("*Executive*") and Aspiration Partners, Inc. (the "*Company*"), as of October 12, 2022.

1.    Separation of Employment.

(a)    *Separation of Employment; Termination of Employment Agreement*. Effective as of October 12, 2022 (the "*Separation Date*"), (i) Executive shall resign his employment with the Company and all of its affiliates, Executive shall resign as a member of the Company's Board of Directors (the "*Board*") and Executive shall cease to be an employee and director of all of the foregoing, and (ii) the employment agreement between the Company and Executive (the "*Employment Agreement*"), dated October 1, 2013 as amended and restated in August 2021, shall, except to the extent provisions of the Employment Agreement are specifically referenced herein, terminate, and neither the Company nor Executive shall have any further obligations thereunder.

(b)    *Accrued Obligations*. Upon the Separation Date, the Company will pay to Executive (i) all accrued salary and all accrued, unused vacation / paid time off through the Separation Date, and (ii) any unreimbursed business expenses incurred by Executive, in accordance with Company policy, prior to the Separation Date (collectively, the "*Accrued Obligations*").

(c)    *Separation Pay*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants (as defined below) and Section 6 and (ii) Executive's execution and delivery to the Company of an effective release of claims in substantially the form attached hereto as Exhibit A (the "*Release*") on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, the Company shall pay to Executive an amount equal to $535,000, which represents 12 months of Executive's annual base salary as in effect on the Separation Date (the "*Severance*"). The Severance shall be paid in a single lump sum payment on the business day immediately following the date on which the Release becomes irrevocable. In addition, no later than one business day following the expiration of the revocation period for Executive's Release, the Company shall execute a general release claims against Executive in the form attached hereto as Exhibit B (provided that Executive has not revoked the Release).

(d)    *Extension of Exercise Period*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants and Section 6 and (ii) Executive's execution and delivery to the Company of the Release on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, all Company stock options held by Executive outstanding as of the Separation Date (each a "*Company Equity Award*") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "*Exercise Period Extension*"); provided that Executive acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that Executive (and not the Company) shall be solely responsible for any tax consequences relating to such reclassification.

2.    Consulting Services.

(a)    *Consulting Services*. During the period commencing on the Separation Date and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "*Consulting Period*"), Executive shall provide the following agreed-upon consulting

1

services with regard to the business and operations of the Company, its subsidiaries and its affiliates as requested by the Company expects to average approximately 10 - 15 hours per week (i) consultation and participation with Company matters as reasonably requested by the Company; and (ii) consultation and assistance with respect to services performed during the course of Executive's employment with the Company (collectively, the "***Services***"). Executive shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services. In addition, in performing the Services, Executive agrees to cooperate reasonably with the Company in accomplishing a smooth and orderly transition of (x) Executive's prior employment responsibilities to other employees of the Company, particularly including pending matters of which Executive has the principal knowledge and background information, and (y) the Company's relationship with an independent auditing firm.

        (b)     *Compensation for Consulting Services*.

        (i)     During the Consulting Period, the Company shall pay Executive a fee (the "***Consulting Fee***") of $25,000 per month as cash consideration for the Services pro-rated for any partial month of Services. The monthly Consulting Fee shall be paid to Executive in arrears within ten days following the end of the calendar month in which such monthly Consulting Fee was earned.

        (ii)     Subject to Executive's execution and non-revocation of the Release and to Executive's valid election to continue healthcare coverage under Section 4980B of the Code, the Company shall continue to provide, during the period beginning on the Separation Date and ending on the earlier of (i) the 12-month anniversary thereof or (ii) the date on which Executive becomes eligible to receive benefits under a "group health plan" (within the meaning of Section 4980B of the Code) of a subsequent employer of Executive (the "***COBRA Period***"), Executive and Executive's eligible dependents with coverage under its group health plans at the same levels and the same cost to Executive as would have applied if Executive's employment had not been terminated based on Executive's elections in effect on the Separation Date, provided, however, that (A) if any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the period of continuation coverage to be, exempt from the application of Section 409A under Treasury Regulation Section 1.409A-1(a)(5), or (B) the Company is otherwise unable to continue to cover Executive under its group health plans without incurring penalties (including without limitation, pursuant to Section 2716 of the Public Health Service Act or the Patient Protection and Affordable Care Act), then, in either case, an amount equal to each remaining Company subsidy shall thereafter be paid to Executive in substantially equal monthly installments over the COBRA Period (or the remaining portion thereof) (in any event, the "***COBRA Payments***").

        (c)     *Termination of Consulting Services.*

        (i)     The Consulting Period shall terminate on the six-month anniversary of the Separation Date (the "***Anniversary Date***"); provided, however, that the Company or Executive may terminate the Consulting Period and the Services hereunder at any time prior to the Anniversary Date, for any reason, upon 60-days written notice to the other party (or immediately by the Company in the event of a termination for Cause (as defined in the Employment Agreement)). If the Consulting Period and the Services hereunder are terminated for any reason, then (i) the Company shall pay to Executive any portion of the Consulting Fee that has been earned but unpaid through the termination date and (ii) except as provided in Section 2(c)(ii) below, Executive shall forfeit all Consulting Fees payable with respect to periods of service following the termination date (if any).

        (ii)     If the Consulting Period and the Services hereunder are terminated prior to the Anniversary Date by reason of Executive's death or Disability (as defined in the Employment Agreement), then, subject to and conditioned upon (i) Executive's continued compliance with the terms and conditions of Section 9 of this Agreement and the Restrictive Covenants and (ii) Executive's execution

2

of a Release, on or within 21 days following the final date of the Consulting Period, and non-revocation of such Release during the seven day period following the date on which such Release is executed the Company shall pay to Executive the Consulting Fee that would have been payable during the remainder of the Consulting Period had the Consulting Period ended on the Anniversary Date, in accordance with the payment timing set forth in Section 2(b).  For the avoidance of doubt, if Executive terminates the Consulting Period and the Services hereunder prior to the Anniversary Date, Executive shall forfeit any entitlement to the payments and benefits set forth in this Section 2(c)(ii).

      (d)    *Return of Company Property*.  Executive represents and warrants that he shall, prior to the termination date, return to the Company any and all property and equipment of the Company, including (i) all keys, files, lists, books and records (and copies thereof) of, or in connection with, the Company's business, equipment (including, but not limited to, computer hardware, software and printers, wireless handheld devices, cellular phones and pagers), access or credit cards, Company identification, and all other property belonging to the Company in Executive's possession or control, and (ii) all documents and copies, including hard and electronic copies, of documents in Executive's possession relating to any Confidential Information (as defined in the Employment Agreement), including without limitation, internal and external business forms, manuals, correspondence, notes and computer programs, and that Executive has not made or retained, and shall not make or retain, any copy or extract of any of the foregoing; provided, however, that Executive may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the Services, (ii) Executive's telephone and address book, and (iii) copies of Executive's own personnel, payroll and benefit documents (provided that such personnel, payroll and benefits documents do not contain any Confidential Information and that the Company has the prior opportunity to review, redact and/or retain any such documents containing Confidential Information).  For the avoidance of doubt, during the Consulting Period, Executive shall be allowed to retain and use (a) Executive's Company issued computer and (b) Executive's Company email and email address, all of which for use in Executive's capacity as a Board member or to provide Services.

      3.    <u>Withholdings and Other Deductions</u>.  All compensation payable to Executive hereunder shall be subject to such withholdings and deductions as the Company is from time to time required to make pursuant to law, governmental regulation or order.

      4.    <u>Warranty</u>.  Executive acknowledges that all payments and benefits under Section 2 of this Agreement and the Company Release constitute additional compensation to which Executive would not be entitled except for Executive's decision to sign this Agreement and to abide by the terms of this Agreement.  With the exception of any equity in the Company or Company provided health and welfare benefits, Executive acknowledges that, upon receipt of the Accrued Obligations, Executive has (i) received all monies and other benefits due to Executive as a result of his employment with and separation from the Company, and (ii) no right, title, or interest in or entitlement to any other payments or benefits other than as set forth in this Agreement.  Executive further represents that he has not sustained a work-related injury or illness which he has not previously reported to the Company.

      5.    <u>Restrictive Covenants</u>. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that (i) Executive previously made certain representations, including with respect to confidential information, intellectual property, non-competition and non-solicitation obligations, as set forth in Sections 7, 8 and 9 of the Employment Agreement, and (ii) Sections 7 - 11 of the Employment Agreement shall remain in full force and effect in accordance with their terms and Executive shall be bound by their terms; provided, however, that notwithstanding anything to the contrary contained in the Employment Agreement, the "Restricted Period" shall end on the Separation Date for purposes of Section 9(a) and 9(b) (iii) of the Employment Agreement (collectively, the "***Restrictive Covenants***").

3

6.      <u>Non-Disparagement</u>. Subject to Section 8, Executive agrees not to publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on any of the Company or any of its affiliates, or that are otherwise disparaging of any of the Company's, its affiliates or any of their past or present officers, directors, employees, advisors, agents, policies, procedures, practices, decision-making, conduct, professionalism or compliance with standards.  Each of the individuals or entities covered by the foregoing agreement on behalf of Executive shall be third party beneficiaries of this Section, entitled to enforce it against Executive and/or seeks damages for its violation.  The Company agrees that the Company's Board members, major shareholders and officers shall not publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on Executive.  The Company agrees that Executive's separation is a resignation by Executive and that the Company, the Company's Board members, major shareholders and officers will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation, whether written or oral, that contradict the statement attached hereto as <u>Exhibit C</u>.  The Company acknowledges and agrees that it shall promptly advise the Company's Board members, major shareholders and officers of the foregoing obligation.

7.      <u>Ongoing Cooperation</u>.  Executive agrees that Executive will reasonably assist and cooperate with the Company and its affiliates (i) concerning reasonable requests for information about the business of the Company or its affiliates or Executive's involvement and participation therein, (ii) in connection with the defense, prosecution or investigation of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or its subsidiaries or affiliates, including any proceeding before any arbitral, administrative, judicial, legislative, or other body or agency, including testifying in any proceeding to the extent such claims, actions, investigations or proceedings relate to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive, and (iii) and in connection with any investigation or review by any federal, state or local regulatory, quasi- or self-regulatory or self-governing authority or organization (including, without limitation, the SEC and FINRA) as any such investigation or review relates to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive.  Executive's reasonable cooperation shall include, but not be limited to, being reasonably available to meet and speak with officers or employees of the Company, its affiliates and/or their advisors (including auditors and any accounting or tax advisors) or counsel at reasonable times and locations, executing accurate and truthful documents, appearing at the Company's request as a witness at depositions, trials or other proceedings without the necessity of a subpoena, and taking such other actions as may reasonably be requested by the Company, its affiliates and/or their advisors or counsel to effectuate the foregoing.  In requesting such services, the Company will consider other commitments that Executive may have at the time of the request.  Executive shall be entitled to indemnification and/or advancement of expenses in accordance with the terms and condition set forth in that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021.

8.      <u>Exceptions</u>

(a)      Notwithstanding anything in this Agreement to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Agreement shall prohibit Executive (or Executive's attorney) from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with the U.S. Securities and Exchange Commission ("***SEC***"), the Financial Industry Regulatory Authority ("***FINRA***"), the EEOC, the NLRB, the Occupational Safety and Health Administration, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice or any other securities regulatory agency, self-regulatory authority or federal, state or local regulatory authority (collectively, "***Government Agencies***"), or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation, (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to any Government

4

Agencies for the purpose of reporting or investigating a suspected violation of law, or from providing such information to Executive's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding, and/or (iii) receiving an award for information provided to any Government Agency; (B) pursuant to 18 USC Section 1833(b), Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Agreement is intended to or shall preclude Executive from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if Executive is required to provide testimony, then unless otherwise directed or requested by a Governmental Agency or law enforcement, Executive shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Agreement prevents Executive from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

(b)     Executive represents and warrants to the Company that as of the date of this Agreement, Executive is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

9.     <u>Arbitration</u>.

(a)     Executive and the Company agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to Executive's employment with or termination of employment from the Company, including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator in accordance with the rules of JAMS pursuant to its Employment Arbitration Rules and Procedures, which are available at http://www.jamsadr.com/rules-employment-arbitration/, and the Company will provide a copy upon Executive's request, as the exclusive remedy for resolving any and all such disputes.

(b)     The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California.  Each party shall be entitled to all types of remedies and relief otherwise available in court (subject to the limitations set forth herein).  The parties agree that any arbitration pursuant to this Agreement shall be brought on an individual, rather than class, collective, or representative basis, and waive the right to pursue any claim subject to arbitration on a class, collective, or representative basis.

(c)     The parties to this Agreement hereby expressly and irrevocably submit themselves to the personal jurisdiction of the United States District Court for the Central District of California or, if subject matter jurisdiction does not exist, the Superior Court of the State of California (the "***Court***") for the purpose of compelling arbitration pursuant to this Agreement and for the purpose of any judicial proceedings seeking to confirm, modify or vacate any arbitration award.

(d)     The fees of the arbitrator and all other costs that are unique to arbitration shall be paid by the Company initially, but if Executive initiates a claim subject to arbitration, Executive

5

shall pay any filing fee up to the amount that Executive would be required to pay if Executive initiated such claim in the Court. Each party shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' fees and/or its own witnesses' fees. The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law.

(e)     WAIVER OF TRIAL BY JURY OR COURT. EXECUTIVE AND THE COMPANY UNDERSTAND THAT BY AGREEING TO ARBITRATE ANY ARBITRATION CLAIM, THEY WILL NOT HAVE THE RIGHT TO HAVE ANY ARBITRATION CLAIM DECIDED BY A JURY OR A COURT, BUT SHALL INSTEAD HAVE ANY ARBITRATION CLAIM DECIDED THROUGH ARBITRATION.

(f)     WAIVER OF OTHER RIGHTS. EXECUTIVE AND THE COMPANY WAIVE ANY CONSTITUTIONAL OR OTHER RIGHT TO BRING CLAIMS COVERED BY THIS AGREEMENT OTHER THAN IN THEIR INDIVIDUAL CAPACITIES. EXCEPT AS MAY BE PROHIBITED BY LAW, THIS WAIVER INCLUDES THE ABILITY TO ASSERT CLAIMS AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(g)     The parties acknowledge that they are entering into this arbitration provision voluntarily, and are represented by counsel. If any part of this arbitration provision is deemed unenforceable, it is entirely severable from the rest and shall not affect or limit the validity or enforceability of the remainder of the provision, or the Agreement.

10.     Code Section 409A.

(a)     To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other such guidance that may be issued after the Effective Date (collectively, "**Section 409A**"). Notwithstanding any provision of this Agreement to the contrary, in the event that following the Effective Date, the Company determines that any compensation or benefits payable under this Agreement may be subject to Section 409A, the Company may adopt such amendments to this Agreement or adopt other policies or procedures (including amendments, policies and procedures with retroactive effect), or take any other actions that the Company determines are necessary or appropriate to preserve the intended tax treatment of the compensation and benefits payable hereunder, including without limitation actions intended to (i) exempt the compensation and benefits payable under this Agreement from Section 409A, and/or (ii) comply with the requirements of Section 409A, provided, however, that this Section 10 does not, and shall not be construed so as to, create any obligation on the part of the Company to adopt any such amendments, policies or procedures or to take any other such actions. In no event shall the Company, its affiliates or any of their respective officers, directors or advisors be liable for any taxes, interest or penalties imposed under Section 409A or any corresponding provision of state or local law.

(b)     Any right under this Agreement to a series of installment payments shall be treated as a right to a series of separate payments. Notwithstanding anything to the contrary in this Agreement, no compensation or benefits shall be paid to Executive during the six-month period following Executive's "separation from service" with the Company (within the meaning of Section 409A) if the Company determines that paying such amounts at the time or times indicated in this Agreement would be a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code. If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of such six-month period (or such earlier date upon which such amount can be paid under Section 409A without resulting in a prohibited distribution, including as a result of Executive's death), the Company shall pay

6

Executive a lump-sum amount equal to the cumulative amount that would have otherwise been payable to Executive during such period (without interest).

(c)    To the extent any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" to which Treasury Regulation Section 1.409A-3(i)(1)(iv) would apply, any such reimbursements or in-kind benefits shall be paid or reimbursed reasonably promptly, but in no event later than December 31st of the year following the year in which the expense was incurred.  The amount of any such payments eligible for reimbursement in one year shall not affect the payments or expenses that are eligible for payment or reimbursement in any other taxable year, and Executive's right to such payments or reimbursements of any such expenses shall not be subject to liquidation or exchange for any other benefit.

11.    Breach.  In the event Executive breaches Sections 2(a), 5 or 6 (including a breach of the Restrictive Covenants), any outstanding obligations of the Company to pay Consulting Fees and COBRA Payments shall immediately terminate.  Executive acknowledges and agrees that Executive's rights to receive the Severance is conditioned on continued compliance with the Restrictive Covenants and Sections 2(a) and 6.

12.    Governing Law.  This Agreement shall be construed under the laws of the State of California, both procedural and substantive.

13.    Waiver.  The failure to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of any party to enforce this Agreement.

14.    Headings.  The headings in this Agreement are provided solely for convenience, and are not intended to be part of, nor to affect or alter the interpretation or meaning of, this Agreement.

15.    Severability.  If any sentence, phrase, section, subsection or portion of this Agreement is found to be illegal or unenforceable, such action shall not affect the validity or enforceability of the remaining sentences, phrases, sections, subsections or portions of this Agreement, which shall remain fully valid and enforceable.

16.    Assignment.  This Agreement is personal to Executive and shall not be assignable by Executive.  The rights of the Company under this Agreement may be assigned by the Company, in its sole discretion, including to any of its affiliates or any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly, acquires all or substantially all of the assets or business of the Company.  This Agreement shall inure to the benefit of, and be binding on, the Company and its successors and assigns.

17.    Ambiguities.  Both parties have participated in the negotiation of this Agreement and, thus, it is understood and agreed that the general rule that ambiguities are to be construed against the drafter shall not apply to this Agreement.  In the event that any language of this Agreement is found to be ambiguous, each party shall have an opportunity to present evidence as to the actual intent of the parties with respect to any such ambiguous language.

18.    Entire Agreement / Amendments.  This Agreement, that certain Fourth Amended and Restated Voting Agreement, dated as of September 14, 2021 as amended effective October 12, 2022, by and among the Company and certain other parties as described therein and the documents referred to herein constitute the entire agreement between Executive and the Company concerning the subject matter hereof.  No covenants, agreements, representations, or warranties of any kind, other than those set forth

7

herein, have been made to any party hereto with respect to this Agreement. All prior discussions and negotiations have been and are merged and integrated into, and are superseded by, this Agreement, including, but not limited to, the Employment Agreement (except as expressly provided herein with respect to Sections 7 - 11 of the Employment Agreement, as amended by Section 5 herein). Notwithstanding the foregoing, Executive shall continue to be entitled to Executive's vested benefits and all right related thereto, rights as a shareholder, and indemnification rights (including but not limited to rights under that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021). No amendments to this Agreement will be valid unless written and signed by Executive and an authorized representative of the Company.

19.    _Counterparts_. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

20.    _Consultation with Counsel_. Executive acknowledges (i) that Executive has thoroughly read and considered all aspects of this Agreement, that Executive understands all its provisions and that Executive is voluntarily entering into this Agreement, (ii) that he has been represented by, or had the opportunity to be represented by independent counsel of his own choice in connection with the negotiation and execution of this Agreement and has been advised to do so by the Company, and (iii) that he has read and understands the Agreement, is fully aware of its legal effect, and has entered into it freely based on his own judgment. Without limiting the generality of the foregoing, Executive acknowledges that he has had the opportunity to consult with his own independent tax advisors with respect to the tax consequences to him of this Agreement, and that he is relying solely on the advice of his independent advisors for such purposes. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. The Company agrees that it shall reimburse Executive for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement, subject to Executive's delivery to the Company of documentation evidencing such fees within 60 days after the Effective Date.

21.    _Notices_. All notices, requests and other communications hereunder shall be in writing and shall be delivered by courier or other means of personal service (including by means of a nationally recognized courier service or professional messenger service), or sent by email or facsimile and also mailed first class, postage prepaid, by certified mail, return receipt requested, in all cases addressed to:

_If to Executive_:

At Executive's last known address evidenced on the Company's payroll records.

_If to the Company_:

Aspiration Partners, Inc.
4551 Glencoe Ave.
Suite 300
Marina del Rey, CA 90292
Attention: Legal Department

All notices, requests and other communications shall be deemed given on the date of actual receipt or delivery as evidenced by written receipt, acknowledgement or other evidence of actual receipt or delivery to the address. In case of service by telecopy, a copy of such notice shall be personally delivered or sent by registered or certified mail, in the manner set forth above, within three business days thereafter. Any party hereto may from time to time by notice in writing served as set forth above designate a different

address or a different or additional person to which all such notices or communications thereafter are to be given.

[*Signature page follows*]

US-DOCS\135645189.15

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

DocuSigned by:

*Andrei Cherny*

157C23F4275F4C5...

Andrei Cherny

_____

Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

_____
Andrei Cherny

DocuSigned by:

*Nate Redmond*

D87378D0F896426...

Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

**EXHIBIT A**
**GENERAL RELEASE**

1.      <u>Release</u>. For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned does hereby release and forever discharge the "***Releasees***" hereunder, consisting of Aspiration Partners, Inc. (the "***Company***"), and the Company's affiliated, related, parent and subsidiary corporations, as well as their respective past and present parents, subsidiaries, associates, affiliates, successors, heirs, assigns, agents, directors, officers, employees, representatives, lawyers, insurers, and all persons acting by, through, under or in concert with them or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the undersigned now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.  The Claims released herein include, without limiting the generality of the foregoing, any Claims in any way arising out of, based upon, or related to the employment, the terms and conditions of employment or termination of employment of the undersigned by the Releasees, or any of them (including, but not limited to, any alleged discrimination, harassment or retaliation); any alleged breach of any express or implied contract of employment; any alleged torts, or other alleged legal restrictions on Releasees' right to terminate the employment of the undersigned; any alleged wrongful discharge, whistleblowing, detrimental reliance, defamation, slander, libel, intentional and negligent emotional distress or compensatory and/or punitive damages; common law, including but not limited to any alleged wrongful or retaliatory discharge in violation of public policy, breach of the covenant of good faith and fair dealing, interference with contractual relations or prospective business advantage, invasion of privacy, false imprisonment, and/or fraud; rights to attorneys' fees, costs, disbursements and/or the like; and any alleged violation of any federal, state or local statute or ordinance including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, Sections 1981 through 1988 of Title 42 of the United States Code, the National Labor Relations Act, the Employee Retirement Income Security Act, all claims under the Family and Medical Leave Act and Worker Adjustment and Retraining Notification Act, and all other federal, state and local leave and/or WARN laws; and any federal, state or local laws of similar effect.

2.      <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the undersigned (i) to payments or benefits under Section 1(c) of the Transition and Employment Separation Agreement, dated October 12, 2022, between the Company and the undersigned, with respect to the payments and benefits provided in exchange for this Release, (ii) to payments or benefits under any equity award agreement between the undersigned and the Company, (iii) to accrued or vested benefits the undersigned may have, if any, as of the date hereof under any applicable plan, policy, practice, program, contract or agreement with the Company, (iv) to any Claims, including claims for indemnification and/or advancement of expenses arising under any indemnification agreement between the undersigned and the Company or under the bylaws, certificate of incorporation or other similar governing document of the Company, (v) to any Claims which cannot be waived by an employee under applicable law, or (vi) with respect to the undersigned's right to communicate directly with, cooperate with, or provide information to, any federal, state or local government regulator.

THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR

A-1

HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE UNDERSIGNED, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS HE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.     <u>Exceptions</u>.  Notwithstanding anything in this Release to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Release shall prohibit the undersigned from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation and/or (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to, any federal, state or local government regulator (including, but not limited to, the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, or the U.S. Department of Justice) for the purpose of reporting or investigating a suspected violation of law, or from providing such information to the undersigned's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding; (B) pursuant to 18 USC Section 1833(b), the undersigned acknowledges that (1) the undersigned will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Release is intended to or shall preclude the undersigned from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if the undersigned is required to provide testimony, then unless otherwise directed or requested by a governmental agency or law enforcement, the undersigned shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Release prevents the undersigned from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

4.     <u>Representations</u>.   The undersigned represents and warrants that there has been no assignment or other transfer of any interest in any Claim which the undersigned may have against Releasees, or any of them, and the undersigned agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the undersigned under this indemnity.  The undersigned further represents and warrants that as of the date of this Release, he is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

5.     <u>No Action</u>.  The undersigned agrees that if the undersigned hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the undersigned agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

A-2

6.  **No Admission**.  The undersigned further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the undersigned.

7.  **OWBPA**.  The undersigned agrees and acknowledges that this Release constitutes a knowing and voluntary waiver and release of all Claims the undersigned has or may have against the Company and/or any of the other Releasees as set forth herein, including, but not limited to, all Claims arising under the Older Worker's Benefit Protection Act and the Age Discrimination in Employment Act. In accordance with the Older Worker's Benefit Protection Act, the undersigned is hereby advised as follows:

(i)  the undersigned has read the terms of this Release, and understands its terms and effects, including the fact that the undersigned agreed to release and forever discharge the Company and each of the Releasees, from any Claims released in this Release;

(ii)  the undersigned understands that, by entering into this Release, the undersigned does not waive any Claims that may arise after the date of the undersigned's execution of this Release, including without limitation any rights or claims that the undersigned may have to secure enforcement of the terms and conditions of this Release;

(iii)  the undersigned has signed this Release voluntarily and knowingly in exchange for the consideration described in this Release, which the undersigned acknowledges is adequate and satisfactory to the undersigned and which the undersigned acknowledges is in addition to any other benefits to which the undersigned is otherwise entitled;

(iv)  the Company advised the undersigned to consult with an attorney prior to executing this Release;

(v)  the undersigned has been given at least 21 days in which to review and consider this Release.  To the extent that the undersigned chooses to sign this Release prior to the expiration of such period, the undersigned acknowledges that the undersigned has done so voluntarily, had sufficient time to consider the Release, to consult with counsel and that the undersigned does not desire additional time and hereby waives the remainder of the 21-day period; and

(vi)  the undersigned may revoke this Release within seven days from the date the undersigned signs this Release and this Release will become effective upon the expiration of that revocation period.  If the undersigned revokes this Release during such seven-day period, this Release will be null and void and of no force or effect on either the Company or the undersigned and the undersigned will not be entitled to any of the payments or benefits, or the Company Release, each of which is expressly conditioned upon the execution and non-revocation of this Release.  Any revocation must be in writing and sent to Cecilia Saez, at csaez@aspiration.com, on or before 11:59 p.m. PT on the seventh day after this Release is executed by the undersigned.

8.  **Governing Law**. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

A-3

IN WITNESS WHEREOF, the undersigned has executed this Release this _____ day of _____, 20___.

_____
Andrei Cherny

A-4

**EXHIBIT B**
**COMPANY RELEASE**

1.     Release. In exchange for the consideration set forth in that certain Transition and Employment Separation Agreement, dated October 12, 2022, between Aspiration Partners, Inc., a Delaware corporation (the "***Company***") and Andrei Cherny (the "***Executive***"), the receipt and adequacy of which are hereby acknowledged, the Company does hereby release and forever discharge the "***Releasees***" hereunder, consisting of the Executive and his heirs and assigns of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the Company and its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them, now have or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.   The Company has authority to release Claims on behalf of its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them.

2.     Claims Not Released.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the Company or its subsidiaries to the Executive's fraud or breach of fiduciary duty (the "***Unreleased Claims***").

THE COMPANY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE COMPANY, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.     Representations.  The Company represents and warrants that there has been no assignment or other transfer of any interest in any Claim (other than any Unreleased Claim) which the Company may have against Releasees, or any of them, and the Company agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the Company under this indemnity.

4.     No Action.  The Company agrees that if the Company hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the Company agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

5.     No Admission.  The Company further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any

liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the Company.

      6.    <u>Acknowledgement</u>.  The Company acknowledges that different or additional facts may be discovered in addition to what is now known or believed to be true by the Company with respect to the matters released in this Release, and the Company agrees that this Release shall be and remain in effect in all respects as a complete and final release of the matters released, notwithstanding any different or additional facts.

      7.    <u>Governing Law</u>. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

* * * * *

B-2

IN WITNESS WHEREOF, the Company has executed this Release this _____ day of _____, 2022.

ASPIRATION PARTNERS, INC.

By: _____

Name:

Title:

**EXHIBIT C**
**STATEMENT**

Andrei has resigned from the Company.

The Company, the Company's Board members, major shareholders and officers (the "Company") will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation being due to Executive's performance or misconduct. Insofar as the Company is asked to respond to a question regarding whether Mr. Cherny's departure was in any way related to performance or misconduct, the Company must respond that it was not.

# EXHIBIT B

**JAMS ARBITRATION**

| | |
|---|---|
| ANDREI CHERNY, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| ASPIRATION PARTNERS, INC., | ) |
| | ) |
| Respondent. | ) |
| | ) |

## CLAIMANT ANDREI CHERNY'S DEMAND FOR ARBITRATION

March 28, 2023

MITCHELL SANDLER LLC

Andrew L Sandler
Christopher L. McCall
1120 20th Street N.W., Suite 725
Washington, D.C.  20036
Primary email:  cmccall@mitchellsandler.com
Primary telephone:  (202) 886-5292

*Attorneys for Claimant Andrei Cherny*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PARTIES ............................................................................................................... 2

JURISDICTION AND VENUE ............................................................................. 2

FACTUAL BACKGROUND .................................................................................. 2

    I.  Cherny's Separation from the Company He Co-Founded and Built............................. 2

    II.  The Separation Agreement.............................................................. 3

        A.  API's Failure to Honor the Terms of the Separation Agreement .................... 3

            1.  API's Failure to Pay Consulting Fees ..................................... 4

            2.  API's Failure to Execute the Agreed-Upon Release.............................. 4

            3.  API's Failure to Permit Cherny to Access His API-Issued Computer and Email Account.............................................. 6

            4.  API's Failure to Reimburse Cherny for Legal Fees.............................. 7

            5.  API's Failure to Provide Continuing Health Insurance ........................ 7

            6.  API's Failure to Confirm Cherny's Right to Exercise Stock Options... 8

CLAIMS ............................................................................................................... 9

    Claim I:  Breach of Contract (Separation Agreement) ....................................... 9

    Claim II:  Declaratory Judgment.................................................................... 10

PRAYER FOR RELIEF ...................................................................................... 11

Claimant Andrei Cherny ("Cherny"), by and through his undersigned counsel, hereby files this demand for arbitration against respondent Aspiration Partners, Inc. ("API" or the "Company"), his former employer, and alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      Cherny co-founded API in 2013 and served as API's Chief Executive Officer ("CEO") with distinction until October 2022, when his employment with API ended.

2.      The terms of Cherny's departure from API are governed by an October 12, 2022 transition and employment separation agreement (the "Separation Agreement").[1]  As set forth in detail below, in the six months since Cherny and API signed the Separation Agreement, API has failed to honor its obligations under the Separation Agreement, despite repeated requests by Cherny.  API has also failed to communicate to Cherny how it intends to rectify its breaches of the Separation Agreement.

3.      API's failure to honor its contractual obligations, its failure to communicate to Cherny a reasonable path forward, and the considerable costs Cherny has incurred in seeking to enforce the terms of the Separation Agreement, have left Cherny with no choice but to commence this proceeding.

4.      Cherny is proud of the work API did under his decade of leadership and bears no animus toward the Company.  Through this proceeding, Cherny seeks nothing more than to enforce his rights under the Separation Agreement, and be reimbursed for the substantial costs he has incurred in doing so.

---

[1] A true and correct copy of the Separation Agreement is attached hereto as Exhibit A.

## PARTIES

5.      Claimant Andrei Cherny is a natural person who resides in the State of Arizona.

6.      Respondent Aspiration Partners, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

## JURISDICTION AND VENUE

7.      In the Separation Agreement, Cherny and API mutually agreed to arbitrate any and all disputes arising out of Cherny's employment before a neutral JAMS arbitrator in Los Angeles, California:

> [Cherny] and [API] agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to [Cherny's] employment with or termination of employment from [API], including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator . . . as the exclusive remedy for resolving any and all such disputes.

Separation Agreement § 9(a); § 9(b) ("The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California.").

8.      The Separation Agreement is governed by California law.  *See* Separation Agreement § 12.

## FACTUAL BACKGROUND

### I.      Cherny's Separation from the Company He Co-Founded and Built

9.      Cherny co-founded API in 2013.  API is a purpose-driven climate action company that delivers tangible environmental and social impact at scale by providing sustainability-minded business and high-quality carbon credits through rigorously-vetted carbon removal and

2

avoidance projects.  A certified B-Corp, API provides an opportunity for enterprises and individuals to invest in its unparalleled global portfolio of premium reforestation and carbon removal and avoidance projects.

10.     From its founding in 2013 until October 12, 2022, Cherny led API as its Chief Executive Officer and served as a director.

## II.     The Separation Agreement

11.     Cherny and API negotiated the terms of Cherny's departure from API, which resulted in the Separation Agreement, entered into as of October 12, 2022.

### A.   API's Failure to Honor the Terms of the Separation Agreement

12.     As set forth in detail below, API has breached the Separation Agreement in multiple ways and, as a direct result of these breaches, Cherny has sustained substantial damages, with the precise amount to be determined at trial.

#### 1.   API's Failure to Pay Consulting Fees

13.     Under the terms of the Separation Agreement, Cherny agreed to perform certain consulting services for API:

> (a) Consulting Services.  During the period commencing on the Separation Date [*i.e.*, October 12, 2022] and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "Consulting Period"), [Cherny] shall provide the following agreed-upon consulting services with regard to the business and operations of [API], its subsidiaries and its affiliates as requested by [API] expects to average approximately 10-15 hours per week (i) consultation and participation with [API] matters as reasonably requested by [API]; and (ii) consultation and assistance with respect to services performed during the course of [Cherny]'s employment with [API] (collectively, the "Services"). [Cherny] shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services.  In addition, in performing the Services, [Cherny] agrees to cooperate reasonably with [API] in accomplishing a smooth and orderly transition of (x) [Cherny]'s prior

> employment responsibilities to other employees of [API], particularly
> including pending matters of which [Cherny] has the principal knowledge
> and background information, and (y) [API]'s relationship with an
> independent auditing firm.

Separation Agreement § 2(a).

14.     The Separation Agreement required API to pay Cherny $25,000 per month for

these consulting services, payable ten days after the last of each month:

> During the Consulting Period, [API] *shall pay* [Cherny] a fee (the
> 'Consulting Fee') of $25,000 per month as cash consideration for the
> Services pro-rated for any partial month of Services.  The monthly
> Consulting Fee *shall be paid* to [Cherny] in arrears within ten days
> following the end of the calendar month in which such monthly Consulting
> Fee was earned.

Separation Agreement § 2(b) (emphasis added).

15.     The Separation Agreement provided that the consulting period would expire six

months from Cherny's October 12, 2022 resignation, or on or about April 12, 2023.  Separation

Agreement § 2(c)(1).

16.     Despite the fact that Cherny has made himself available to provide the consulting

services since October 12, 2022 and has repeatedly assured Aspiration personnel that he is

"ready and willing to do whatever is requested or whatever [he] can cooperate on," API has not

made a single required payment.

**2.  API's Failure to Execute the Agreed-Upon Release**

17.     The Separation Agreement required Cherny and API to execute general releases,

which were carefully negotiated by the parties and attached as exhibits to the Separation

Agreement.  Separation Agreement § 1(c).

18.     As required by the Separation Agreement, Cherny executed the release attached as Exhibit A to the Transition Agreement on or about October 12, 2022, and has not revoked the release.

19.     The Separation Agreement required API to execute the release attached as Exhibit B to the Separation Agreement, and did not permit API to modify or amend the release prior to execution.  Separation Agreement § 1(c) ("In addition, no later than one business day following the expiration of the revocation period for [Cherny]'s Release, [API] *shall* execute a general release [*sic* – of] claims against [Cherny] *in the form attached hereto as Exhibit B* (provided that [Cherny] has not revoked the Release).") (emphasis added).

20.     On October 20, 2022, API provided a release to Cherny that materially differed from the release negotiated by the parties and attached as Exhibit B to the Separation Agreement. Specifically, whereas the release mutually agreed to by the parties released Cherny from claims by API "from the beginning of time to the date hereof [October 20, 2022]," API modified the release to release Cherny from claims by API "from the beginning of time to October 12, 2022."

21.     In other words, API unilaterally sought to shorten the time period covered by the release by eight days, from October 20, 2022 (the day API executed the release) to October 12, 2022 (the date Cherny's resignation became effective).

22.     API has defended its material alterations to the release on the purported ground that "no provision of the Separation Agreement states that the time periods covered by Mr. Cherny's release and Aspiration's release would not be coterminous, as is typical when mutual releases are given," but this ignores the fact that the releases were heavily negotiated by the parties and expressly agreed upon.  Under the Separation Agreement, API was required to execute the release "in the form attached hereto as Exhibit B," but it did not do so.

**3.  API's Failure to Permit Cherny to Access His API-Issued Computer and Email Account**

23.    The Separation Agreement required Cherny to return property belonging to API, but expressly authorized him to retain certain property, including his API computer and email account:

> [Cherny] represents and warrants that he shall, prior to the termination date, return to [API] any and all property and equipment of [API] . . . provided, however, that [Cherny] may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the [consulting] Services, (ii) [Cherny]'s telephone and address book, and (iii) copies of [Cherny]'s own personnel, payroll and benefit documents . . . . For the avoidance of doubt, during the Consulting Period, [Cherny] shall be allowed to retain and use (a) [Cherny]'s Company issued computer and (b) [Cherny]'s Company email and email address, all of which for use in [Cherny]'s capacity as a Board member or to provide Services.

Separation Agreement § 2(d).

24.    Thus, the Separation Agreement requires that Cherny "*shall be* allowed to retain and use (a) [Cherny]'s Company issued computer and (b) [Cherny]'s Company email and email address" from October 12, 2022 (the effective date of the Separation Agreement) through April 12, 2023 (the expiration of the Consulting Period).  Separation Agreement § 2(d) (emphasis added).

25.    Despite repeated requests, however, API has denied Cherny access to his API computer and email account.  API has maintained that it can unilaterally deny him access to his computer and email account because the Company has discretion to determine the services Cherny is to provide and the tools Cherny will be given to provide the services, but that ignores the mandatory nature of the language in the Separation Agreement.

### 4. **API's Failure to Reimburse Cherny for Legal Fees**

26.     The Separation Agreement required API to reimburse Cherny up to $10,000 for legal fees incurred in negotiating the Separation Agreement.  Separation Agreement § 20 ("[API] agrees that it shall reimburse [Cherny] for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement subject to [Cherny]'s delivery to [API] of documentation evidencing such fees within 60 days after the Effective Date.").

27.     On November 17, 2022 – well within 60 days of the October 12, 2022 effective date of the Separation Agreement – Cherny submitted a request to API for reimbursement of $10,040 in legal fees, along with an invoice from counsel evidencing such fees.

28.     Despite the fact that Cherny incurred legal fees in excess of $10,000 in negotiating the Separation Agreement, requested reimbursement within 60 days of execution of the Separation Agreement, and submitted documentation evidencing the fees, API has not reimbursed Cherny for his fees.

### 5. **API's Failure to Provide Continuing Health Insurance**

29.     For the year following Cherny's October 12, 2022 resignation (or until October 12, 2023), the Separation Agreement required API to provide Cherny and his eligible dependents "with coverage under [API's] group health plans at the same levels and the same cost to [Cherny] as would have applied if [Cherny]'s employment had not been terminated."  Separation Agreement § 2(b)(ii).

30.     Notwithstanding this provision, API has failed to provide Cherny and his eligible dependents with health coverage on the terms set forth in the Separation Agreement.

**6.  API's Failure to Confirm Cherny's Right to Exercise Stock Options**

31.    The Separation Agreement expressly authorized Cherny to retain all stock options vested prior to his resignation, and to exercise those options for an extended period of time:

> [A]ll [API] stock options held by [Cherny] outstanding as of the Separation Date (each a "Company Equity Award") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "Exercise Period Extension"); provided that [Cherny] acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that [Cherny] (and not [API]) shall be solely responsible for any tax consequences relating to such reclassification.

Separation Agreement § 1(d).

32.    At the time of his resignation, Cherny held a number of stock options that were outstanding, vested, and exercisable and, thus, under Section 1(d) of the Separation Agreement, these stock options remain outstanding and exercisable.

33.    By letters dated October 21, 2022, October 27, 2022, and November 8, 2022 Cherny requested that API confirm that his stock options remain outstanding and exercisable. On November 9, 2022, API responded, but did not confirm whether his options are outstanding and exercisable, and instead only referred Cherny to the terms of Section 1(d) of the Separation Agreement.  This response was insufficient, and Cherny is entitled to API's confirmation that his stock options remain outstanding and exercisable.

## CLAIM I:  BREACH OF CONTRACT (SEPARATION AGREEMENT)

34.     Cherny repeats and realleges the foregoing allegations as if fully set forth herein.

35.     The Separation Agreement is a valid and enforceable contract.

36.     API breached Section 2 of the Separation Agreement by refusing to pay Cherny $25,000 per month for consulting services, despite the fact that Cherny has performed the consulting services as required.

37.     API breached Section 1(c) of the Separation Agreement by failing to execute the release negotiated by the parties and attached as Exhibit B to the Separation Agreement.

38.     API breached Section 2(d) of the Separation Agreement by refusing to permit Cherny access to his API-issued computer and email account.

39.     API breached Section 20 of the Separation Agreement by failing to reimburse Cherny for legal fees incurred in negotiating the Separation Agreement.

40.     API breached Section § 2(b)(ii) of the Separation Agreement by failing to provide Cherny with continuing health insurance.

41.     As a direct result of these breaches of the Separation Agreement, Cherny has sustained damages in an amount to be determined at trial.

## CLAIM II:  DECLARATORY JUDGMENT (ARBITRATION FEES)

42.      Cherny repeats and realleges the foregoing allegations as if fully set forth herein.

43.      The Separation Agreement provides as follows with respect to the payment of arbitration fees:

> The fees of the arbitrator and all other costs that are unique to arbitration shall be paid by [API] initially, but if [Cherny] initiates a claim subject to arbitration, [Cherny] shall pay any filing fee up to the amount that [Cherny] would be required to pay if [Cherny] initiated such claim in the Court.  Each party shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' fees and/or its own witnesses' fees.  The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law.

Separation Agreement § 9(d).

44.      The "Court" referenced in Section 9(d) is defined in the Separation Agreement as the United States District Court for the Central District of California.  Separation Agreement § 9(c).  According to the United States District Court for the Central District of California's Schedule of Fees, the filing fee to initiate a civil case is $350.[2]  JAMS charges a filing fee of $2,000 to initiate a two-party arbitration.[3]  Under Section 9(d) of the Separation Agreement, Cherny is only required to pay a filing fee equal to the amount of the filing fee it would cost to commence the action in Court, which is $350, and API is responsible for the difference, which is $1,650 ($2,000 subtracted by $350).

---

[2] The United States District Court for the Central District of California's Fee Schedule is available at U:\LA\SPZenShared\AUTOMATION\USDC Forms\!Posted Forms\WordPerfect\G-72.wpd (uscourts.gov) (last accessed March 28, 2023).

[3] JAMS's Arbitration Schedule of Fees and Costs is available at Arbitration Schedule of Fees & Costs | JAMS Mediation, Arbitration, ADR Services (jamsadr.com) (last accessed March 28, 2023).

45.     Accordingly, Cherny seeks a declaration that API is contractually obligated to pay Cherny $1,650.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Cherny respectfully requests that the arbitrator enter judgment in favor of Cherny and against API, and award Cherny the following relief:

1.     Order API to pay Cherny the $25,000 per month consulting fees required under Section 2 of the Separation Agreement for the period from October 12, 2022 through the present.

2.     Order API to execute the release attached as Exhibit B to the Separation Agreement.

3.     Order API to provide Cherny with immediate access to his API-issued computer and email account.

4.     Order API to pay Cherny $10,000 to reimburse Cherny for legal fees incurred in connection with the negotiation and execution of the Separation Agreement.

5.     Order API to provide Cherny and his eligible dependents with continuing health insurance coverage.

6.     Order API to confirm in writing that Cherny's stock option awards remain valid and outstanding.

7.     Declare that API is obligated to reimburse Cherny $1,650 in arbitration filing fees within ten days.

8.     Order API to pay Cherny pre- and post-judgment interest.

9.      Order API to pay Cherny all costs and attorneys' fees he has incurred in seeking

the enforcement of his rights under the Separation Agreement, including all costs and attorneys'

fees for bringing the instant arbitration.

10.      Any other relief the arbitrator deems just and proper.

Dated:      Washington, D.C.
            March 28, 2023

            MITCHELL SANDLER LLC


            By: */s/ Andrew L Sandler*_____

            Andrew L Sandler
            Christopher L. McCall
            1120 20th Street N.W., Suite 725
            Washington, D.C.  20036
            Primary email:  cmccall@mitchellsandler.com
            Primary telephone:  (202) 886-5292

            *Attorneys for Claimant Andrei Cherny*

# EXHIBIT A

## TRANSITION AND EMPLOYMENT SEPARATION AGREEMENT

This Transition and Employment Separation Agreement (the "*Agreement*") is made and entered into by and between Andrei Cherny ("*Executive*") and Aspiration Partners, Inc. (the "*Company*"), as of October 12, 2022.

1. <u>Separation of Employment</u>.

(a) *Separation of Employment; Termination of Employment Agreement*. Effective as of October 12, 2022 (the "*Separation Date*"), (i) Executive shall resign his employment with the Company and all of its affiliates, Executive shall resign as a member of the Company's Board of Directors (the "*Board*") and Executive shall cease to be an employee and director of all of the foregoing, and (ii) the employment agreement between the Company and Executive (the "*Employment Agreement*"), dated October 1, 2013 as amended and restated in August 2021, shall, except to the extent provisions of the Employment Agreement are specifically referenced herein, terminate, and neither the Company nor Executive shall have any further obligations thereunder.

(b) *Accrued Obligations*. Upon the Separation Date, the Company will pay to Executive (i) all accrued salary and all accrued, unused vacation / paid time off through the Separation Date, and (ii) any unreimbursed business expenses incurred by Executive, in accordance with Company policy, prior to the Separation Date (collectively, the "*Accrued Obligations*").

(c) *Separation Pay*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants (as defined below) and Section 6 and (ii) Executive's execution and delivery to the Company of an effective release of claims in substantially the form attached hereto as <u>Exhibit A</u> (the "*Release*") on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, the Company shall pay to Executive an amount equal to $535,000, which represents 12 months of Executive's annual base salary as in effect on the Separation Date (the "*Severance*"). The Severance shall be paid in a single lump sum payment on the business day immediately following the date on which the Release becomes irrevocable. In addition, no later than one business day following the expiration of the revocation period for Executive's Release, the Company shall execute a general release claims against Executive in the form attached hereto as <u>Exhibit B</u> (provided that Executive has not revoked the Release).

(d) *Extension of Exercise Period*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants and Section 6 and (ii) Executive's execution and delivery to the Company of the Release on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, all Company stock options held by Executive outstanding as of the Separation Date (each a "*Company Equity Award*") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "*Exercise Period Extension*"); provided that Executive acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that Executive (and not the Company) shall be solely responsible for any tax consequences relating to such reclassification.

2. <u>Consulting Services</u>.

(a) *Consulting Services*. During the period commencing on the Separation Date and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "*Consulting Period*"), Executive shall provide the following agreed-upon consulting

1

services with regard to the business and operations of the Company, its subsidiaries and its affiliates as requested by the Company expects to average approximately 10 - 15 hours per week (i) consultation and participation with Company matters as reasonably requested by the Company; and (ii) consultation and assistance with respect to services performed during the course of Executive's employment with the Company (collectively, the "***Services***"). Executive shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services. In addition, in performing the Services, Executive agrees to cooperate reasonably with the Company in accomplishing a smooth and orderly transition of (x) Executive's prior employment responsibilities to other employees of the Company, particularly including pending matters of which Executive has the principal knowledge and background information, and (y) the Company's relationship with an independent auditing firm.

(b)    *Compensation for Consulting Services*.

(i)    During the Consulting Period, the Company shall pay Executive a fee (the "***Consulting Fee***") of $25,000 per month as cash consideration for the Services pro-rated for any partial month of Services.  The monthly Consulting Fee shall be paid to Executive in arrears within ten days following the end of the calendar month in which such monthly Consulting Fee was earned.

(ii)    Subject to Executive's execution and non-revocation of the Release and to Executive's valid election to continue healthcare coverage under Section 4980B of the Code, the Company shall continue to provide, during the period beginning on the Separation Date and ending on the earlier of (i) the 12-month anniversary thereof or (ii) the date on which Executive becomes eligible to receive benefits under a "group health plan" (within the meaning of Section 4980B of the Code) of a subsequent employer of Executive (the "***COBRA Period***"), Executive and Executive's eligible dependents with coverage under its group health plans at the same levels and the same cost to Executive as would have applied if Executive's employment had not been terminated based on Executive's elections in effect on the Separation Date, provided, however, that (A) if any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the period of continuation coverage to be, exempt from the application of Section 409A under Treasury Regulation Section 1.409A-1(a)(5), or (B) the Company is otherwise unable to continue to cover Executive under its group health plans without incurring penalties (including without limitation, pursuant to Section 2716 of the Public Health Service Act or the Patient Protection and Affordable Care Act), then, in either case, an amount equal to each remaining Company subsidy shall thereafter be paid to Executive in substantially equal monthly installments over the COBRA Period (or the remaining portion thereof) (in any event, the "***COBRA Payments***").

(c)    *Termination of Consulting Services.*

(i)    The Consulting Period shall terminate on the six-month anniversary of the Separation Date (the "***Anniversary Date***"); provided, however, that the Company or Executive may terminate the Consulting Period and the Services hereunder at any time prior to the Anniversary Date, for any reason, upon 60-days written notice to the other party (or immediately by the Company in the event of a termination for Cause (as defined in the Employment Agreement)).  If the Consulting Period and the Services hereunder are terminated for any reason, then (i) the Company shall pay to Executive any portion of the Consulting Fee that has been earned but unpaid through the termination date and (ii) except as provided in Section 2(c)(ii) below, Executive shall forfeit all Consulting Fees payable with respect to periods of service following the termination date (if any).

(ii)    If the Consulting Period and the Services hereunder are terminated prior to the Anniversary Date by reason of Executive's death or Disability (as defined in the Employment Agreement), then, subject to and conditioned upon (i) Executive's continued compliance with the terms and conditions of Section 9 of this Agreement and the Restrictive Covenants and (ii) Executive's execution

2

of a Release, on or within 21 days following the final date of the Consulting Period, and non-revocation of such Release during the seven day period following the date on which such Release is executed the Company shall pay to Executive the Consulting Fee that would have been payable during the remainder of the Consulting Period had the Consulting Period ended on the Anniversary Date, in accordance with the payment timing set forth in Section 2(b).  For the avoidance of doubt, if Executive terminates the Consulting Period and the Services hereunder prior to the Anniversary Date, Executive shall forfeit any entitlement to the payments and benefits set forth in this Section 2(c)(ii).

        (d)    *Return of Company Property*.  Executive represents and warrants that he shall, prior to the termination date, return to the Company any and all property and equipment of the Company, including (i) all keys, files, lists, books and records (and copies thereof) of, or in connection with, the Company's business, equipment (including, but not limited to, computer hardware, software and printers, wireless handheld devices, cellular phones and pagers), access or credit cards, Company identification, and all other property belonging to the Company in Executive's possession or control, and (ii) all documents and copies, including hard and electronic copies, of documents in Executive's possession relating to any Confidential Information (as defined in the Employment Agreement), including without limitation, internal and external business forms, manuals, correspondence, notes and computer programs, and that Executive has not made or retained, and shall not make or retain, any copy or extract of any of the foregoing; provided, however, that Executive may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the Services, (ii) Executive's telephone and address book, and (iii) copies of Executive's own personnel, payroll and benefit documents (provided that such personnel, payroll and benefits documents do not contain any Confidential Information and that the Company has the prior opportunity to review, redact and/or retain any such documents containing Confidential Information).  For the avoidance of doubt, during the Consulting Period, Executive shall be allowed to retain and use (a) Executive's Company issued computer and (b) Executive's Company email and email address, all of which for use in Executive's capacity as a Board member or to provide Services.

        3.    <u>Withholdings and Other Deductions</u>.  All compensation payable to Executive hereunder shall be subject to such withholdings and deductions as the Company is from time to time required to make pursuant to law, governmental regulation or order.

        4.    <u>Warranty</u>.  Executive acknowledges that all payments and benefits under Section 2 of this Agreement and the Company Release constitute additional compensation to which Executive would not be entitled except for Executive's decision to sign this Agreement and to abide by the terms of this Agreement.  With the exception of any equity in the Company or Company provided health and welfare benefits, Executive acknowledges that, upon receipt of the Accrued Obligations, Executive has (i) received all monies and other benefits due to Executive as a result of his employment with and separation from the Company, and (ii) no right, title, or interest in or entitlement to any other payments or benefits other than as set forth in this Agreement.  Executive further represents that he has not sustained a work-related injury or illness which he has not previously reported to the Company.

        5.    <u>Restrictive Covenants</u>. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that (i) Executive previously made certain representations, including with respect to confidential information, intellectual property, non-competition and non-solicitation obligations, as set forth in Sections 7, 8 and 9 of the Employment Agreement, and (ii) Sections 7 - 11 of the Employment Agreement shall remain in full force and effect in accordance with their terms and Executive shall be bound by their terms; provided, however, that notwithstanding anything to the contrary contained in the Employment Agreement, the "Restricted Period" shall end on the Separation Date for purposes of Section 9(a) and 9(b) (iii) of the Employment Agreement (collectively, the "**_Restrictive Covenants_**").

3

6.      <u>Non-Disparagement</u>. Subject to Section 8, Executive agrees not to publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on any of the Company or any of its affiliates, or that are otherwise disparaging of any of the Company's, its affiliates or any of their past or present officers, directors, employees, advisors, agents, policies, procedures, practices, decision-making, conduct, professionalism or compliance with standards. Each of the individuals or entities covered by the foregoing agreement on behalf of Executive shall be third party beneficiaries of this Section, entitled to enforce it against Executive and/or seeks damages for its violation. The Company agrees that the Company's Board members, major shareholders and officers shall not publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on Executive. The Company agrees that Executive's separation is a resignation by Executive and that the Company, the Company's Board members, major shareholders and officers will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation, whether written or oral, that contradict the statement attached hereto as <u>Exhibit C</u>. The Company acknowledges and agrees that it shall promptly advise the Company's Board members, major shareholders and officers of the foregoing obligation.

7.      <u>Ongoing Cooperation</u>. Executive agrees that Executive will reasonably assist and cooperate with the Company and its affiliates (i) concerning reasonable requests for information about the business of the Company or its affiliates or Executive's involvement and participation therein, (ii) in connection with the defense, prosecution or investigation of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or its subsidiaries or affiliates, including any proceeding before any arbitral, administrative, judicial, legislative, or other body or agency, including testifying in any proceeding to the extent such claims, actions, investigations or proceedings relate to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive, and (iii) and in connection with any investigation or review by any federal, state or local regulatory, quasi- or self-regulatory or self-governing authority or organization (including, without limitation, the SEC and FINRA) as any such investigation or review relates to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive. Executive's reasonable cooperation shall include, but not be limited to, being reasonably available to meet and speak with officers or employees of the Company, its affiliates and/or their advisors (including auditors and any accounting or tax advisors) or counsel at reasonable times and locations, executing accurate and truthful documents, appearing at the Company's request as a witness at depositions, trials or other proceedings without the necessity of a subpoena, and taking such other actions as may reasonably be requested by the Company, its affiliates and/or their advisors or counsel to effectuate the foregoing. In requesting such services, the Company will consider other commitments that Executive may have at the time of the request. Executive shall be entitled to indemnification and/or advancement of expenses in accordance with the terms and condition set forth in that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021.

8.      <u>Exceptions</u>

(a)      Notwithstanding anything in this Agreement to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Agreement shall prohibit Executive (or Executive's attorney) from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with the U.S. Securities and Exchange Commission ("**SEC**"), the Financial Industry Regulatory Authority ("**FINRA**"), the EEOC, the NLRB, the Occupational Safety and Health Administration, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice or any other securities regulatory agency, self-regulatory authority or federal, state or local regulatory authority (collectively, "**Government Agencies**"), or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation, (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to any Government

4

Agencies for the purpose of reporting or investigating a suspected violation of law, or from providing such information to Executive's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding, and/or (iii) receiving an award for information provided to any Government Agency; (B) pursuant to 18 USC Section 1833(b), Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Agreement is intended to or shall preclude Executive from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if Executive is required to provide testimony, then unless otherwise directed or requested by a Governmental Agency or law enforcement, Executive shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Agreement prevents Executive from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

(b)     Executive represents and warrants to the Company that as of the date of this Agreement, Executive is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

9.     <u>Arbitration</u>.

(a)     Executive and the Company agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to Executive's employment with or termination of employment from the Company, including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator in accordance with the rules of JAMS pursuant to its Employment Arbitration Rules and Procedures, which are available at http://www.jamsadr.com/rules-employment-arbitration/, and the Company will provide a copy upon Executive's request, as the exclusive remedy for resolving any and all such disputes.

(b)     The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California.  Each party shall be entitled to all types of remedies and relief otherwise available in court (subject to the limitations set forth herein).  The parties agree that any arbitration pursuant to this Agreement shall be brought on an individual, rather than class, collective, or representative basis, and waive the right to pursue any claim subject to arbitration on a class, collective, or representative basis.

(c)     The parties to this Agreement hereby expressly and irrevocably submit themselves to the personal jurisdiction of the United States District Court for the Central District of California or, if subject matter jurisdiction does not exist, the Superior Court of the State of California (the "***Court***") for the purpose of compelling arbitration pursuant to this Agreement and for the purpose of any judicial proceedings seeking to confirm, modify or vacate any arbitration award.

(d)     The fees of the arbitrator and all other costs that are unique to arbitration shall be paid by the Company initially, but if Executive initiates a claim subject to arbitration, Executive

shall pay any filing fee up to the amount that Executive would be required to pay if Executive initiated such claim in the Court. Each party shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' fees and/or its own witnesses' fees. The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law.

(e)     WAIVER OF TRIAL BY JURY OR COURT. EXECUTIVE AND THE COMPANY UNDERSTAND THAT BY AGREEING TO ARBITRATE ANY ARBITRATION CLAIM, THEY WILL NOT HAVE THE RIGHT TO HAVE ANY ARBITRATION CLAIM DECIDED BY A JURY OR A COURT, BUT SHALL INSTEAD HAVE ANY ARBITRATION CLAIM DECIDED THROUGH ARBITRATION.

(f)     WAIVER OF OTHER RIGHTS. EXECUTIVE AND THE COMPANY WAIVE ANY CONSTITUTIONAL OR OTHER RIGHT TO BRING CLAIMS COVERED BY THIS AGREEMENT OTHER THAN IN THEIR INDIVIDUAL CAPACITIES. EXCEPT AS MAY BE PROHIBITED BY LAW, THIS WAIVER INCLUDES THE ABILITY TO ASSERT CLAIMS AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(g)     The parties acknowledge that they are entering into this arbitration provision voluntarily, and are represented by counsel. If any part of this arbitration provision is deemed unenforceable, it is entirely severable from the rest and shall not affect or limit the validity or enforceability of the remainder of the provision, or the Agreement.

10.     Code Section 409A.

(a)     To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other such guidance that may be issued after the Effective Date (collectively, "***Section 409A***"). Notwithstanding any provision of this Agreement to the contrary, in the event that following the Effective Date, the Company determines that any compensation or benefits payable under this Agreement may be subject to Section 409A, the Company may adopt such amendments to this Agreement or adopt other policies or procedures (including amendments, policies and procedures with retroactive effect), or take any other actions that the Company determines are necessary or appropriate to preserve the intended tax treatment of the compensation and benefits payable hereunder, including without limitation actions intended to (i) exempt the compensation and benefits payable under this Agreement from Section 409A, and/or (ii) comply with the requirements of Section 409A, provided, however, that this Section 10 does not, and shall not be construed so as to, create any obligation on the part of the Company to adopt any such amendments, policies or procedures or to take any other such actions. In no event shall the Company, its affiliates or any of their respective officers, directors or advisors be liable for any taxes, interest or penalties imposed under Section 409A or any corresponding provision of state or local law.

(b)     Any right under this Agreement to a series of installment payments shall be treated as a right to a series of separate payments. Notwithstanding anything to the contrary in this Agreement, no compensation or benefits shall be paid to Executive during the six-month period following Executive's "separation from service" with the Company (within the meaning of Section 409A) if the Company determines that paying such amounts at the time or times indicated in this Agreement would be a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code. If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of such six-month period (or such earlier date upon which such amount can be paid under Section 409A without resulting in a prohibited distribution, including as a result of Executive's death), the Company shall pay

6

Executive a lump-sum amount equal to the cumulative amount that would have otherwise been payable to Executive during such period (without interest).

(c) To the extent any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" to which Treasury Regulation Section 1.409A-3(i)(1)(iv) would apply, any such reimbursements or in-kind benefits shall be paid or reimbursed reasonably promptly, but in no event later than December 31st of the year following the year in which the expense was incurred. The amount of any such payments eligible for reimbursement in one year shall not affect the payments or expenses that are eligible for payment or reimbursement in any other taxable year, and Executive's right to such payments or reimbursements of any such expenses shall not be subject to liquidation or exchange for any other benefit.

11.     Breach. In the event Executive breaches Sections 2(a), 5 or 6 (including a breach of the Restrictive Covenants), any outstanding obligations of the Company to pay Consulting Fees and COBRA Payments shall immediately terminate. Executive acknowledges and agrees that Executive's rights to receive the Severance is conditioned on continued compliance with the Restrictive Covenants and Sections 2(a) and 6.

12.     Governing Law. This Agreement shall be construed under the laws of the State of California, both procedural and substantive.

13.     Waiver. The failure to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of any party to enforce this Agreement.

14.     Headings. The headings in this Agreement are provided solely for convenience, and are not intended to be part of, nor to affect or alter the interpretation or meaning of, this Agreement.

15.     Severability. If any sentence, phrase, section, subsection or portion of this Agreement is found to be illegal or unenforceable, such action shall not affect the validity or enforceability of the remaining sentences, phrases, sections, subsections or portions of this Agreement, which shall remain fully valid and enforceable.

16.     Assignment. This Agreement is personal to Executive and shall not be assignable by Executive. The rights of the Company under this Agreement may be assigned by the Company, in its sole discretion, including to any of its affiliates or any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly, acquires all or substantially all of the assets or business of the Company. This Agreement shall inure to the benefit of, and be binding on, the Company and its successors and assigns.

17.     Ambiguities. Both parties have participated in the negotiation of this Agreement and, thus, it is understood and agreed that the general rule that ambiguities are to be construed against the drafter shall not apply to this Agreement. In the event that any language of this Agreement is found to be ambiguous, each party shall have an opportunity to present evidence as to the actual intent of the parties with respect to any such ambiguous language.

18.     Entire Agreement / Amendments. This Agreement, that certain Fourth Amended and Restated Voting Agreement, dated as of September 14, 2021 as amended effective October 12, 2022, by and among the Company and certain other parties as described therein and the documents referred to herein constitute the entire agreement between Executive and the Company concerning the subject matter hereof. No covenants, agreements, representations, or warranties of any kind, other than those set forth

7

herein, have been made to any party hereto with respect to this Agreement.  All prior discussions and negotiations have been and are merged and integrated into, and are superseded by, this Agreement, including, but not limited to, the Employment Agreement (except as expressly provided herein with respect to Sections 7 - 11 of the Employment Agreement, as amended by Section 5 herein).  Notwithstanding the foregoing, Executive shall continue to be entitled to Executive's vested benefits and all right related thereto, rights as a shareholder, and indemnification rights (including but not limited to rights under that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021). No amendments to this Agreement will be valid unless written and signed by Executive and an authorized representative of the Company.

      19.    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

      20.    <u>Consultation with Counsel</u>.  Executive acknowledges (i) that Executive has thoroughly read and considered all aspects of this Agreement, that Executive understands all its provisions and that Executive is voluntarily entering into this Agreement, (ii) that he has been represented by, or had the opportunity to be represented by independent counsel of his own choice in connection with the negotiation and execution of this Agreement and has been advised to do so by the Company, and (iii) that he has read and understands the Agreement, is fully aware of its legal effect, and has entered into it freely based on his own judgment.  Without limiting the generality of the foregoing, Executive acknowledges that he has had the opportunity to consult with his own independent tax advisors with respect to the tax consequences to him of this Agreement, and that he is relying solely on the advice of his independent advisors for such purposes. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. The Company agrees that it shall reimburse Executive for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement, subject to Executive's delivery to the Company of documentation evidencing such fees within 60 days after the Effective Date.

      21.    <u>Notices</u>.  All notices, requests and other communications hereunder shall be in writing and shall be delivered by courier or other means of personal service (including by means of a nationally recognized courier service or professional messenger service), or sent by email or facsimile and also mailed first class, postage prepaid, by certified mail, return receipt requested, in all cases addressed to:

              <u>If to Executive</u>:

              At Executive's last known address evidenced on the Company's payroll records.

              <u>If to the Company</u>:

              Aspiration Partners, Inc.
              4551 Glencoe Ave.
              Suite 300
              Marina del Rey, CA 90292
              Attention: Legal Department

All notices, requests and other communications shall be deemed given on the date of actual receipt or delivery as evidenced by written receipt, acknowledgement or other evidence of actual receipt or delivery to the address.  In case of service by telecopy, a copy of such notice shall be personally delivered or sent by registered or certified mail, in the manner set forth above, within three business days thereafter.  Any party hereto may from time to time by notice in writing served as set forth above designate a different

8

address or a different or additional person to which all such notices or communications thereafter are to be given.

[*Signature page follows*]

9

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

DocuSigned by:

*Andrei Cherny*

157C23F4275F4C5...

Andrei Cherny


_____

Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

_____
Andrei Cherny


DocuSigned by:

*Nate Redmond*

D87378D0F896426...
_____
Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

**EXHIBIT A**
**GENERAL RELEASE**

1.     <u>Release</u>. For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned does hereby release and forever discharge the "***Releasees***" hereunder, consisting of Aspiration Partners, Inc. (the "***Company***"), and the Company's affiliated, related, parent and subsidiary corporations, as well as their respective past and present parents, subsidiaries, associates, affiliates, successors, heirs, assigns, agents, directors, officers, employees, representatives, lawyers, insurers, and all persons acting by, through, under or in concert with them or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the undersigned now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.  The Claims released herein include, without limiting the generality of the foregoing, any Claims in any way arising out of, based upon, or related to the employment, the terms and conditions of employment or termination of employment of the undersigned by the Releasees, or any of them (including, but not limited to, any alleged discrimination, harassment or retaliation); any alleged breach of any express or implied contract of employment; any alleged torts, or other alleged legal restrictions on Releasees' right to terminate the employment of the undersigned; any alleged wrongful discharge, whistleblowing, detrimental reliance, defamation, slander, libel, intentional and negligent emotional distress or compensatory and/or punitive damages; common law, including but not limited to any alleged wrongful or retaliatory discharge in violation of public policy, breach of the covenant of good faith and fair dealing, interference with contractual relations or prospective business advantage, invasion of privacy, false imprisonment, and/or fraud; rights to attorneys' fees, costs, disbursements and/or the like; and any alleged violation of any federal, state or local statute or ordinance including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, Sections 1981 through 1988 of Title 42 of the United States Code, the National Labor Relations Act, the Employee Retirement Income Security Act, all claims under the Family and Medical Leave Act and Worker Adjustment and Retraining Notification Act, and all other federal, state and local leave and/or WARN laws; and any federal, state or local laws of similar effect.

2.     <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the undersigned (i) to payments or benefits under Section 1(c) of the Transition and Employment Separation Agreement, dated October 12, 2022, between the Company and the undersigned, with respect to the payments and benefits provided in exchange for this Release, (ii) to payments or benefits under any equity award agreement between the undersigned and the Company, (iii) to accrued or vested benefits the undersigned may have, if any, as of the date hereof under any applicable plan, policy, practice, program, contract or agreement with the Company, (iv) to any Claims, including claims for indemnification and/or advancement of expenses arising under any indemnification agreement between the undersigned and the Company or under the bylaws, certificate of incorporation or other similar governing document of the Company, (v) to any Claims which cannot be waived by an employee under applicable law, or (vi) with respect to the undersigned's right to communicate directly with, cooperate with, or provide information to, any federal, state or local government regulator.

THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR
OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR

A-1

HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE UNDERSIGNED, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS HE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.      Exceptions.  Notwithstanding anything in this Release to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Release shall prohibit the undersigned from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation and/or (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to, any federal, state or local government regulator (including, but not limited to, the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, or the U.S. Department of Justice) for the purpose of reporting or investigating a suspected violation of law, or from providing such information to the undersigned's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding; (B) pursuant to 18 USC Section 1833(b), the undersigned acknowledges that (1) the undersigned will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Release is intended to or shall preclude the undersigned from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if the undersigned is required to provide testimony, then unless otherwise directed or requested by a governmental agency or law enforcement, the undersigned shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Release prevents the undersigned from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

4.      Representations.   The undersigned represents and warrants that there has been no assignment or other transfer of any interest in any Claim which the undersigned may have against Releasees, or any of them, and the undersigned agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the undersigned under this indemnity.  The undersigned further represents and warrants that as of the date of this Release, he is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

5.      No Action.  The undersigned agrees that if the undersigned hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the undersigned agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

A-2

6.     No Admission.  The undersigned further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the undersigned.

7.     OWBPA.  The undersigned agrees and acknowledges that this Release constitutes a knowing and voluntary waiver and release of all Claims the undersigned has or may have against the Company and/or any of the other Releasees as set forth herein, including, but not limited to, all Claims arising under the Older Worker's Benefit Protection Act and the Age Discrimination in Employment Act. In accordance with the Older Worker's Benefit Protection Act, the undersigned is hereby advised as follows:

(i)     the undersigned has read the terms of this Release, and understands its terms and effects, including the fact that the undersigned agreed to release and forever discharge the Company and each of the Releasees, from any Claims released in this Release;

(ii)    the undersigned understands that, by entering into this Release, the undersigned does not waive any Claims that may arise after the date of the undersigned's execution of this Release, including without limitation any rights or claims that the undersigned may have to secure enforcement of the terms and conditions of this Release;

(iii)   the undersigned has signed this Release voluntarily and knowingly in exchange for the consideration described in this Release, which the undersigned acknowledges is adequate and satisfactory to the undersigned and which the undersigned acknowledges is in addition to any other benefits to which the undersigned is otherwise entitled;

(iv)    the Company advised the undersigned to consult with an attorney prior to executing this Release;

(v)     the undersigned has been given at least 21 days in which to review and consider this Release.  To the extent that the undersigned chooses to sign this Release prior to the expiration of such period, the undersigned acknowledges that the undersigned has done so voluntarily, had sufficient time to consider the Release, to consult with counsel and that the undersigned does not desire additional time and hereby waives the remainder of the 21-day period; and

(vi)    the undersigned may revoke this Release within seven days from the date the undersigned signs this Release and this Release will become effective upon the expiration of that revocation period.  If the undersigned revokes this Release during such seven-day period, this Release will be null and void and of no force or effect on either the Company or the undersigned and the undersigned will not be entitled to any of the payments or benefits, or the Company Release, each of which is expressly conditioned upon the execution and non-revocation of this Release.  Any revocation must be in writing and sent to Cecilia Saez, at csaez@aspiration.com, on or before 11:59 p.m. PT on the seventh day after this Release is executed by the undersigned.

8.     Governing Law. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

A-3

IN WITNESS WHEREOF, the undersigned has executed this Release this _____ day of _____, 20___.

_____
Andrei Cherny

A-4

**EXHIBIT B**
**COMPANY RELEASE**

1.    Release. In exchange for the consideration set forth in that certain Transition and Employment Separation Agreement, dated October 12, 2022, between Aspiration Partners, Inc., a Delaware corporation (the "***Company***") and Andrei Cherny (the "***Executive***"), the receipt and adequacy of which are hereby acknowledged, the Company does hereby release and forever discharge the "***Releasees***" hereunder, consisting of the Executive and his heirs and assigns of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the Company and its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them,  now have or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.    The Company has authority to release Claims on behalf of its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them.

2.    Claims Not Released.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the Company or its subsidiaries to the Executive's fraud or breach of fiduciary duty (the "***Unreleased Claims***").

THE COMPANY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE COMPANY, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.    Representations.  The Company represents and warrants that there has been no assignment or other transfer of any interest in any Claim (other than any Unreleased Claim) which the Company may have against Releasees, or any of them, and the Company agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the Company under this indemnity.

4.    No Action.  The Company agrees that if the Company hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the Company agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

5.    No Admission.  The Company further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any

B-1

liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the Company.

6.     <u>Acknowledgement</u>.  The Company acknowledges that different or additional facts may be discovered in addition to what is now known or believed to be true by the Company with respect to the matters released in this Release, and the Company agrees that this Release shall be and remain in effect in all respects as a complete and final release of the matters released, notwithstanding any different or additional facts.

7.     <u>Governing Law</u>. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

* * * * *

B-2

IN WITNESS WHEREOF, the Company has executed this Release this ____ day of _____, 2022.

ASPIRATION PARTNERS, INC.


By: _____
Name:
Title:

**EXHIBIT C**
**STATEMENT**

Andrei has resigned from the Company.

The Company, the Company's Board members, major shareholders and officers (the "Company") will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation being due to Executive's performance or misconduct. Insofar as the Company is asked to respond to a question regarding whether Mr. Cherny's departure was in any way related to performance or misconduct, the Company must respond that it was not.

# EXHIBIT C



# APPOINTMENT OF ARBITRATOR

NOTICE TO ALL PARTIES                                    June 15, 2023

       Re:    Cherny, Andrei vs. Aspiration Partners, Inc.
               Reference #:  5220002918

Dear Parties:

Hon. Glenda Sanders (Ret.) has been appointed as Arbitrator in the above-referenced matter.  In accordance with the JAMS Employment Arbitration Rules no party may have *ex-parte* communications with the Arbitrator.  Any necessary communication with the Arbitrator must be initiated through the case manager.

The Arbitrator will bill in accordance with the enclosed Fee Schedule.  Each party will be assessed a pro rata share of all fees and expenses, unless JAMS is notified otherwise by the arbitrator or parties.  Under appropriate circumstances, the Arbitrator may award against any party JAMS fees and expenses.  JAMS agreement to render services is not only with the parties, but extends to the attorney or other representative of the parties in the arbitration.

The parties have been billed a preliminary deposit to cover the expense of all pre-hearing work, such as reading, drafting of orders, and conference calls.  An invoice for this deposit is attached.  Payment is due upon receipt.  Upon receipt of payment, a Preliminary Arbitration Management Conference Call will be scheduled with the Arbitrator.

Your new contact person for this file is Hanna Ahn, Case Manager to Hon. Glenda Sanders (Ret.).

Hanna Ahn
5 Park Plaza Suite 400
Irvine, CA 92614
Phone: 714-937-8237
Fax: 714-939-8710
Email: hahn@jamsadr.com

Contact me at 916-830-7103 or arazumovsky@jamsadr.com if you have questions.

Sincerely,

Alisa Razumovsky
Case Manager
arazumovsky@jamsadr.com

Enclosure

# DEPOSIT REQUEST



**Invoice Date**
6/14/2023

**Invoice Number**
6707938

Bill To:

**Ms. Louise Ann Fernandez Esq.**
**Bartko Zankel Bunzel & Miller**
**One Embarcadero Center**
**Suite 800**
**San Francisco, CA 94111**
**US**

| Reference #: | 5220002918 - Rep# 6 |
|---|---|
| Billing Specialist: | **Mindiola, Nicholaus** |
| Email: | **nmindiola@jamsadr.com** |
| Telephone: | **949-224-4626** |
| Employer ID: | **68-0542699** |

RE: **Cherny, Andrei vs. Aspiration Partners, Inc.**

Representing: **Aspiration Partners, Inc.**

Neutral(s):  **JAMS 1-JAMS**

Hearing Type: **ARBITRATION**                    AR

| Date / Time | Description | Your Share |
|---|---|---|
| 6/14/23 | **JAMS INC** Deposit for services: To be applied to professional time (session time, pre and post session reading, research, preparation, conference calls, travel, etc.), expenses, and case management fees. Please review the Neutral's fee schedule regarding case management fee and cancellation policies. Supplemental deposit requests will be assessed as needed. Any unused portion of this deposit will be refunded at the conclusion of the case. | $ 12,500.00 |

| | |
|---|---|
| **Total Billed:** | $ 12,500.00 |
| **Total Payment:** | $ 0 |
| **Balance:** | $ 12,500.00 |

Invoice total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc. Payment is due upon receipt.

**Click here to pay**

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**



# General Fee Schedule
*Hon. Glenda Sanders (Ret.)*

---

## PROFESSIONAL FEES

**Daily Rate** ..…………………..…………………………..**$12,500**
Includes up to 8 hours of session time on the scheduled day

**Half Day Rate**..…………………..………………………**$9,500**
Includes up to 4 hours of session time on the scheduled day

- Other professional time (including additional hearing time, pre- and post-hearing reading and research, conference calls, and drafting orders and awards) will be billed at $1,250 per hour. This may include travel time.

## ARBITRATION FEES

**Filing Fee**
$2,000 – Two Party Matter
$3,500 – Matters involving three or more parties
$2,000 – Counterclaims
• Entire Filing Fee must be paid in full to expedite the commencement of the proceedings
• A refund of $1,000 will be issued if the matter is withdrawn within five days of filing. After five days, the Filing Fee is non-refundable.

**Case Management Fee**
- 13% of Professional Fees
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.

## CASE MANAGEMENT FEES FOR OTHER MATTERS
**(Discovery, Special Master, Reference, and Appraisal)**
Initial non-refundable Case Management Fee of $875 per party
Plus 13% of Professional Fees

**Neutral Analysis Matters**
Contact JAMS for administrative and pricing details.

## CANCELLATION/CONTINUANCE POLICY

| Number of Days | | Cancellation/Continuance Period | | Fee |
|---|---|---|---|---|
| 1 day or less | ……………… | 30 days or more prior to session | ……………… | 100% REFUNDABLE, except for time incurred |
| 2 to 4 days | ……………… | 45 days or more prior to session | ……………… | 100% REFUNDABLE, except for time incurred |
| 5 to 10 days | ……………… | 60 days or more prior to session | ……………… | 100% REFUNDABLE, except for time incurred |
| 11 days or more | ……………… | 90 days or more prior to session | ……………… | 100% REFUNDABLE, except for time incurred |
| Sessions of any length | ……………… | Inside the cancellation/continuance period | ……………… | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees, including all applicable Case Management Fees, are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with a hearing in another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A deposit request for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- Refund Policy: Overpayments are issued to the billing contact on the matter regardless of the paying party.
- All fees are due and payable in advance of services rendered and by any applicable due date as stated in a hearing confirmation letter. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is $400. The employer must bear the remainder of the employee's share of the Filing Fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between consumers and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. The company must bear the remainder of the consumer's share of the Filing Fee and all Case Management Fees.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an initial abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.
- JAMS panelists may use a law clerk depending on the complexity of the case. The parties will be informed of the engagement if the neutral plans to employ a clerk. The clerk's hourly rate will be billed to the parties subject to the agreed fee split and in accordance with JAMS' policies.

JAMS agreement to render services is with the attorney, the party, and/or other representatives of the party.

**Century City • Inland Empire • Las Vegas • Los Angeles • Orange County • San Diego**
www.jamsadr.com • Updated 4/19/2023

# EXHIBIT D

## JAMS ARBITRATION

| | | |
|---|---|---|
| ANDREI CHERNY, | ) | |
| | ) | JAMS Reference No. 5220002918 |
| Claimant, | ) | |
| | ) | Hon. Glenda Sanders |
| v. | ) | |
| | ) | |
| ASPIRATION PARTNERS, INC., | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## <u>CLAIMANT ANDREI CHERNY'S AMENDED DEMAND FOR ARBITRATION</u>

August 25, 2023

MITCHELL SANDLER LLC

Andrew L Sandler
Christopher L. McCall
1120 20th Street N.W., Suite 725
Washington, D.C.  20036
Primary email:  cmccall@mitchellsandler.com
Primary telephone:  (202) 886-5292

*Attorneys for Claimant Andrei Cherny*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................. 1

PARTIES ................................................................................................. 2

JURISDICTION AND VENUE ............................................................... 3

FACTUAL BACKGROUND .................................................................. 3

    I.  Cherny's Separation from the Company He Co-Founded and Built ............................. 3

    II.  The Separation Agreement ........................................................... 4

        A.  Aspiration's Repeated, Willful, and Bad Faith Breaches of the Separation Agreement ................................................................ 4

            1.  Aspiration's Failure to Pay Consulting Fees ......................................... 6

            2.  Aspiration's Bad Faith Failure to Execute the Agreed-Upon Release .. 8

            3.  Aspiration's Failure to Permit Cherny to Access His Aspiration-Issued Computer and Email Account ................................................... 9

            4.  Aspiration's Failure to Reimburse Cherny for Legal Fees Incurred in Negotiating the Separation Agreement ................................... 10

            5.  Aspiration's Failure to Provide Continuing Health Insurance ............. 11

            6.  Aspiration's Failure to Confirm Cherny's Right to Exercise Stock Options ................................................................................. 11

    III.  Cherny Is Entitled to Recover His Costs and Fees – Including His Attorney's Fees – Incurred in Enforcing the Separation Agreement Under Section 1717(a) of the California Civil Code ................................................................................. 12

CLAIM I:  Breach of Contract ............................................................... 14

PRAYER FOR RELIEF ........................................................................ 15

Claimant Andrei Cherny ("Cherny"), by and through his undersigned counsel, hereby files this amended demand for arbitration against respondent Aspiration Partners, Inc. ("Aspiration"), his former employer, and alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.    Cherny co-founded Aspiration in 2013 and served as Aspiration's Chief Executive Officer ("CEO") with distinction until October 2022, when his employment with Aspiration ended.

2.    The terms of Cherny's departure from Aspiration are governed by an October 12, 2022 transition and employment separation agreement (the "Separation Agreement").[1]  As set forth in detail below, in the over ten months since Cherny and Aspiration signed the Separation Agreement, not only has Aspiration failed to honor its obligations under the Separation Agreement, despite repeated requests by Cherny, but the evidence suggests Aspiration never had any intention of doing so.

3.    Indeed, one day after Cherny executed the Separation Agreement, Aspiration's largest shareholder, who is also a board member, sent Cherny a letter demanding that Cherny preserve documents "in anticipation of potential litigation."[2]  The next day this shareholder sent another letter to Cherny demanding information from Cherny to "evaluate[] his rights and claims against Mr. Cherny."[3]  These baseless threats of litigation, issued in the two days immediately following Cherny's execution of the Separation Agreement, and the fact that Aspiration simply

---

[1] A true and correct copy of the Separation Agreement is attached hereto as Exhibit A.

[2] A true and correct copy of the October 13, 2022 letter is attached hereto as Exhibit B.

[3] A true and correct copy of the October 14, 2022 letter is attached hereto as Exhibit C.

ignored multiple communications from Cherny seeking to enforce his rights, demonstrate that Aspiration never intended to comply with its obligations under the Separation Agreement, which left Cherny no choice but to commence this action.  Cherny expects that discovery in this action will uncover further evidence of Aspiration's bad faith conduct in the form of communications between and among board members before and after Cherny's separation stating that Aspiration never intended to comply with the Separation Agreement.

4.      To date Cherny has incurred $167,781 in attorney's fees in his attempts to enforce his clear contractual rights under the Separation Agreement.  Under California law – which governs the Separation Agreement – Cherny is entitled to recover the attorney's fees incurred due to Aspiration's failure to comply with its contractual obligations.  Moreover, it would be profoundly inequitable and unfair to require Cherny to bear the substantial costs of Aspiration's bad faith refusal to honor its obligations under all the circumstances, as described in detail below.

5.      Through this proceeding, Cherny seeks nothing more than to enforce his rights under the Separation Agreement, and be reimbursed for the substantial costs he has incurred in doing so.

## PARTIES

6.      Claimant Andrei Cherny is a natural person who resides in the State of Arizona.

7.      Respondent Aspiration Partners, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

## JURISDICTION AND VENUE

8.      In the Separation Agreement, Cherny and Aspiration mutually agreed to arbitrate any and all disputes arising out of Cherny's employment before a neutral JAMS arbitrator in Los Angeles, California:

> [Cherny] and [Aspiration] agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to [Cherny's] employment with or termination of employment from [Aspiration], including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator . . . as the exclusive remedy for resolving any and all such disputes.

Separation Agreement § 9(a); § 9(b) ("The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California.").

9.      The Separation Agreement is governed by California law.  *See* Separation Agreement § 12.

## FACTUAL BACKGROUND

### I.    Cherny's Separation from the Company He Co-Founded and Built

10.      Cherny co-founded Aspiration in 2013.  Aspiration is a purpose-driven climate action company that delivers tangible environmental and social impact at scale by providing sustainability-minded business and high-quality carbon credits through rigorously-vetted carbon removal and avoidance projects.  A certified B-Corp, Aspiration provides an opportunity for

enterprises and individuals to invest in its unparalleled global portfolio of premium reforestation and carbon removal and avoidance projects.

11.     From its founding in 2013 until October 12, 2022, Cherny led Aspiration as its CEO and a director.

12.     In July of 2022, Cherny gave notice of his intention to resign.

II.     **The Separation Agreement**

13.     Cherny and Aspiration negotiated the terms of Cherny's departure from Aspiration, which resulted in the Separation Agreement, entered into as of October 12, 2022.

14.     The Separation Agreement required each party to execute a general release, which were incorporated by reference into and designated part of the Separation Agreement. Separation Agreement § 18.

A.  **Aspiration's Repeated, Willful, and Bad Faith Breaches of the Separation Agreement**

15.     As set forth in detail below, Aspiration has repeatedly, willfully, and in bad faith breached the Separation Agreement in multiple ways and, as a direct result of these breaches, Cherny has sustained substantial damages and incurred substantial costs and fees – including $167,781 in attorney's fees to date – with the precise amount to be determined at trial.

16.     Prior to commencing this action, Cherny repeatedly attempted to force Aspiration to comply with its obligations and avoid costly and protracted litigation, to no avail.  Indeed, in many instances Aspiration simply ignored Cherny's communications.

4

17.     For example, on October 21, 2022 Cherny sent a letter to Aspiration objecting to, *inter alia*, Aspiration's unilateral modification of a release agreed to by the parties, which suggested Aspiration was acting in bad faith.[4]  Cherny received no substantive response.

18.     On October 27, 2022, Cherny sent another letter to Aspiration to follow up on his prior letter and to raise new concerns regarding conduct by Aspiration that evidenced a clear attempt to evade its obligations under the Separation Agreement.[5]  Cherny's letter made clear that Aspiration "could resolve the issues raised in this letter by simply complying with its obligations under" the Separation Agreement and that, if Aspiration failed to resolve the issues expeditiously, Cherny would be forced to commence legal action.  Cherny received no substantive response.

19.     On November 8, 2022, Cherny sent yet another letter to Aspiration, requesting responses to his prior letters.[6]  Cherny's letter made clear that he bore no ill will toward Aspiration but was only seeking to enforce his rights under the Separation Agreement:

> We wish to be clear that Mr. Cherny has waited as long as possible to pursue such remedies because he is committed to supporting the continued success of Aspiration.  There is no reason that Mr. Cherny and the Company should be at odds.  All he is asking is for the Company to live up to the simple steps in the agreements it has made.

20.     It was only after Cherny sent this third letter to Aspiration that he received a response, which dismissed the issues Cherny raised as nothing more than sour grapes and

---

[4] A true and correct copy of the October 21, 2022 letter is attached hereto as Exhibit D.

[5] A true and correct copy of the October 27, 2022 letter is attached hereto as Exhibit E.

[6] A true and correct copy of the November 8, 2022 letter is attached hereto as Exhibit F.

characterized Cherny's efforts to enforce the Separation Agreement as "continued antagonism" that "disserves Aspiration's interests."[7]

21.    Aspiration's repeated failures to respond meaningfully – if at all – to Cherny's efforts to enforce the Separation Agreement left Cherny no choice but to commence this action.

22.    On June 6, 2023 – over two months after Cherny commenced this action – Aspiration filed an amended answer in which it conceded Cherny's entitlement to some, but not all, of his rights under the Separation Agreement, but this belated acknowledgement is only further evidence of Aspiration's bad faith, as Aspiration is transparently attempting to impose substantial costs – in the form of attorney's fees – on Cherny's efforts to enforce his contractual rights.

### 1.  Aspiration's Failure to Pay Consulting Fees

23.    Under the terms of the Separation Agreement, Cherny agreed to perform certain consulting services for Aspiration:

> (a) Consulting Services.  During the period commencing on the Separation Date [*i.e.*, October 12, 2022] and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "Consulting Period"), [Cherny] shall provide the following agreed-upon consulting services with regard to the business and operations of [Aspiration], its subsidiaries and its affiliates as requested by [Aspiration] expects to average approximately 10-15 hours per week (i) consultation and participation with [Aspiration] matters as reasonably requested by [Aspiration]; and (ii) consultation and assistance with respect to services performed during the course of [Cherny]'s employment with [Aspiration] (collectively, the "Services").  [Cherny] shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services.  In addition, in performing the Services, [Cherny] agrees to cooperate reasonably with [Aspiration] in accomplishing a smooth and orderly transition of (x) [Cherny]'s prior employment responsibilities to other employees of [Aspiration], particularly including pending matters of

---

[7] A true and correct copy of the November 9, 2022 letter is attached hereto as Exhibit G.

> which [Cherny] has the principal knowledge and background information,
> and (y) [Aspiration]'s relationship with an independent auditing firm.

Separation Agreement § 2(a).

24.     The Separation Agreement required Aspiration to pay Cherny $25,000 per month for these consulting services, payable ten days after the last of each month:

> During the Consulting Period, [Aspiration] *shall pay* [Cherny] a fee (the 'Consulting Fee') of $25,000 per month as cash consideration for the Services pro-rated for any partial month of Services.  The monthly Consulting Fee *shall be paid* to [Cherny] in arrears within ten days following the end of the calendar month in which such monthly Consulting Fee was earned.

Separation Agreement § 2(b) (emphasis added).

25.     The Separation Agreement provided that the consulting period would expire six months from Cherny's October 12, 2022 resignation, or on or about April 12, 2023.  Separation Agreement § 2(c)(1).

26.     On October 26, 2022, Cherny wrote to the Chair of the Board of Directors that he "stand[s] ready and willing to do whatever is requested" to provide the consulting services.  He received no response.

27.     The first consulting payment was due on November 10, 2022, less than one month after the Separation Agreement was signed.  Aspiration did not make this or any other required payment.

### 2.  Aspiration's Bad Faith Failure to Execute the Agreed-Upon Release

28.     The Separation Agreement required Cherny and Aspiration to execute general releases, which were carefully negotiated by the parties and attached as exhibits to the Separation Agreement.  Separation Agreement § 1(c).

29.     The Separation Agreement incorporated the releases by reference – indeed, they were exhibits to the Separation Agreement – and provided that the two releases are part of the Separation Agreement.  Separation Agreement § 18.

30.     As required by the Separation Agreement, Cherny executed the release attached as Exhibit A to the Separation Agreement on or about October 12, 2022 (the "Cherny Release"), and did not revoke the release during the seven-day period when he was entitled to do so.[8]

31.     The Separation Agreement required Aspiration to execute the release attached as Exhibit B to the Separation Agreement, and did not permit Aspiration to modify or amend the release prior to execution.  Separation Agreement § 1(c) ("In addition, no later than one business day following the expiration of the revocation period for [Cherny]'s Release, [Aspiration] *shall* execute a general release [*sic* – of] claims against [Cherny] *in the form attached hereto as Exhibit B* (provided that [Cherny] has not revoked the Release).") (emphasis added).

32.     On October 20, 2022, Aspiration provided a release to Cherny that materially differed from the release negotiated by the parties and attached as Exhibit B to the Separation Agreement (the "Aspiration Release").[9]  Specifically, whereas the release mutually agreed to by the parties released Cherny from claims by Aspiration "from the beginning of time to the date hereof [October 20, 2022]," Aspiration modified the release to release Cherny from claims by Aspiration "from the beginning of time to October 12, 2022."

---

[8] A true and correct copy of the October 12, 2022 Cherny Release is attached hereto as Exhibit H.

[9] A true and correct copy of the October 20, 2022 Aspiration Release is attached hereto as Exhibit I.

33.    In other words, Aspiration unilaterally sought to shorten the time period covered by the release by eight days, from October 20, 2022 (the day Aspiration executed the release) to October 12, 2022 (the date Cherny's resignation became effective).  Cherny believes that Aspiration did so in bad faith and acting at the behest of Aspiration's largest shareholder and a board member, who, as described above, in the days following Cherny's resignation, issued a number of baseless and frivolous threats of litigation against Cherny.

34.    Aspiration has defended its material alterations to the release on the purported ground that "no provision of the Separation Agreement states that the time periods covered by Mr. Cherny's release and Aspiration's release would not be coterminous, as is typical when mutual releases are given," but this ignores the fact that the releases were heavily negotiated by the parties and expressly agreed upon.

35.    Under the Separation Agreement, Aspiration was required to execute the release "in the form attached hereto as Exhibit B," but it did not do so.

### 3.    Aspiration's Failure to Permit Cherny to Access His Aspiration-Issued Computer and Email Account

36.    The Separation Agreement required Cherny to return property belonging to Aspiration, but expressly authorized him to retain certain property, including his Aspiration computer and email account:

> [Cherny] represents and warrants that he shall, prior to the termination date, return to [Aspiration] any and all property and equipment of [Aspiration] . . . provided, however, that [Cherny] may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the [consulting] Services, (ii) [Cherny]'s telephone and address book, and (iii) copies of [Cherny]'s own personnel, payroll and benefit documents . . . . For the avoidance of doubt, during the Consulting Period, [Cherny] *shall be allowed* to retain and use (a) [Cherny]'s Company issued computer and

(b) [Cherny]'s Company email and email address, all of which for use in [Cherny]'s capacity as a Board member or to provide Services.

Separation Agreement § 2(d) (emphasis added).

37.     Less than a month after executing the Separation Agreement, Cherny was denied access to his Aspiration computer and email account, and Cherny received no response to his note to the Chair of Aspiration's Board of Directors regarding the denial of access.  Despite repeated requests by Cherny prior to the expiration of the consulting period, however, Aspiration has continued to deny Cherny access to his Aspiration computer and email account.  Aspiration has maintained that it can unilaterally deny Cherny access to his computer and email account because the Company has discretion to determine the services Cherny is to provide and the tools Cherny will be given to provide the services, but that ignores the mandatory nature of the language in the Separation Agreement.

### 4.   <u>Aspiration's Failure to Reimburse Cherny for Legal Fees Incurred in Negotiating the Separation Agreement</u>

38.     The Separation Agreement required Aspiration to reimburse Cherny up to $10,000 for legal fees incurred in negotiating the Separation Agreement.  Separation Agreement § 20 ("[Aspiration] agrees that it shall reimburse [Cherny] for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement subject to [Cherny]'s delivery to [Aspiration] of documentation evidencing such fees within 60 days after the Effective Date.").

39.     On November 17, 2022 – well within 60 days of the October 12, 2022 effective date of the Separation Agreement – Cherny submitted a request to Aspiration for reimbursement of $10,040 in legal fees, along with an invoice from counsel evidencing such fees.

40.     Despite the fact that Cherny incurred legal fees in excess of $10,000 in negotiating the Separation Agreement, requested reimbursement within 60 days of execution of the Separation Agreement, and submitted documentation evidencing the fees, Aspiration has not reimbursed Cherny for his fees.

### 5.    Aspiration's Failure to Provide Continuing Health Insurance

41.     For the year following Cherny's October 12, 2022 resignation (or until October 12, 2023), the Separation Agreement required Aspiration to provide Cherny and his eligible dependents "with coverage under [Aspiration's] group health plans at the same levels and the same cost to [Cherny] as would have applied if [Cherny]'s employment had not been terminated."  Separation Agreement § 2(b)(ii).

42.     Notwithstanding this provision, Aspiration has failed to provide Cherny and his eligible dependents with health coverage on the terms set forth in the Separation Agreement.

### 6.    Aspiration's Failure to Confirm Cherny's Right to Exercise Stock Options

43.     The Separation Agreement expressly authorized Cherny to retain all stock options vested prior to his resignation, and to exercise those options for an extended period of time:

> [A]ll [Aspiration] stock options held by [Cherny] outstanding as of the Separation Date (each a "Company Equity Award") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "Exercise Period Extension"); provided that [Cherny] acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that [Cherny] (and not [Aspiration]) shall be solely responsible for any tax consequences relating to such reclassification.

Separation Agreement § 1(d).

44.     At the time of his resignation, Cherny held a number of stock options that were outstanding, vested, and exercisable and, thus, under Section 1(d) of the Separation Agreement, these stock options remain outstanding and exercisable.

45.     By letters dated October 21, 2022, October 27, 2022, and November 8, 2022 Cherny requested that Aspiration confirm that his stock options remain outstanding and exercisable, but Aspiration has refused to do so.  Aspiration simply ignored Cherny's first two letters, and in response to his third letter Aspiration merely referred Cherny to the terms of Section 1(d) of the Separation Agreement, without confirming whether his options are outstanding and exercisable.

### III.     Cherny Is Entitled to Recover His Costs and Fees – Including His Attorney's Fees – Incurred in Enforcing the Separation Agreement Under Section 1717(a) of the California Civil Code

46.     The Separation Agreement provided that the "arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law." Separation Agreement, § 9(d).

47.     The Separation Agreement and the releases thereto are governed by California law.  Separation Agreement § 12, Aspiration Release § 7, Cherny Release § 8.

48.     The Cherny Release contained a provision stating that, if Cherny asserts a claim against Aspiration, then Cherny will be required to pay Aspiration's attorney's fees.  Cherny Release § 5.

49.    The Aspiration Release contained a provision stating that, if Aspiration asserts a claim against Cherny, then Aspiration will be required to pay Cherny's attorney's fees. Aspiration Release § 4.

50.    Under California law, if a contract provides for attorney's fees only to one party, the other party shall be awarded attorney's fees if the other party prevails on a claim under the contract:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, *shall be* entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717(a) (emphasis added).

51.    California law further provides that the reciprocal right to attorney's fees cannot be waived.  Cal. Civ. Code § 1717(a) ("Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section.  Any provision in any such contract which provides for a waiver of attorney's fees is void.").

52.    Section 1717(a) of the California Civil Code constitutes a "fundamental policy concerning the reciprocity of attorney fee provisions in contracts," *ABF Cap. Corp. v. Grove Properties Co.*, 126 Cal. App. 4th 204, 217 (2005), and courts construe the statute "liberally," *Carmel Fin., LLC v. Schoenmann*, 622 F. Supp. 3d 830, 847 (N.D. Cal. 2022).

53.    Here, because the Cherny Release and the Aspiration Release only required one party to reimburse attorney's fees, Section 1717(a) of the California Civil Code applies, and

requires that Cherny be awarded attorney's fees if he is determined to be the prevailing party in this action.  To date, Cherny has incurred legal fees of approximately $167,781.

54.    The California Supreme Court has held that, "in determining whether a contract contains an applicable attorney fees provision, courts have construe[d] together several documents concerning the same subject and made as part of the same transaction even though the documents were not executed contemporaneously and do not refer to each other." *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 759 (2017).  Thus, the fact that the unilateral attorney's fee provision was contained in the releases executed after the Separation Agreement does not alter Cherny's entitlement to attorney's fees if he prevails in this action.

## CLAIM I:  BREACH OF CONTRACT

55.    Cherny repeats and realleges the foregoing allegations as if fully set forth herein.

56.    The Separation Agreement is a valid and enforceable contract.

57.    Aspiration breached Section 2 of the Separation Agreement by refusing to pay Cherny $25,000 per month for consulting services, despite the fact that Cherny has performed the consulting services as required.

58.    Aspiration breached Section 1(c) of the Separation Agreement by failing to execute the release negotiated by the parties and attached as Exhibit B to the Separation Agreement.

59.    Aspiration breached Section 2(d) of the Separation Agreement by refusing to permit Cherny access to his Aspiration-issued computer and email account.

60.    Aspiration breached Section 20 of the Separation Agreement by failing to reimburse Cherny for legal fees incurred in negotiating the Separation Agreement.

61.    Aspiration breached Section § 2(b)(ii) of the Separation Agreement by failing to provide Cherny with continuing health insurance.

62.    As a direct result of foregoing breaches of the Separation Agreement, Cherny has sustained damages in an amount to be determined at trial.

63.    As a direct result of these breaches of the Separation Agreement, Cherny has incurred costs and fees – including attorney's fees – to which he is entitled to payment by Aspiration under Section 1717(a) of the California Civil Code.  To date, Cherny has incurred legal fees of approximately $167,781.

## **PRAYER FOR RELIEF**

WHEREFORE, Cherny respectfully requests that the Arbitrator enter judgment in favor of Cherny and against Aspiration, and award Cherny the following relief:

1.    Order Aspiration to pay Cherny $25,000 per month in consulting fees for the period from October 12, 2022 through April 12, 2023, as required by Section 2 of the Separation Agreement.

2.    Order Aspiration to execute the release attached as Exhibit B to the Separation Agreement, as required by Section 1(c) of the Separation Agreement.

3.    Order Aspiration to pay damages, in an amount to be determined at trial, for its refusal to provide Cherny with access to his Aspiration-issued computer and email account, as required by Section 2(d) of the Separation Agreement.

4.    Order Aspiration to pay Cherny $10,000 to reimburse Cherny for legal fees incurred in connection with the negotiation and execution of the Separation Agreement, as required by Section 20 of the Separation Agreement.

5.      Order Aspiration to provide Cherny and his eligible dependents with continuing health insurance coverage, as required by Section § 2(b)(ii) of the Separation Agreement.

6.      Order Aspiration to confirm that Cherny's stock option awards remain outstanding, consistent with Section 1(d) of the Separation Agreement.

7.      Order Aspiration to pay Cherny all costs and fees – including attorney's fees – Cherny has incurred in enforcing the Separation Agreement, as required by Section 9(d) of the Separation Agreement and Section 1717(a) of the California Civil Code.  To date, Cherny has incurred legal fees of approximately $167,781.

8.      Order Aspiration to pay Cherny pre- and post-judgment interest.

9.      Any other relief the Arbitrator deems just and proper.

Dated:        Washington, D.C.
              August 25, 2023

                        MITCHELL SANDLER LLC

                        By:  /s/ Christopher L. McCall

                        Andrew L Sandler
                        Christopher L. McCall
                        1120 20th Street N.W., Suite 725
                        Washington, D.C.  20036
                        Primary email:  cmccall@mitchellsandler.com
                        Primary telephone:  (202) 886-5292

                        *Attorneys for Claimant Andrei Cherny*

# EXHIBIT A

**TRANSITION AND EMPLOYMENT SEPARATION AGREEMENT**

        This Transition and Employment Separation Agreement (the "***Agreement***") is made and entered into by and between Andrei Cherny ("***Executive***") and Aspiration Partners, Inc. (the "***Company***"), as of October 12, 2022.

        1.      <u>Separation of Employment</u>.

        (a)    *Separation of Employment; Termination of Employment Agreement*. Effective as of October 12, 2022 (the "***Separation Date***"), (i) Executive shall resign his employment with the Company and all of its affiliates, Executive shall resign as a member of the Company's Board of Directors (the "***Board***") and Executive shall cease to be an employee and director of all of the foregoing, and (ii) the employment agreement between the Company and Executive (the "***Employment Agreement***"), dated October 1, 2013 as amended and restated in August 2021, shall, except to the extent provisions of the Employment Agreement are specifically referenced herein, terminate, and neither the Company nor Executive shall have any further obligations thereunder.

        (b)    *Accrued Obligations*. Upon the Separation Date, the Company will pay to Executive (i) all accrued salary and all accrued, unused vacation / paid time off through the Separation Date, and (ii) any unreimbursed business expenses incurred by Executive, in accordance with Company policy, prior to the Separation Date (collectively, the "***Accrued Obligations***").

        (c)    *Separation Pay*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants (as defined below) and Section 6 and (ii) Executive's execution and delivery to the Company of an effective release of claims in substantially the form attached hereto as <u>Exhibit A</u> (the "***Release***") on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, the Company shall pay to Executive an amount equal to $535,000, which represents 12 months of Executive's annual base salary as in effect on the Separation Date (the "***Severance***"). The Severance shall be paid in a single lump sum payment on the business day immediately following the date on which the Release becomes irrevocable. In addition, no later than one business day following the expiration of the revocation period for Executive's Release, the Company shall execute a general release claims against Executive in the form attached hereto as <u>Exhibit B</u> (provided that Executive has not revoked the Release).

        (d)    *Extension of Exercise Period*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants and Section 6 and (ii) Executive's execution and delivery to the Company of the Release on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, all Company stock options held by Executive outstanding as of the Separation Date (each a "***Company Equity Award***") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "***Exercise Period Extension***"); provided that Executive acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that Executive (and not the Company) shall be solely responsible for any tax consequences relating to such reclassification.

        2.      <u>Consulting Services</u>.

        (a)    *Consulting Services*. During the period commencing on the Separation Date and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "***Consulting Period***"), Executive shall provide the following agreed-upon consulting

1

services with regard to the business and operations of the Company, its subsidiaries and its affiliates as requested by the Company expects to average approximately 10 - 15 hours per week (i) consultation and participation with Company matters as reasonably requested by the Company; and (ii) consultation and assistance with respect to services performed during the course of Executive's employment with the Company (collectively, the "***Services***"). Executive shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services. In addition, in performing the Services, Executive agrees to cooperate reasonably with the Company in accomplishing a smooth and orderly transition of (x) Executive's prior employment responsibilities to other employees of the Company, particularly including pending matters of which Executive has the principal knowledge and background information, and (y) the Company's relationship with an independent auditing firm.

        (b)    *Compensation for Consulting Services*.

        (i)    During the Consulting Period, the Company shall pay Executive a fee (the "***Consulting Fee***") of $25,000 per month as cash consideration for the Services pro-rated for any partial month of Services.  The monthly Consulting Fee shall be paid to Executive in arrears within ten days following the end of the calendar month in which such monthly Consulting Fee was earned.

        (ii)    Subject to Executive's execution and non-revocation of the Release and to Executive's valid election to continue healthcare coverage under Section 4980B of the Code, the Company shall continue to provide, during the period beginning on the Separation Date and ending on the earlier of (i) the 12-month anniversary thereof or (ii) the date on which Executive becomes eligible to receive benefits under a "group health plan" (within the meaning of Section 4980B of the Code) of a subsequent employer of Executive (the "***COBRA Period***"), Executive and Executive's eligible dependents with coverage under its group health plans at the same levels and the same cost to Executive as would have applied if Executive's employment had not been terminated based on Executive's elections in effect on the Separation Date, provided, however, that (A) if any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the period of continuation coverage to be, exempt from the application of Section 409A under Treasury Regulation Section 1.409A-1(a)(5), or (B) the Company is otherwise unable to continue to cover Executive under its group health plans without incurring penalties (including without limitation, pursuant to Section 2716 of the Public Health Service Act or the Patient Protection and Affordable Care Act), then, in either case, an amount equal to each remaining Company subsidy shall thereafter be paid to Executive in substantially equal monthly installments over the COBRA Period (or the remaining portion thereof) (in any event, the "***COBRA Payments***").

        (c)  *Termination of Consulting Services.*

        (i)    The Consulting Period shall terminate on the six-month anniversary of the Separation Date (the "***Anniversary Date***"); provided, however, that the Company or Executive may terminate the Consulting Period and the Services hereunder at any time prior to the Anniversary Date, for any reason, upon 60-days written notice to the other party (or immediately by the Company in the event of a termination for Cause (as defined in the Employment Agreement)).  If the Consulting Period and the Services hereunder are terminated for any reason, then (i) the Company shall pay to Executive any portion of the Consulting Fee that has been earned but unpaid through the termination date and (ii) except as provided in Section 2(c)(ii) below, Executive shall forfeit all Consulting Fees payable with respect to periods of service following the termination date (if any).

        (ii)    If the Consulting Period and the Services hereunder are terminated prior to the Anniversary Date by reason of Executive's death or Disability (as defined in the Employment Agreement), then, subject to and conditioned upon (i) Executive's continued compliance with the terms and conditions of Section 9 of this Agreement and the Restrictive Covenants and (ii) Executive's execution

2

of a Release, on or within 21 days following the final date of the Consulting Period, and non-revocation of such Release during the seven day period following the date on which such Release is executed the Company shall pay to Executive the Consulting Fee that would have been payable during the remainder of the Consulting Period had the Consulting Period ended on the Anniversary Date, in accordance with the payment timing set forth in Section 2(b). For the avoidance of doubt, if Executive terminates the Consulting Period and the Services hereunder prior to the Anniversary Date, Executive shall forfeit any entitlement to the payments and benefits set forth in this Section 2(c)(ii).

(d)     *Return of Company Property*.  Executive represents and warrants that he shall, prior to the termination date, return to the Company any and all property and equipment of the Company, including (i) all keys, files, lists, books and records (and copies thereof) of, or in connection with, the Company's business, equipment (including, but not limited to, computer hardware, software and printers, wireless handheld devices, cellular phones and pagers), access or credit cards, Company identification, and all other property belonging to the Company in Executive's possession or control, and (ii) all documents and copies, including hard and electronic copies, of documents in Executive's possession relating to any Confidential Information (as defined in the Employment Agreement), including without limitation, internal and external business forms, manuals, correspondence, notes and computer programs, and that Executive has not made or retained, and shall not make or retain, any copy or extract of any of the foregoing; provided, however, that Executive may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the Services, (ii) Executive's telephone and address book, and (iii) copies of Executive's own personnel, payroll and benefit documents (provided that such personnel, payroll and benefits documents do not contain any Confidential Information and that the Company has the prior opportunity to review, redact and/or retain any such documents containing Confidential Information). For the avoidance of doubt, during the Consulting Period, Executive shall be allowed to retain and use (a) Executive's Company issued computer and (b) Executive's Company email and email address, all of which for use in Executive's capacity as a Board member or to provide Services.

3.     Withholdings and Other Deductions.  All compensation payable to Executive hereunder shall be subject to such withholdings and deductions as the Company is from time to time required to make pursuant to law, governmental regulation or order.

4.     Warranty.  Executive acknowledges that all payments and benefits under Section 2 of this Agreement and the Company Release constitute additional compensation to which Executive would not be entitled except for Executive's decision to sign this Agreement and to abide by the terms of this Agreement. With the exception of any equity in the Company or Company provided health and welfare benefits, Executive acknowledges that, upon receipt of the Accrued Obligations, Executive has (i) received all monies and other benefits due to Executive as a result of his employment with and separation from the Company, and (ii) no right, title, or interest in or entitlement to any other payments or benefits other than as set forth in this Agreement. Executive further represents that he has not sustained a work-related injury or illness which he has not previously reported to the Company.

5.     Restrictive Covenants. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that (i) Executive previously made certain representations, including with respect to confidential information, intellectual property, non-competition and non-solicitation obligations, as set forth in Sections 7, 8 and 9 of the Employment Agreement, and (ii) Sections 7 - 11 of the Employment Agreement shall remain in full force and effect in accordance with their terms and Executive shall be bound by their terms; provided, however, that notwithstanding anything to the contrary contained in the Employment Agreement, the "Restricted Period" shall end on the Separation Date for purposes of Section 9(a) and 9(b) (iii) of the Employment Agreement (collectively, the "***Restrictive Covenants***").

6.     <u>Non-Disparagement</u>. Subject to Section 8, Executive agrees not to publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on any of the Company or any of its affiliates, or that are otherwise disparaging of any of the Company's, its affiliates or any of their past or present officers, directors, employees, advisors, agents, policies, procedures, practices, decision-making, conduct, professionalism or compliance with standards. Each of the individuals or entities covered by the foregoing agreement on behalf of Executive shall be third party beneficiaries of this Section, entitled to enforce it against Executive and/or seeks damages for its violation. The Company agrees that the Company's Board members, major shareholders and officers shall not publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on Executive. The Company agrees that Executive's separation is a resignation by Executive and that the Company, the Company's Board members, major shareholders and officers will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation, whether written or oral, that contradict the statement attached hereto as <u>Exhibit C</u>. The Company acknowledges and agrees that it shall promptly advise the Company's Board members, major shareholders and officers of the foregoing obligation.

7.     <u>Ongoing Cooperation</u>. Executive agrees that Executive will reasonably assist and cooperate with the Company and its affiliates (i) concerning reasonable requests for information about the business of the Company or its affiliates or Executive's involvement and participation therein, (ii) in connection with the defense, prosecution or investigation of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or its subsidiaries or affiliates, including any proceeding before any arbitral, administrative, judicial, legislative, or other body or agency, including testifying in any proceeding to the extent such claims, actions, investigations or proceedings relate to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive, and (iii) and in connection with any investigation or review by any federal, state or local regulatory, quasi- or self-regulatory or self-governing authority or organization (including, without limitation, the SEC and FINRA) as any such investigation or review relates to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive. Executive's reasonable cooperation shall include, but not be limited to, being reasonably available to meet and speak with officers or employees of the Company, its affiliates and/or their advisors (including auditors and any accounting or tax advisors) or counsel at reasonable times and locations, executing accurate and truthful documents, appearing at the Company's request as a witness at depositions, trials or other proceedings without the necessity of a subpoena, and taking such other actions as may reasonably be requested by the Company, its affiliates and/or their advisors or counsel to effectuate the foregoing. In requesting such services, the Company will consider other commitments that Executive may have at the time of the request. Executive shall be entitled to indemnification and/or advancement of expenses in accordance with the terms and condition set forth in that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021.

8.     <u>Exceptions</u>

(a)     Notwithstanding anything in this Agreement to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Agreement shall prohibit Executive (or Executive's attorney) from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with the U.S. Securities and Exchange Commission ("***SEC***"), the Financial Industry Regulatory Authority ("***FINRA***"), the EEOC, the NLRB, the Occupational Safety and Health Administration, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice or any other securities regulatory agency, self-regulatory authority or federal, state or local regulatory authority (collectively, "***Government Agencies***"), or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation, (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to any Government

4

Agencies for the purpose of reporting or investigating a suspected violation of law, or from providing such information to Executive's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding, and/or (iii) receiving an award for information provided to any Government Agency; (B) pursuant to 18 USC Section 1833(b), Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Agreement is intended to or shall preclude Executive from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if Executive is required to provide testimony, then unless otherwise directed or requested by a Governmental Agency or law enforcement, Executive shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Agreement prevents Executive from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

(b)     Executive represents and warrants to the Company that as of the date of this Agreement, Executive is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

9.    <u>Arbitration</u>.

(a)     Executive and the Company agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to Executive's employment with or termination of employment from the Company, including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator in accordance with the rules of JAMS pursuant to its Employment Arbitration Rules and Procedures, which are available at http://www.jamsadr.com/rules-employment-arbitration/, and the Company will provide a copy upon Executive's request, as the exclusive remedy for resolving any and all such disputes.

(b)     The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California. Each party shall be entitled to all types of remedies and relief otherwise available in court (subject to the limitations set forth herein). The parties agree that any arbitration pursuant to this Agreement shall be brought on an individual, rather than class, collective, or representative basis, and waive the right to pursue any claim subject to arbitration on a class, collective, or representative basis.

(c)     The parties to this Agreement hereby expressly and irrevocably submit themselves to the personal jurisdiction of the United States District Court for the Central District of California or, if subject matter jurisdiction does not exist, the Superior Court of the State of California (the "***Court***") for the purpose of compelling arbitration pursuant to this Agreement and for the purpose of any judicial proceedings seeking to confirm, modify or vacate any arbitration award.

(d)     The fees of the arbitrator and all other costs that are unique to arbitration shall be paid by the Company initially, but if Executive initiates a claim subject to arbitration, Executive

5

shall pay any filing fee up to the amount that Executive would be required to pay if Executive initiated such claim in the Court.  Each party shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' fees and/or its own witnesses' fees.  The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law.

(e)    WAIVER OF TRIAL BY JURY OR COURT.  EXECUTIVE AND THE COMPANY UNDERSTAND THAT BY AGREEING TO ARBITRATE ANY ARBITRATION CLAIM, THEY WILL NOT HAVE THE RIGHT TO HAVE ANY ARBITRATION CLAIM DECIDED BY A JURY OR A COURT, BUT SHALL INSTEAD HAVE ANY ARBITRATION CLAIM DECIDED THROUGH ARBITRATION.

(f)    WAIVER OF OTHER RIGHTS.  EXECUTIVE AND THE COMPANY WAIVE ANY CONSTITUTIONAL OR OTHER RIGHT TO BRING CLAIMS COVERED BY THIS AGREEMENT OTHER THAN IN THEIR INDIVIDUAL CAPACITIES.  EXCEPT AS MAY BE PROHIBITED BY LAW, THIS WAIVER INCLUDES THE ABILITY TO ASSERT CLAIMS AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(g)    The parties acknowledge that they are entering into this arbitration provision voluntarily, and are represented by counsel.  If any part of this arbitration provision is deemed unenforceable, it is entirely severable from the rest and shall not affect or limit the validity or enforceability of the remainder of the provision, or the Agreement.

10.    Code Section 409A.

(a)    To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other such guidance that may be issued after the Effective Date (collectively, "***Section 409A***").  Notwithstanding any provision of this Agreement to the contrary, in the event that following the Effective Date, the Company determines that any compensation or benefits payable under this Agreement may be subject to Section 409A, the Company may adopt such amendments to this Agreement or adopt other policies or procedures (including amendments, policies and procedures with retroactive effect), or take any other actions that the Company determines are necessary or appropriate to preserve the intended tax treatment of the compensation and benefits payable hereunder, including without limitation actions intended to (i) exempt the compensation and benefits payable under this Agreement from Section 409A, and/or (ii) comply with the requirements of Section 409A, provided, however, that this Section 10 does not, and shall not be construed so as to, create any obligation on the part of the Company to adopt any such amendments, policies or procedures or to take any other such actions.  In no event shall the Company, its affiliates or any of their respective officers, directors or advisors be liable for any taxes, interest or penalties imposed under Section 409A or any corresponding provision of state or local law.

(b)    Any right under this Agreement to a series of installment payments shall be treated as a right to a series of separate payments.  Notwithstanding anything to the contrary in this Agreement, no compensation or benefits shall be paid to Executive during the six-month period following Executive's "separation from service" with the Company (within the meaning of Section 409A) if the Company determines that paying such amounts at the time or times indicated in this Agreement would be a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code.  If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of such six-month period (or such earlier date upon which such amount can be paid under Section 409A without resulting in a prohibited distribution, including as a result of Executive's death), the Company shall pay

6

Executive a lump-sum amount equal to the cumulative amount that would have otherwise been payable to Executive during such period (without interest).

(c)    To the extent any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" to which Treasury Regulation Section 1.409A-3(i)(1)(iv) would apply, any such reimbursements or in-kind benefits shall be paid or reimbursed reasonably promptly, but in no event later than December 31st of the year following the year in which the expense was incurred. The amount of any such payments eligible for reimbursement in one year shall not affect the payments or expenses that are eligible for payment or reimbursement in any other taxable year, and Executive's right to such payments or reimbursements of any such expenses shall not be subject to liquidation or exchange for any other benefit.

11.    <u>Breach</u>.  In the event Executive breaches Sections 2(a), 5 or 6 (including a breach of the Restrictive Covenants), any outstanding obligations of the Company to pay Consulting Fees and COBRA Payments shall immediately terminate.  Executive acknowledges and agrees that Executive's rights to receive the Severance is conditioned on continued compliance with the Restrictive Covenants and Sections 2(a) and 6.

12.    <u>Governing Law</u>.  This Agreement shall be construed under the laws of the State of California, both procedural and substantive.

13.    <u>Waiver</u>.  The failure to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of any party to enforce this Agreement.

14.    <u>Headings</u>.  The headings in this Agreement are provided solely for convenience, and are not intended to be part of, nor to affect or alter the interpretation or meaning of, this Agreement.

15.    <u>Severability</u>.  If any sentence, phrase, section, subsection or portion of this Agreement is found to be illegal or unenforceable, such action shall not affect the validity or enforceability of the remaining sentences, phrases, sections, subsections or portions of this Agreement, which shall remain fully valid and enforceable.

16.    <u>Assignment</u>.  This Agreement is personal to Executive and shall not be assignable by Executive.  The rights of the Company under this Agreement may be assigned by the Company, in its sole discretion, including to any of its affiliates or any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly, acquires all or substantially all of the assets or business of the Company.  This Agreement shall inure to the benefit of, and be binding on, the Company and its successors and assigns.

17.    <u>Ambiguities</u>.  Both parties have participated in the negotiation of this Agreement and, thus, it is understood and agreed that the general rule that ambiguities are to be construed against the drafter shall not apply to this Agreement.  In the event that any language of this Agreement is found to be ambiguous, each party shall have an opportunity to present evidence as to the actual intent of the parties with respect to any such ambiguous language.

18.    <u>Entire Agreement / Amendments</u>.  This Agreement, that certain Fourth Amended and Restated Voting Agreement, dated as of September 14, 2021 as amended effective October 12, 2022, by and among the Company and certain other parties as described therein and the documents referred to herein constitute the entire agreement between Executive and the Company concerning the subject matter hereof.  No covenants, agreements, representations, or warranties of any kind, other than those set forth

7

herein, have been made to any party hereto with respect to this Agreement. All prior discussions and negotiations have been and are merged and integrated into, and are superseded by, this Agreement, including, but not limited to, the Employment Agreement (except as expressly provided herein with respect to Sections 7 - 11 of the Employment Agreement, as amended by Section 5 herein). Notwithstanding the foregoing, Executive shall continue to be entitled to Executive's vested benefits and all right related thereto, rights as a shareholder, and indemnification rights (including but not limited to rights under that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021). No amendments to this Agreement will be valid unless written and signed by Executive and an authorized representative of the Company.

19. <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

20. <u>Consultation with Counsel</u>. Executive acknowledges (i) that Executive has thoroughly read and considered all aspects of this Agreement, that Executive understands all its provisions and that Executive is voluntarily entering into this Agreement, (ii) that he has been represented by, or had the opportunity to be represented by independent counsel of his own choice in connection with the negotiation and execution of this Agreement and has been advised to do so by the Company, and (iii) that he has read and understands the Agreement, is fully aware of its legal effect, and has entered into it freely based on his own judgment. Without limiting the generality of the foregoing, Executive acknowledges that he has had the opportunity to consult with his own independent tax advisors with respect to the tax consequences to him of this Agreement, and that he is relying solely on the advice of his independent advisors for such purposes. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. The Company agrees that it shall reimburse Executive for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement, subject to Executive's delivery to the Company of documentation evidencing such fees within 60 days after the Effective Date.

21. <u>Notices</u>. All notices, requests and other communications hereunder shall be in writing and shall be delivered by courier or other means of personal service (including by means of a nationally recognized courier service or professional messenger service), or sent by email or facsimile and also mailed first class, postage prepaid, by certified mail, return receipt requested, in all cases addressed to:

<u>If to Executive</u>:

At Executive's last known address evidenced on the Company's payroll records.

<u>If to the Company</u>:

Aspiration Partners, Inc.
4551 Glencoe Ave.
Suite 300
Marina del Rey, CA 90292
Attention: Legal Department

All notices, requests and other communications shall be deemed given on the date of actual receipt or delivery as evidenced by written receipt, acknowledgement or other evidence of actual receipt or delivery to the address. In case of service by telecopy, a copy of such notice shall be personally delivered or sent by registered or certified mail, in the manner set forth above, within three business days thereafter. Any party hereto may from time to time by notice in writing served as set forth above designate a different

US-DOCS\135645189.15

address or a different or additional person to which all such notices or communications thereafter are to be given.

[*Signature page follows*]

US-DOCS\135645189.15

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

DocuSigned by:

*Andrei Cherny*

157C23F4275F4C5...

Andrei Cherny

_____

Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

_____
Andrei Cherny

DocuSigned by:

*Nate Redmond*

D87378D0F896426...
_____
Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

**EXHIBIT A**
**GENERAL RELEASE**

1.    <u>Release</u>.  For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned does hereby release and forever discharge the "***Releasees***" hereunder, consisting of Aspiration Partners, Inc. (the "***Company***"), and the Company's affiliated, related, parent and subsidiary corporations, as well as their respective past and present parents, subsidiaries, associates, affiliates, successors, heirs, assigns, agents, directors, officers, employees, representatives, lawyers, insurers, and all persons acting by, through, under or in concert with them or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the undersigned now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.  The Claims released herein include, without limiting the generality of the foregoing, any Claims in any way arising out of, based upon, or related to the employment, the terms and conditions of employment or termination of employment of the undersigned by the Releasees, or any of them (including, but not limited to, any alleged discrimination, harassment or retaliation); any alleged breach of any express or implied contract of employment; any alleged torts, or other alleged legal restrictions on Releasees' right to terminate the employment of the undersigned; any alleged wrongful discharge, whistleblowing, detrimental reliance, defamation, slander, libel, intentional and negligent emotional distress or compensatory and/or punitive damages; common law, including but not limited to any alleged wrongful or retaliatory discharge in violation of public policy, breach of the covenant of good faith and fair dealing, interference with contractual relations or prospective business advantage, invasion of privacy, false imprisonment, and/or fraud; rights to attorneys' fees, costs, disbursements and/or the like; and any alleged violation of any federal, state or local statute or ordinance including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, Sections 1981 through 1988 of Title 42 of the United States Code, the National Labor Relations Act, the Employee Retirement Income Security Act, all claims under the Family and Medical Leave Act and Worker Adjustment and Retraining Notification Act, and all other federal, state and local leave and/or WARN laws; and any federal, state or local laws of similar effect.

2.    <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the undersigned (i) to payments or benefits under Section 1(c) of the Transition and Employment Separation Agreement, dated October 12, 2022, between the Company and the undersigned, with respect to the payments and benefits provided in exchange for this Release, (ii) to payments or benefits under any equity award agreement between the undersigned and the Company, (iii) to accrued or vested benefits the undersigned may have, if any, as of the date hereof under any applicable plan, policy, practice, program, contract or agreement with the Company, (iv) to any Claims, including claims for indemnification and/or advancement of expenses arising under any indemnification agreement between the undersigned and the Company or under the bylaws, certificate of incorporation or other similar governing document of the Company, (v) to any Claims which cannot be waived by an employee under applicable law, or (vi) with respect to the undersigned's right to communicate directly with, cooperate with, or provide information to, any federal, state or local government regulator.

THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR

A-1

HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE UNDERSIGNED, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS HE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.    Exceptions.  Notwithstanding anything in this Release to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Release shall prohibit the undersigned from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation and/or (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to, any federal, state or local government regulator (including, but not limited to, the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, or the U.S. Department of Justice) for the purpose of reporting or investigating a suspected violation of law, or from providing such information to the undersigned's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding; (B) pursuant to 18 USC Section 1833(b), the undersigned acknowledges that (1) the undersigned will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Release is intended to or shall preclude the undersigned from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if the undersigned is required to provide testimony, then unless otherwise directed or requested by a governmental agency or law enforcement, the undersigned shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Release prevents the undersigned from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

4.    Representations.  The undersigned represents and warrants that there has been no assignment or other transfer of any interest in any Claim which the undersigned may have against Releasees, or any of them, and the undersigned agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the undersigned under this indemnity.  The undersigned further represents and warrants that as of the date of this Release, he is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

5.    No Action.  The undersigned agrees that if the undersigned hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the undersigned agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

A-2

6.      **No Admission**.  The undersigned further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the undersigned.

7.      **OWBPA**.  The undersigned agrees and acknowledges that this Release constitutes a knowing and voluntary waiver and release of all Claims the undersigned has or may have against the Company and/or any of the other Releasees as set forth herein, including, but not limited to, all Claims arising under the Older Worker's Benefit Protection Act and the Age Discrimination in Employment Act. In accordance with the Older Worker's Benefit Protection Act, the undersigned is hereby advised as follows:

(i)      the undersigned has read the terms of this Release, and understands its terms and effects, including the fact that the undersigned agreed to release and forever discharge the Company and each of the Releasees, from any Claims released in this Release;

(ii)     the undersigned understands that, by entering into this Release, the undersigned does not waive any Claims that may arise after the date of the undersigned's execution of this Release, including without limitation any rights or claims that the undersigned may have to secure enforcement of the terms and conditions of this Release;

(iii)    the undersigned has signed this Release voluntarily and knowingly in exchange for the consideration described in this Release, which the undersigned acknowledges is adequate and satisfactory to the undersigned and which the undersigned acknowledges is in addition to any other benefits to which the undersigned is otherwise entitled;

(iv)     the Company advised the undersigned to consult with an attorney prior to executing this Release;

(v)      the undersigned has been given at least 21 days in which to review and consider this Release.  To the extent that the undersigned chooses to sign this Release prior to the expiration of such period, the undersigned acknowledges that the undersigned has done so voluntarily, had sufficient time to consider the Release, to consult with counsel and that the undersigned does not desire additional time and hereby waives the remainder of the 21-day period; and

(vi)     the undersigned may revoke this Release within seven days from the date the undersigned signs this Release and this Release will become effective upon the expiration of that revocation period.  If the undersigned revokes this Release during such seven-day period, this Release will be null and void and of no force or effect on either the Company or the undersigned and the undersigned will not be entitled to any of the payments or benefits, or the Company Release, each of which is expressly conditioned upon the execution and non-revocation of this Release.  Any revocation must be in writing and sent to Cecilia Saez, at csaez@aspiration.com, on or before 11:59 p.m. PT on the seventh day after this Release is executed by the undersigned.

8.      **Governing Law**. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

A-3

IN WITNESS WHEREOF, the undersigned has executed this Release this _____ day of _____, 20___.

_____

Andrei Cherny

**EXHIBIT B**
**COMPANY RELEASE**

1. <u>Release</u>. In exchange for the consideration set forth in that certain Transition and Employment Separation Agreement, dated October 12, 2022, between Aspiration Partners, Inc., a Delaware corporation (the "***Company***") and Andrei Cherny (the "***Executive***"), the receipt and adequacy of which are hereby acknowledged, the Company does hereby release and forever discharge the "***Releasees***" hereunder, consisting of the Executive and his heirs and assigns of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the Company and its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them, now have or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof. The Company has authority to release Claims on behalf of its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them.

2. <u>Claims Not Released</u>. Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the Company or its subsidiaries to the Executive's fraud or breach of fiduciary duty (the "***Unreleased Claims***").

THE COMPANY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE COMPANY, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3. <u>Representations</u>. The Company represents and warrants that there has been no assignment or other transfer of any interest in any Claim (other than any Unreleased Claim) which the Company may have against Releasees, or any of them, and the Company agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer. It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the Company under this indemnity.

4. <u>No Action</u>. The Company agrees that if the Company hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the Company agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

5. <u>No Admission</u>. The Company further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any

US-DOCS\135645189.15

liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the Company.

6.      <u>Acknowledgement</u>.  The Company acknowledges that different or additional facts may be discovered in addition to what is now known or believed to be true by the Company with respect to the matters released in this Release, and the Company agrees that this Release shall be and remain in effect in all respects as a complete and final release of the matters released, notwithstanding any different or additional facts.

7.      <u>Governing Law</u>. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

\* \* \* \* \*

B-2

IN WITNESS WHEREOF, the Company has executed this Release this _____ day of
_____, 2022.

ASPIRATION PARTNERS, INC.

By: _____

Name:

Title:

**EXHIBIT C**
**STATEMENT**

Andrei has resigned from the Company.

The Company, the Company's Board members, major shareholders and officers (the "Company") will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation being due to Executive's performance or misconduct. Insofar as the Company is asked to respond to a question regarding whether Mr. Cherny's departure was in any way related to performance or misconduct, the Company must respond that it was not.

# EXHIBIT B

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-310-712-6600
FACSIMILE: 1-310-712-8800
WWW.SULLCROM.COM

*1888 Century Park East*
*Los Angeles, California 90067-1725*

NEW YORK • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

October 13, 2022

<u>Via E-mail</u>

Andrew Sandler, Esq.,
Liana Prieto, Esq.,
    Mitchell Sandler,
        1120 20th Street, N.W.,
            Suite 725,
                Washington, D.C. 20036.

Re:    <u>Andrei Cherny</u>

Dear Mr. Sandler and Ms. Prieto:

We represent Joe Sanberg.  We understand you represent Andrei Cherny. Please treat this as notice that Mr. Cherny, and all persons who may have acted on behalf of Mr. Cherny, including your firm, should retain in anticipation of potential litigation all documents reflecting communications concerning Aspiration, Mr. Sanberg, and any entities associated with Mr. Sanberg, including but not limited to all documents constituting or reflecting such communications with Bloomberg, Laurel Communications, or other third parties.  This retention notice includes texts, emails, instant messages, voicemails and communications in any other form.

Sincerely,

Robert A. Sacks

cc:    Joe Sanberg
       Alison Ressler

# EXHIBIT C

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-310-712-6600
FACSIMILE: 1-310-712-8800
WWW.SULLCROM.COM

*1888 Century Park East*
*Los Angeles, California 90067-1725*

NEW YORK • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 14, 2022

Via E-mail

Andrew Sandler, Esq.,
Liana Prieto, Esq.,
        Mitchell Sandler,
                1120 20th Street, N.W.,
                        Suite 725,
                                Washington, D.C. 20036.

Re:     Andrei Cherny

Dear Mr. Sandler and Ms. Prieto:

Further to my letter of yesterday, as Mr. Sanberg evaluates his rights and claims against Mr. Cherny, please identify all communications that Mr. Cherney had with any Aspiration employee or outside party at any time following his execution of his Transition and Separation Agreement during which he discussed Aspiration, his departure from Aspiration or Mr. Sanberg, including communications with Sonali Basak at Bloomberg.  For each such communication, identify the time, persons involved, and substance of what Mr. Cherny said.  If Mr. Cherny denies that he or anyone acting on his behalf communicated with Sonali Basak, please provide an unequivocal statement to that effect.

Sincerely,

Robert A. Sacks

cc:     Joe Sanberg
        Alison Ressler

# EXHIBIT D



October 21, 2022

**VIA ELECTRONIC MAIL ONLY**

Michelle L.C. Carpenter
Latham & Watkins LLP
335 S. Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Michelle.Carpenter@lw.com

Nima J. Movahedi
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Nima.movahedi@lw.com

     RE:    Transition and Employment Separation Agreement

Dear Michelle and Nima:

The Transition and Employment Separation Agreement (the "Agreement") between Mr. Andrei Cherny and Aspiration Partners, Inc. (the "Company"), executed on October 12, 2022, requires that "no later than one business day following the expiration of the revocation period for Executive's Release, the Company shall execute a general release claims against Executive ***in the form attached hereto as Exhibit B***." The release delivered by the Company is unacceptable.

The release provided, as compared to the release form attached to the Agreement, releases claims "from the beginning of time to October 12, 2022," rather than "from the beginning of time to the date hereof." As noted in your email transmitting the Company's release, "they requested the company release claims as of the same date." We presume that "they" is the Board of Directors of the Company. Mr. Cherny did not consent to this change and the Company has no right to unilaterally modify the release or any other part of the Agreement. The time for negotiating the language of Exhibit B ended with the execution of the Agreement. The Company must execute and provide an unmodified Exhibit B.

Beyond the fact that our client is entitled to strict compliance with the terms of the Agreement, which includes a release "from the beginning of time to the date hereof," the unilateral modification in conjunction with the threatening letters sent by Mr. Sandberg's counsel suggest possible bad faith on the part of the Company. As we are sure you are aware, in the days after signing the Agreement, Mr. Cherny received the attached letters from Mr. Sandberg's counsel.

**MITCHELL SANDLER LLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

Ms. Carpenter and Mr. Movahedi
October 21, 2022
Page 2

Mr. Sandberg has made clear through his conduct that he intends to harass, threaten, and disparage Mr. Cherny, notwithstanding the execution of the Agreement.

Mr. Cherny demands that the Company provide the release in the form attached to the Agreement as Exhibit B before the end of the day. Failure to do so will constitute a breach of the agreement by the Company and Mr. Cherny reserves all rights with respect to that breach.

Additionally, we request a copy of the Board resolution evidencing extension of the exercise period for Mr. Cherny's options and confirmation that the extension has been recorded in Carta.

Very truly yours,

Liana R. Prieto

Encl.

# EXHIBIT E



October 27, 2022

**VIA ELECTRONIC MAIL ONLY**

Michelle L.C. Carpenter
Latham & Watkins LLP
335 S. Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Michelle.Carpenter@lw.com

Nima J. Movahedi
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Nima.movahedi@lw.com

      RE:    Breach of Agreements with Mr. Cherny

Dear Ms. Carpenter and Mr. Movahedi:

On October 21, 2022, we sent a letter to you regarding the breach of the Transition and Employment Separation Agreement (the "Transition Agreement") between Mr. Andrei Cherny and Aspiration Partners, Inc. (the "Company") by the Company. As detailed in that letter, the Company's unilateral modification of the release after the Transition Agreement's execution is impermissible. In our letter we demanded that the Company execute the release in the form attached to the Transition Agreement as Exhibit B. We also requested that the Company provide a copy of the Board resolution evidencing extension of the exercise period for Mr. Cherny's options and confirmation that the extension has been recorded in Carta. As of the date of this letter, we have not received a release in the required form executed by the Company, evidence Board action extending Mr. Cherny's exercise period, or any substantive response to our letter.

In the meanwhile, the Company has also breached the Fourth Amended and Restated Voting Agreement, as amended (the "Voting Agreement"). Pursuant to Section 1.2(c) of the Voting Agreement, Mr. Cherny has the right to designate the Common Director "subject to the reasonable approval of the then serving Chairperson of the Board." On October 14, 2022, Mr. Cherny designated Mr. Todd Baker to serve as the Common Director pursuant to Section 1.2(c) of the Voting Agreement. Mr. Baker has decades of experience working at the intersection of technology and financial services. He has worked as a Chief Strategy and Development Officer at three large financial institutions, law firm partner, consultant, academic, researcher, speaker, and commentator. Mr. Baker is more than qualified to fulfill the obligations of a director of the Company given the Company's value, industry, and reputation. Mr. Baker spoke with the Chair

**MITCHELL SANDLER LLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

Ms. Carpenter and Mr. Movahedi
October 27, 2022
Page 2

of the Board, Mr. Nate Redmond, on October 18, 2022. Nevertheless, 13 days after his designation by Mr. Cherny, Mr. Baker has yet to be appointed to the Board.

Prior to Mr. Cherny signing the Transition Agreement and agreeing to amend the Voting Rights Agreement, Mr. Redmond and Mr. Movahedi repeatedly assured Mr. Cherny that Mr. Redmond would exercise his power of "reasonable approval" in good faith and that, provided the designee was neither Mr. Cherny himself or what they termed a "Trojan Horse" designed to frustrate the smooth operations of the Board, the designee would be acceptable. Mr. Cherny relied on that promise in his decision to sign the agreements. Given Mr. Baker's experience and background, there is no basis for Mr. Redmond to withhold approval of Mr. Baker. The Company's refusal to appoint Mr. Baker is in violation of Mr. Cherny's shareholder rights and the Voting Agreement. As a result of the Company excluding Mr. Cherny from Board meetings and communications prior to his separation from the Company, the Common Director seat has been effectively vacant since September - and formally vacant since October 13th. Mr. Cherny and all shareholders, including the common shareholders, are being irreparably harmed by the lack of representation on the Board and exclusion from the Board's deliberative process during this crucial time for the Company. Mr. Cherny demands that, by October 28, 2022, Mr. Redmond grant his approval to the designation of Mr. Baker to the Board and that Mr. Baker then be immediately seated on the Board. Be further advised that we reserve our rights to challenge any actions taken by the Board during this period of illegal exclusion of the Common Director.

The Company could resolve the issues raised in this letter by simply complying with its obligations under both the Transition Agreement and the Voting Agreement. In the event that these actions are not resolved expeditiously, further legal action will be taken.

Very sincerely yours,

Liana R. Prieto

# EXHIBIT F



November 8, 2022

<u>**VIA ELECTRONIC MAIL ONLY**</u>

Nima J. Movahedi
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Nima.movahedi@lw.com

   RE: Breach of Agreements with Mr. Cherny

Dear Mr. Movahedi:

On October 21, 2022, we sent a letter to you regarding the breach of the Transition and Employment Separation Agreement (the "Transition Agreement") between Mr. Andrei Cherny and Aspiration Partners, Inc. (the "Company") by the Company related to the Company's unilateral alteration of the release language and refusal, after numerous requests, to provide confirmation of compliance with Section 1(d). On October 27, 2022, we sent a letter regarding the breach of the Fourth Amended and Restated Voting Agreement, as amended (the "Voting Agreement"), due to Mr. Nate Redmond's unreasonable refusal to approve Mr. Cherny's designee to the Board of Directors. In the weeks since, Mr. Cherny has personally reached out to Mr. Redmond to implore him to address these issues without the need to resort to legal action and to ask that the Company live up to its agreements. To date, we have not received a substantive response to any of our communications.

Unfortunately, we have reached the point where the Company's breaches of the Transition Agreement and the Voting Agreement cannot continue unaddressed. Mr. Cherny will have no option but to pursue appropriate remedies including, but not limited to, seeking an order for specific performance of the Voting Agreement in Delaware state court through the immediate appointment of Mr. Todd Baker to the Company's Board of Directors as the Common Director.

Furthermore, Mr. Cherny may also seek to set aside any actions taken by the Board during the time of illegal exclusion of the Common Director from the Board. The Board's exclusion of the Common Director constitutes a breach of duty, a failure to act in good faith, and intentional misconduct, all of which create personal liability for the Company's directors. As such, we request that a copy of this letter be provided to each of the directors to make them aware of their potential individual liability. We will also be sharing a copy of this letter with the Board Observers of the Company given their information rights.

**MITCHELL SANDLER LLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

Mr. Movahedi
November 8, 2022
Page 2

As you know, Board Chair Redmond demanded Mr. Cherny resign from the Board of the Company he co-founded and ran for nearly a decade during the negotiation of the Transition Agreement so as to create an opportunity for less contentious Board relations. Mr. Cherny had and has rights and duties under the Voting Agreement to represent the common shareholders on the Board, rights that are in no way connected to his service as Chief Executive Officer. Mr. Cherny has the right under the Voting Agreement to designate a director of his choosing for the Common Director seat. During the negotiations, the Company proposed language to insert a right for the Board Chair to reasonably approve Mr. Cherny's designee. You and Mr. Redmond repeatedly assured Mr. Cherny that Mr. Redmond would exercise his power of "reasonable approval" in good faith. Mr. Redmond represented that provided the designee was neither Mr. Cherny himself nor what Mr. Redmond termed a "Trojan Horse" designed to frustrate the smooth operations of the Board, any qualified designee would be accepted. Mr. Cherny relied on Mr. Redmond's representations in his decision to resign from the Board and sign the agreements.

On October 14, 2022, Mr. Cherny designated Mr. Todd Baker to serve as the Common Director pursuant to Section 1.2(c) of the Voting Agreement. Mr. Baker has decades of experience working at the intersection of technology and financial services. He has worked as a Chief Strategy and Development Officer at three large financial institutions, major law firm partner, consultant, academic, researcher, speaker, and commentator. Mr. Baker is more than qualified to fulfill the obligations of a director of the Company. However, for nearly four weeks, Mr. Redmond has refused to approve Mr. Baker's designation. Since that time, one additional hurdle after another has been introduced, in a slow motion "process" that is nothing more than a transparent, bad faith attempt to deny the common shareholders representation on the Board during a critical time for the Company. That the Board has gone through so much trouble and created this much legal risk for the Company to frustrate Mr. Cherney's designation allows, in our opinion, for no other conclusion than that this is designed to prevent addressing critical finance and accounting questions previously raised by past officers of the Company. It cannot be permitted.

Mr. Cherny also wishes to put the Company on notice that he is considering initiation of an arbitration proceedings based on the Company's multiple breaches of the Transition Agreement if these breaches are not promptly addressed. These include the attempt to unilaterally change the terms of the Company's release, refusal to confirm the extension of Mr. Cherny's options, and shutting off Mr. Cherny's access to his computer.

We wish to be clear that Mr. Cherny has waited as long as possible to pursue such remedies because he is committed to supporting the continued success of Aspiration. There is no reason that Mr. Cherny and the Company should be at odds. All he is asking is for the Company to live up to the simple steps in the agreements it has made. It is time for the Company to take these actions as required under both the Transition Agreement and the Voting Agreement. Specifically, Mr. Cherny demands that the Company:

Mr. Movahedi
November 8, 2022
Page 3

- Appoint Mr. Baker to the Board of Directors;
- Execute the release in the form attached to the Transition Agreement as Exhibit B;
- Provide documentary confirmation of the extension of the exercise period for Mr. Cherny's options as provided for in Section 1(d) of the Transition Agreement; and,
- Reinstate Mr. Cherny's Company laptop and email address as required by Section 2(d) of the Transition Agreement.

The Company's failure to comply with its agreements despite numerous entreaties that it do so leaves Mr. Cherny with no real option but to pursue his available remedies, including those outlined above, to enforce the agreements and his rights thereunder.

Very sincerely yours,

Liana R. Prieto

cc:    Brian Laibow (blaibow@oaktreecapital.com)
       Dan Carroll (Dan@inherentgroup.com)
       Charles Tollinche (ctollinche@dnscap.com)
       Frank Yeary (frank@darwincapitalgroup.com)
       Joe Chen (joe.chen@renren-inc.com)
       Mark Klein (mklein@surocap.com)

# EXHIBIT G

MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.*
TERRY E. SANCHEZ
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. M°DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
JONATHAN E. ALTMAN
KELLY M. KLAUS
BRAD D. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.*
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
KYLE W. MACH
HEATHER E. TAKAHASHI

ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.*
GINGER D. ANDERS P.C.*
MARGARET G. MARASCHINO
ADAM R. GILDERSLEEVE
ADAM B. WEISS
KELLY L. C. HIRES
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS*
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL
VICTORIA A. DEGTYAREVA
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
JOHN B. MAJOR
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
STEPHANIE G. HERRERA
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ANNE K. CONLEY

DAVID W. MORESHEAD
ANDRE W. BREWSTER III
ROWLEY J. RICE
DAHLIA MIGNOUNA*
BRANDON R. TEACHOUT
USHA CHILUKURI VANCE
ALEXANDER S. GORIN
ZARA BARI
BRENDAN B. GANTS*
LAUREN E. ROSS*
BENJAMIN G. BAROKH
ABE DOLL
MICHELE C. NIELSEN
APRIL YOUPEE-ROLL
MEGAN McCREADIE
STEPHEN HYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU*
NATALIE KARL
BRANDON MARTINEZ
ERINMA E. MAH
CARRIE C. LITTEN
RUBY J. GARRETT*
JAMES R. SALZMANN
SAMIR HALAWI
ROBIN S. GRAY
MICA L. MOORE
JOSEPH MOSES
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
OLIVER BROWN
PAUL E. MARTIN
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI RELAVAN OVED
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK
CALEB W. PEIFFER
GREGORY T. S. BISCHOPING*
JAMES B. LUGURI
STEVEN B. R. LEVICK
SARA H. WORTH
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER

ROSIO FLORES
JESSICA O. LAIRD
ERICA C. TOOCH
EVELYN DANFORTH-SCOTT
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MIRANDA E. REHAUT
TIANA S. BAHERI
STEPHANY REAVES*
LAUREN E. KUHN
MINKEE K. SOHN
GARRETT SOLBERG
TED KANG
ADAM W. KWON
JOSEPH N. GLYNN

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
MARK H. EPSTEIN
MICHAEL E. GREANEY
SARAH J. COLE
FAYE PAUL TELLER
BOBBY MALHOTRA

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN D.C.
ALL OTHERS ADMITTED IN CA

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

———

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

———

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

November 9, 2022

Writer's Direct Contact
(213) 683-9540
(213) 683-4040 FAX
robert.dellangelo@mto.com

**VIA E-MAIL**

Liana R. Prieto, Esq.
Mitchell Sandler LLC
1120 20th Street, NW, Suite 725
Washington, DC 20036
lprieto@mitchellsandler.com

Re:     Consideration of Mr. Cherny's Board Designee

Dear Ms. Prieto:

I write on behalf of the Board of Directors of Aspiration Partners, Inc. ("Aspiration") in response to your November 8, 2022 letter on behalf of Andrei Cherny.

Mr. Cherny's assertions that Aspiration has breached agreements with him are baseless, and his continued antagonism after resigning as Aspiration's CEO disserves Aspiration's interests. If, as he claims, Mr. Cherny "is committed to supporting the continued success of Aspiration," he should honor the agreements that he signed and allow his designee to the Board to be considered and seated in accordance with the agreed-upon and customary process.

**<u>Reasonable Approval of Mr. Cherny's Board Designee</u>**

Mr. Cherny claims that Aspiration breached the Fourth Amended and Restated Voting Agreement, as last amended on October 12, 2022 ("Voting Agreement"), because his Board designee was not seated with instantaneous effect. But the Voting Agreement does not entitle Mr. Cherny to cause his designee to become a director immediately. Section 1.2(c) provides that Mr. Cherny may designate an individual, "which designated individual shall until October 12, 2024 be subject to the reasonable approval of the then serving Chairperson of the Board." Mr. Cherny's efforts to short-circuit the "reasonable approval" required by Section 1.2(c) are improper.

MUNGER, TOLLES & OLSON LLP

Liana R. Prieto, Esq.
November 9, 2022
Page 2

On Friday, October 14, 2022, Mr. Cherny identified Todd Baker as his designee under Section 1.2(c). In doing so, he acknowledged "the right next step" would be to connect Mr. Baker and the Chairperson, Mr. Redmond. Mr. Redmond responded to Mr. Cherny the same day, stating that he "would be happy to meet with Todd." That night, however, Mr. Cherny seemed to cast Section 1.2(c) aside, calling it "flabbergasting" that Mr. Redmond would want to speak with Mr. Baker; referring to "my appointment of Todd to the seat, which I had expected would take place today"; and insisting that the seat cannot "be treated as if it were empty despite having designated Todd." Mr. Redmond replied on Saturday, October 15, reiterating that he was "looking forward to meeting Todd." Mr. Cherny then wrote: "I expect that Todd is on the Board and has been since 9:26am PT on Friday."

Far from refusing to grant reasonable approval of Mr. Cherny's designee, Mr. Redmond has discussed this matter with Mr. Cherny repeatedly by email, phone, and text, and has explained that the required "reasonable approval" process would occur. It is customary for a potential new director to meet with key stakeholders, including other directors and a company's chief executive officer. (As Mr. Cherny knows, Mr. Jealous participated in similar meetings before he joined Aspiration's Board.) The purpose is to assess a potential director's qualifications as well as whether he or she will be able to develop productive working relationships for the good of the company. Mr. Cherny has not disagreed that such steps are typical and appropriate. Neither does your letter, which claims only that "hurdles" are making the process too "slow." Yet it is Mr. Cherny's own disruptive conduct in recent weeks that has made it all the more important to ensure that his designee can work constructively with his or her fellow directors and management.

The "reasonable approval" process is continuing. For example, we understand that on November 4, Mr. Cherny's designee met with Mr. AlHusseini, a current director. We also understand that at that meeting, Mr. Baker expressed possible reluctance about joining the Board. Nonetheless, the Chairperson requests that Mr. Baker (or if Mr. Baker has withdrawn, another designee) complete the enclosed customary director questionnaire. Once the questionnaire is returned, final meetings have occurred, and any other relevant requested information is obtained, Mr. Cherny's designee will be considered promptly and if appropriate, approved.

Your letter's suggestion that Board action taken before Mr. Baker is seated is invalid is incorrect, as it rests on Mr. Cherny's unsupported theory of instantaneous effect, that is, that Mr. Baker "is on the Board and has been since 9:26am PT on" October 14.

Finally, although your letter refers to purported statements by Mr. Redmond before the Voting Agreement was amended on October 12, 2022, Section 7.11 of the Voting Agreement provides that the written agreements "constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled." In any event, stating that any "qualified designee" who would not "frustrate the smooth operations of the Board" would be approved is fully consistent with the "reasonable approval" process to which Mr. Cherny agreed but now apparently objects.

MUNGER, TOLLES & OLSON LLP

Liana R. Prieto, Esq.
November 9, 2022
Page 3

### **Other Issues Raised by Mr. Cherny**

Mr. Cherny's assertions about purported breaches by Aspiration of his Transition and Employment Separation Agreement ("Separation Agreement") are baseless as well.

As to the release, no provision of the Separation Agreement states that the time periods covered by Mr. Cherny's release and Aspiration's release would not be coterminous, as is typical when mutual releases are given. Mr. Cherny's efforts now to secure a more extensive release by Aspiration, perhaps reflecting concern about potential liability for his conduct during the week after resigning, are meritless. In any event, even if Aspiration had released claims through October 20, 2022 (rather than through October 12, 2022, as Mr. Cherny did), Aspiration would not be bound to extend the exercise period for Mr. Cherny's options under Section 1(d) of the Separation Agreement if the conditions for such extension—including "continued compliance with the Restrictive Covenants and Section 6" of the Separation Agreement—were not met.

Relatedly, Mr. Cherny's request for "documentary confirmation of the extension of the exercise period" misreads Section 1(d). The Board approved and ratified Aspiration's entry into the Separation Agreement, including Section 1(d), so that provision currently is in effect in accordance with its terms. If Mr. Cherny attempts to exercise the options, the extent to which the options are "exercisable" will be determined pursuant to (and subject to) Section 1(d), including the "continued compliance" condition.

As to Mr. Cherny's "Company laptop and email address," Mr. Cherny is no longer an officer, director, or employee of Aspiration. He is a consultant, with rights defined by the Separation Agreement. Section 2(d) of the Separation Agreement, to which your letter refers, does not grant him unrestricted rights to any Company property or email. On the contrary, it specifies what Mr. Cherny "may retain": his "telephone and address book"; his "own personnel, payroll and benefit documents"; and any property or information "reasonably necessary to provide the Services." It likewise specifies that any retention and use of a "Company issued computer" or "Company email and email address" would be "for use in [his] capacity as a Board member or to provide Services." Mr. Cherny is not a Board member, and as to providing Services, Aspiration determines what Services to request and therefore what Mr. Cherny needs to provide them.

* * *

The Board encourages Mr. Baker (or any other designee of Mr. Cherny) to complete the director questionnaire promptly and to continue to meet with key stakeholders, so that the "reasonable approval" process can conclude and a designee can be seated.

Very truly yours,

*/s/ Robert L. Dell Angelo*

Robert L. Dell Angelo

Encl.

MUNGER, TOLLES & OLSON LLP

Liana R. Prieto, Esq.
November 9, 2022
Page 4


cc:    Nate Redmond

# EXHIBIT H

**GENERAL RELEASE**

1.  <u>Release</u>. For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned does hereby release and forever discharge the "***Releasees***" hereunder, consisting of Aspiration Partners, Inc. (the "***Company***"), and the Company's affiliated, related, parent and subsidiary corporations, as well as their respective past and present parents, subsidiaries, associates, affiliates, successors, heirs, assigns, agents, directors, officers, employees, representatives, lawyers, insurers, and all persons acting by, through, under or in concert with them or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the undersigned now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.  The Claims released herein include, without limiting the generality of the foregoing, any Claims in any way arising out of, based upon, or related to the employment, the terms and conditions of employment or termination of employment of the undersigned by the Releasees, or any of them (including, but not limited to, any alleged discrimination, harassment or retaliation); any alleged breach of any express or implied contract of employment; any alleged torts, or other alleged legal restrictions on Releasees' right to terminate the employment of the undersigned; any alleged wrongful discharge, whistleblowing, detrimental reliance, defamation, slander, libel, intentional and negligent emotional distress or compensatory and/or punitive damages; common law, including but not limited to any alleged wrongful or retaliatory discharge in violation of public policy, breach of the covenant of good faith and fair dealing, interference with contractual relations or prospective business advantage, invasion of privacy, false imprisonment, and/or fraud; rights to attorneys' fees, costs, disbursements and/or the like; and any alleged violation of any federal, state or local statute or ordinance including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, Sections 1981 through 1988 of Title 42 of the United States Code, the National Labor Relations Act, the Employee Retirement Income Security Act, all claims under the Family and Medical Leave Act and Worker Adjustment and Retraining Notification Act, and all other federal, state and local leave and/or WARN laws; and any federal, state or local laws of similar effect.

2.  <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the undersigned (i) to payments or benefits under Section 1(c) of the Transition and Employment Separation Agreement, dated October 12, 2022, between the Company and the undersigned, with respect to the payments and benefits provided in exchange for this Release, (ii) to payments or benefits under any equity award agreement between the undersigned and the Company, (iii) to accrued or vested benefits the undersigned may have, if any, as of the date hereof under any applicable plan, policy, practice, program, contract or agreement with the Company, (iv) to any Claims, including claims for indemnification and/or advancement of expenses arising under any indemnification agreement between the undersigned and the Company or under the bylaws, certificate of incorporation or other similar governing document of the Company, (v) to any Claims which cannot be waived by an employee under applicable law, or (vi) with respect to the undersigned's right to communicate directly with, cooperate with, or provide information to, any federal, state or local government regulator.

THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF

A-1

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE UNDERSIGNED, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY
WAIVES ANY RIGHTS HE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER
STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.      <u>Exceptions</u>.  Notwithstanding anything in this Release to the contrary, and solely to the
extent required by applicable law, (A) nothing contained in this Release shall prohibit the undersigned from
(i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any
investigation by, or cooperating with any governmental agency or entity or making other disclosures that
are protected under the whistleblower provisions of applicable law or regulation and/or (ii) communicating
directly with, cooperating with, or providing information (including trade secrets) in confidence to, any
federal, state or local government regulator (including, but not limited to, the U.S. Securities and Exchange
Commission, the U.S. Commodity Futures Trading Commission, or the U.S. Department of Justice) for the
purpose of reporting or investigating a suspected violation of law, or from providing such information to
the undersigned's attorney or in a sealed complaint or other document filed in a lawsuit or other
governmental proceeding; (B) pursuant to 18 USC Section 1833(b), the undersigned acknowledges that (1)
the undersigned will not be held criminally or civilly liable under any federal or state trade secret law for
the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official,
either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a
suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding,
if such filing is made under seal; (C) nothing in this Release is intended to or shall preclude the undersigned
from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other
judicial, administrative or legal process or otherwise as required by law; and, if the undersigned is required
to provide testimony, then unless otherwise directed or requested by a governmental agency or law
enforcement, the undersigned shall notify the Company in writing as promptly as practicable after receiving
any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony
(or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford
the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and
(D) nothing in this Release prevents the undersigned from discussing or disclosing information about
unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the
undersigned has reason to believe is unlawful.

4.      <u>Representations</u>.  The undersigned represents and warrants that there has been no
assignment or other transfer of any interest in any Claim which the undersigned may have against Releasees,
or any of them, and the undersigned agrees to indemnify and hold Releasees, and each of them, harmless
from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees,
or any of them, as the result of any such assignment or transfer or any rights or Claims under any such
assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a
condition precedent to recovery by the Releasees against the undersigned under this indemnity.  The
undersigned further represents and warrants that as of the date of this Release, he is not aware of any
violation of federal, state or local law by the Company or any officer or director of the Company.

5.      <u>No Action</u>.  The undersigned agrees that if the undersigned hereafter commences any suit
arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts
against Releasees, or any of them, any of the Claims released hereunder, then the undersigned agrees to pay
to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys'
fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

A-2

6.      No Admission.  The undersigned further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the undersigned.

7.      OWBPA.  The undersigned agrees and acknowledges that this Release constitutes a knowing and voluntary waiver and release of all Claims the undersigned has or may have against the Company and/or any of the other Releasees as set forth herein, including, but not limited to, all Claims arising under the Older Worker's Benefit Protection Act and the Age Discrimination in Employment Act. In accordance with the Older Worker's Benefit Protection Act, the undersigned is hereby advised as follows:

    (i)      the undersigned has read the terms of this Release, and understands its terms and effects, including the fact that the undersigned agreed to release and forever discharge the Company and each of the Releasees, from any Claims released in this Release;

    (ii)      the undersigned understands that, by entering into this Release, the undersigned does not waive any Claims that may arise after the date of the undersigned's execution of this Release, including without limitation any rights or claims that the undersigned may have to secure enforcement of the terms and conditions of this Release;

    (iii)      the undersigned has signed this Release voluntarily and knowingly in exchange for the consideration described in this Release, which the undersigned acknowledges is adequate and satisfactory to the undersigned and which the undersigned acknowledges is in addition to any other benefits to which the undersigned is otherwise entitled;

    (iv)      the Company advised the undersigned to consult with an attorney prior to executing this Release;

    (v)      the undersigned has been given at least 21 days in which to review and consider this Release.  To the extent that the undersigned chooses to sign this Release prior to the expiration of such period, the undersigned acknowledges that the undersigned has done so voluntarily, had sufficient time to consider the Release, to consult with counsel and that the undersigned does not desire additional time and hereby waives the remainder of the 21-day period; and

    (vi)      the undersigned may revoke this Release within seven days from the date the undersigned signs this Release and this Release will become effective upon the expiration of that revocation period.  If the undersigned revokes this Release during such seven-day period, this Release will be null and void and of no force or effect on either the Company or the undersigned and the undersigned will not be entitled to any of the payments or benefits, or the Company Release, each of which is expressly conditioned upon the execution and non-revocation of this Release.  Any revocation must be in writing and sent to Cecilia Saez, at csaez@aspiration.com, on or before 11:59 p.m. PT on the seventh day after this Release is executed by the undersigned.

8.      Governing Law. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

A-3

IN WITNESS WHEREOF, the undersigned has executed this Release this 12th day of October, 2022.

DocuSigned by:

*Andrei Cherny*

157C23F4275F4C5...

_____

Andrei Cherny

# EXHIBIT I

# COMPANY RELEASE

1.     <u>Release</u>. In exchange for the consideration set forth in that certain Transition and Employment Separation Agreement (the "***Separation Agreement***"), dated October 12, 2022, between Aspiration Partners, Inc., a Delaware corporation (the "***Company***") and Andrei Cherny (the "***Executive***"), the receipt and adequacy of which are hereby acknowledged, the Company does hereby release and forever discharge the "***Releasees***" hereunder, consisting of the Executive and his heirs and assigns of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the Company and its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them, now have or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to October 12, 2022.  The Company has authority to release Claims on behalf of its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them.

2.     <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the Company or its subsidiaries to the Executive's fraud or breach of fiduciary duty or any claim for breach of the Separation Agreement (the "***Unreleased Claims***").

THE COMPANY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE COMPANY, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.     <u>Representations</u>.  The Company represents and warrants that there has been no assignment or other transfer of any interest in any Claim (other than any Unreleased Claim) which the Company may have against Releasees, or any of them, and the Company agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the Company under this indemnity.

4.     <u>No Action</u>.  The Company agrees that if the Company hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the Company agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

5.     <u>No Admission</u>.  The Company further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any

1

liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the Company.

6.    Acknowledgement.  The Company acknowledges that different or additional facts may be discovered in addition to what is now known or believed to be true by the Company with respect to the matters released in this Release, and the Company agrees that this Release shall be and remain in effect in all respects as a complete and final release of the matters released, notwithstanding any different or additional facts.

7.    Governing Law. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

* * * * *

2

IN WITNESS WHEREOF, the Company has executed this Release this 20th day of October, 2022.

ASPIRATION PARTNERS, INC.

By: _Nate Redmond_

Name: Nate Redmond

Title: Chair of the board

# EXHIBIT E

**JAMS ARBITRATION**

| | |
|---|---|
| ANDREI CHERNY,        ) | JAMS Reference No. 5220002918 |
|        ) | |
|     Claimant,    ) | |
|        ) | Hon. Glenda Sanders |
|     v.      ) | |
|        ) | |
| ASPIRATION PARTNERS, INC.,   ) | |
|        ) | |
|     Respondent.   ) | |

## CLAIMANT ANDREI CHERNY'S
## SECOND AMENDED DEMAND FOR ARBITRATION

October 31, 2023

MITCHELL SANDLER LLC

Andrew L Sandler
Christopher L. McCall
1120 20th Street N.W., Suite 725
Washington, D.C.  20036
Primary email:  cmccall@mitchellsandler.com
Primary telephone:  (202) 886-5292

*Attorneys for Claimant Andrei Cherny*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................... 1

PARTIES ...................................................................................................................... 3

JURISDICTION AND VENUE ................................................................................... 3

FACTUAL BACKGROUND ....................................................................................... 3

    I.  Cherny's Separation from the Company He Co-Founded and Built............................. 4

    II.  The Separation Agreement.................................................................................. 4

        A.  Aspiration's Repeated, Willful, and Bad Faith Breaches of the Separation Agreement................................................................................................. 4

            1.  Aspiration's Failure to Pay Consulting Fees ........................................ 6

            2.  Aspiration's Bad Faith Failure to Execute the Agreed-Upon Release .. 8

            3.  Aspiration's Failure to Permit Cherny to Access His Aspiration-Issued Computer and Email Account................................................................. 10

            4.  Aspiration's Failure to Reimburse Cherny for Legal Fees Incurred in Negotiating the Separation Agreement ................................................... 11

            5.  Aspiration's Failure to Provide Continuing Health Insurance............. 12

            6.  Aspiration's Failure to Confirm Cherny's Right to Exercise Stock Options................................................................................................. 12

    III.  Cherny Is Entitled to Recover His Costs and Fees – Including His Attorney's Fees – Incurred in Enforcing the Separation Agreement Under Section 1717(a) of the California Civil Code ................................................................................................. 14

CLAIM I:  Breach of Contract.................................................................................... 16

PRAYER FOR RELIEF ............................................................................................. 18

Claimant Andrei Cherny ("Cherny"), by and through his undersigned counsel, hereby files this second amended demand for arbitration against respondent Aspiration Partners, Inc. ("Aspiration"), his former employer, and alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      Cherny co-founded Aspiration in 2013 and served as Aspiration's Chief Executive Officer ("CEO") with distinction until October 2022, when his employment with Aspiration ended.

2.      The terms of Cherny's departure from Aspiration are governed by an October 12, 2022 transition and employment separation agreement (the "Separation Agreement").[1]  As set forth in detail below, in the over ten months since Cherny and Aspiration signed the Separation Agreement, not only has Aspiration failed to honor its obligations under the Separation Agreement, despite repeated requests by Cherny, but the evidence suggests Aspiration never had any intention of doing so.

3.      Indeed, one day after Cherny executed the Separation Agreement, Aspiration's largest shareholder, who is also a board member, sent Cherny a letter demanding that Cherny preserve documents "in anticipation of potential litigation."[2]  The next day this shareholder sent another letter to Cherny demanding information from Cherny to "evaluate[] his rights and claims against Mr. Cherny."[3]  These baseless threats of litigation, issued in the two days immediately following Cherny's execution of the Separation Agreement, and the fact that Aspiration simply

---

[1] A true and correct copy of the Separation Agreement is attached hereto as Exhibit A.

[2] A true and correct copy of the October 13, 2022 letter is attached hereto as Exhibit B.

[3] A true and correct copy of the October 14, 2022 letter is attached hereto as Exhibit C.

ignored multiple communications from Cherny seeking to enforce his rights, demonstrate that Aspiration never intended to comply with its obligations under the Separation Agreement, which left Cherny no choice but to commence this action. Cherny expects that discovery in this action will uncover further evidence of Aspiration's bad faith conduct in the form of communications between and among board members before and after Cherny's separation stating that Aspiration never intended to comply with the Separation Agreement.

4.      To date Cherny has incurred $197,090 in attorney's fees in his attempts to enforce his clear contractual rights under the Separation Agreement. Under California law – which governs the Separation Agreement – Cherny is entitled to recover the attorney's fees incurred due to Aspiration's failure to comply with its contractual obligations. Moreover, it would be profoundly inequitable and unfair to require Cherny to bear the substantial costs of Aspiration's bad faith refusal to honor its obligations under all the circumstances, as described in detail below.

5.      Through this proceeding, Cherny seeks nothing more than to enforce his rights under the Separation Agreement, and be reimbursed for the substantial costs he has incurred in doing so.

6.      Cherny submits this second amended arbitration demand pursuant to the October 18, 2023 Report and Scheduling Order Number Two (the "Scheduling Order"), which required Cherny to: (a) "identify the issues no longer in dispute" based on Aspiration's September 21, 2023 answer to Cherny's Amended Demand for Arbitration (the "Aspiration Answer"), (b) set forth the basis for damages sought by Cherny in connection with the loss of access to his Aspiration-issued computers, and (c) "set forth the basis for recovery of attorneys' fees beyond the $10,000 specified in the Separation Agreement."

## PARTIES

7.    Claimant Andrei Cherny is a natural person who resides in the State of Arizona.

8.    Respondent Aspiration Partners, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

## JURISDICTION AND VENUE

9.    In the Separation Agreement, Cherny and Aspiration mutually agreed to arbitrate any and all disputes arising out of Cherny's employment before a neutral JAMS arbitrator in Los Angeles, California:

> [Cherny] and [Aspiration] agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to [Cherny's] employment with or termination of employment from [Aspiration], including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator . . . as the exclusive remedy for resolving any and all such disputes.

Separation Agreement § 9(a); § 9(b) ("The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California.").

10.    The Separation Agreement is governed by California law. *See* Separation Agreement § 12.

## FACTUAL BACKGROUND

### I.    Cherny's Separation from the Company He Co-Founded and Built

11.    Cherny co-founded Aspiration in 2013.  Aspiration is a purpose-driven climate action company that delivers tangible environmental and social impact at scale by providing sustainability-minded business and high-quality carbon credits through rigorously-vetted carbon removal and avoidance projects.  A certified B-Corp, Aspiration provides an opportunity for enterprises and individuals to invest in its unparalleled global portfolio of premium reforestation and carbon removal and avoidance projects.

12.    From its founding in 2013 until October 12, 2022, Cherny led Aspiration as its CEO and a director.

13.    In July of 2022, Cherny gave notice of his intention to resign.

### II.    The Separation Agreement

14.    Cherny and Aspiration negotiated the terms of Cherny's departure from Aspiration, which resulted in the Separation Agreement, entered into as of October 12, 2022.

15.    The Separation Agreement required each party to execute a general release, which were incorporated by reference into and designated part of the Separation Agreement. Separation Agreement § 18.

### A.  Aspiration's Repeated, Willful, and Bad Faith Breaches of the Separation Agreement

16.    As set forth in detail below, Aspiration has repeatedly, willfully, and in bad faith breached the Separation Agreement in multiple ways and, as a direct result of these breaches,

Cherny has sustained substantial damages and incurred substantial costs and fees – including $197,090 in attorney's fees to date – with the precise amount to be determined at trial.

17.     Prior to commencing this action, Cherny repeatedly attempted to force Aspiration to comply with its obligations and avoid costly and protracted litigation, to no avail.  Indeed, in many instances Aspiration simply ignored Cherny's communications.

18.     For example, on October 21, 2022 Cherny sent a letter to Aspiration objecting to, *inter alia*, Aspiration's unilateral modification of a release agreed to by the parties, which suggested Aspiration was acting in bad faith.[4]  Cherny received no substantive response.

19.     On October 27, 2022, Cherny sent another letter to Aspiration to follow up on his prior letter and to raise new concerns regarding conduct by Aspiration that evidenced a clear attempt to evade its obligations under the Separation Agreement.[5]  Cherny's letter made clear that Aspiration "could resolve the issues raised in this letter by simply complying with its obligations under" the Separation Agreement and that, if Aspiration failed to resolve the issues expeditiously, Cherny would be forced to commence legal action.  Cherny received no substantive response.

20.     On November 8, 2022, Cherny sent yet another letter to Aspiration, requesting responses to his prior letters.[6]  Cherny's letter made clear that he bore no ill will toward Aspiration but was only seeking to enforce his rights under the Separation Agreement:

> We wish to be clear that Mr. Cherny has waited as long as possible to pursue such remedies because he is committed to supporting the continued success of Aspiration.  There is no reason that Mr. Cherny and the

---

[4] A true and correct copy of the October 21, 2022 letter is attached hereto as Exhibit D.

[5] A true and correct copy of the October 27, 2022 letter is attached hereto as Exhibit E.

[6] A true and correct copy of the November 8, 2022 letter is attached hereto as Exhibit F.

Company should be at odds.  All he is asking is for the Company to live up to the simple steps in the agreements it has made.

21.    It was only after Cherny sent this third letter to Aspiration that he received a response, which dismissed the issues Cherny raised as nothing more than sour grapes and characterized Cherny's efforts to enforce the Separation Agreement as "continued antagonism" that "disserves Aspiration's interests."[7]

22.    Aspiration's repeated failures to respond meaningfully – if at all – to Cherny's efforts to enforce the Separation Agreement left Cherny no choice but to commence this action.

23.    On June 6, 2023 – over two months after Cherny commenced this action – Aspiration filed an amended answer in which it conceded Cherny's entitlement to some, but not all, of his rights under the Separation Agreement, but this belated acknowledgement is only further evidence of Aspiration's bad faith, as Aspiration is transparently attempting to impose substantial costs – in the form of attorney's fees – on Cherny's efforts to enforce his contractual rights.

## 1.    <u>Aspiration's Failure to Pay Consulting Fees</u>

24.    Under the terms of the Separation Agreement, Cherny agreed to perform certain consulting services for Aspiration:

> (a) Consulting Services.  During the period commencing on the Separation Date [*i.e.*, October 12, 2022] and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "Consulting Period"), [Cherny] shall provide the following agreed-upon consulting services with regard to the business and operations of [Aspiration], its subsidiaries and its affiliates as requested by [Aspiration] expects to average approximately 10-15 hours per week (i) consultation and participation with [Aspiration] matters as reasonably requested by [Aspiration]; and (ii) consultation and assistance with respect to services performed during the course of [Cherny]'s employment with [Aspiration]

---

[7] A true and correct copy of the November 9, 2022 letter is attached hereto as Exhibit G.

(collectively, the "Services").  [Cherny] shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services.  In addition, in performing the Services, [Cherny] agrees to cooperate reasonably with [Aspiration] in accomplishing a smooth and orderly transition of (x) [Cherny]'s prior employment responsibilities to other employees of [Aspiration], particularly including pending matters of which [Cherny] has the principal knowledge and background information, and (y) [Aspiration]'s relationship with an independent auditing firm.

Separation Agreement § 2(a).

25.    The Separation Agreement required Aspiration to pay Cherny $25,000 per month for these consulting services, payable ten days after the last of each month:

> During the Consulting Period, [Aspiration] *shall pay* [Cherny] a fee (the 'Consulting Fee') of $25,000 per month as cash consideration for the Services pro-rated for any partial month of Services.  The monthly Consulting Fee *shall be paid* to [Cherny] in arrears within ten days following the end of the calendar month in which such monthly Consulting Fee was earned.

Separation Agreement § 2(b) (emphasis added).

26.    The Separation Agreement provided that the consulting period would expire six months from Cherny's October 12, 2022 resignation, or on or about April 12, 2023.  Separation Agreement § 2(c)(1).

27.    On October 26, 2022, Cherny wrote to the Chair of the Board of Directors that he "stand[s] ready and willing to do whatever is requested" to provide the consulting services.  He received no response.

28.    The first consulting payment was due on November 10, 2022, less than one month after the Separation Agreement was signed.  Aspiration did not make this or any other required payment.

29.     In Aspiration's Answer, it agreed to pay Cherny $150,000 in consulting fees.  *See* Aspiration Answer ¶ 1.  Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in dispute.

### 2.  Aspiration's Bad Faith Failure to Execute the Agreed-Upon Release

30.     The Separation Agreement required Cherny and Aspiration to execute general releases, which were carefully negotiated by the parties and attached as exhibits to the Separation Agreement.  Separation Agreement § 1(c).

31.     The Separation Agreement incorporated the releases by reference – indeed, they were exhibits to the Separation Agreement – and provided that the two releases are part of the Separation Agreement.  Separation Agreement § 18.

32.     As required by the Separation Agreement, Cherny executed the release attached as Exhibit A to the Separation Agreement on or about October 12, 2022 (the "Cherny Release"), and did not revoke the release during the seven-day period when he was entitled to do so.[8]

33.     The Separation Agreement required Aspiration to execute the release attached as Exhibit B to the Separation Agreement, and did not permit Aspiration to modify or amend the release prior to execution.  Separation Agreement § 1(c) ("In addition, no later than one business day following the expiration of the revocation period for [Cherny]'s Release, [Aspiration] *shall* execute a general release [*sic* – of] claims against [Cherny] *in the form attached hereto as Exhibit B* (provided that [Cherny] has not revoked the Release).") (emphasis added).

---

[8] A true and correct copy of the October 12, 2022 Cherny Release is attached hereto as Exhibit H.

34.     On October 20, 2022, Aspiration provided a release to Cherny that materially

differed from the release negotiated by the parties and attached as Exhibit B to the Separation

Agreement (the "Aspiration Release").[9]  Specifically, whereas the release mutually agreed to by

the parties released Cherny from claims by Aspiration "from the beginning of time to the date

hereof [October 20, 2022]," Aspiration modified the release to release Cherny from claims by

Aspiration "from the beginning of time to October 12, 2022."

35.     In other words, Aspiration unilaterally sought to shorten the time period covered

by the release by eight days, from October 20, 2022 (the day Aspiration executed the release) to

October 12, 2022 (the date Cherny's resignation became effective).  Cherny believes that

Aspiration did so in bad faith and acting at the behest of Aspiration's largest shareholder and a

board member, who, as described above, in the days following Cherny's resignation, issued a

number of baseless and frivolous threats of litigation against Cherny.

36.     Aspiration has defended its material alterations to the release on the purported

ground that "no provision of the Separation Agreement states that the time periods covered by

Mr. Cherny's release and Aspiration's release would not be coterminous, as is typical when

mutual releases are given," but this ignores the fact that the releases were heavily negotiated by

the parties and expressly agreed upon.

37.     Under the Separation Agreement, Aspiration was required to execute the release

"in the form attached hereto as Exhibit B," but it did not do so.

---

[9] A true and correct copy of the October 20, 2022 Aspiration Release is attached hereto as
Exhibit I.

38.     In Aspiration's Answer, it agreed to "re-execute its release under the Separation Agreement, Exhibit B, so that it is effective through October 20, 2022." *See* Aspiration Answer ¶ 2.  Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in dispute.

### 3.   Aspiration's Failure to Permit Cherny to Access His Aspiration-Issued Computer and Email Account

39.     The Separation Agreement required Cherny to return property belonging to Aspiration, but expressly authorized him to retain certain property, including his Aspiration computer and email account:

> [Cherny] represents and warrants that he shall, prior to the termination date, return to [Aspiration] any and all property and equipment of [Aspiration] . . . provided, however, that [Cherny] may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the [consulting] Services, (ii) [Cherny]'s telephone and address book, and (iii) copies of [Cherny]'s own personnel, payroll and benefit documents . . . . For the avoidance of doubt, during the Consulting Period, [Cherny] *shall be allowed* to retain and use (a) [Cherny]'s Company issued computer and (b) [Cherny]'s Company email and email address, all of which for use in [Cherny]'s capacity as a Board member or to provide Services.

Separation Agreement § 2(d) (emphasis added).

40.     Less than a month after executing the Separation Agreement, Cherny was denied access to his Aspiration computer and email account, and Cherny received no response to his note to the Chair of Aspiration's Board of Directors regarding the denial of access.  Despite repeated requests by Cherny prior to the expiration of the consulting period, however, Aspiration has continued to deny Cherny access to his Aspiration computer and email account.  Aspiration has maintained that it can unilaterally deny Cherny access to his computer and email account because the Company has discretion to determine the services Cherny is to provide and the tools

Cherny will be given to provide the services, but that ignores the mandatory nature of the
language in the Separation Agreement.

41.     Cherny is no longer seeking to have his access to his Aspiration-issued computers
and email account restored, and Cherny is no longer seeking damages due to Aspiration's breach
of Section 2(d) of the Separation Agreement.  Accordingly, as required by the Scheduling Order,
Cherny states that this issue is no longer in dispute.

### 4.   **Aspiration's Failure to Reimburse Cherny for Legal Fees Incurred in Negotiating the Separation Agreement**

42.     The Separation Agreement required Aspiration to reimburse Cherny up to
$10,000 for legal fees incurred in negotiating the Separation Agreement.  Separation Agreement
§ 20 ("[Aspiration] agrees that it shall reimburse [Cherny] for up to $10,000 in attorneys' fees
actually incurred in connection with the negotiation and execution of this Agreement subject to
[Cherny]'s delivery to [Aspiration] of documentation evidencing such fees within 60 days after
the Effective Date.").

43.     On November 17, 2022 – well within 60 days of the October 12, 2022 effective
date of the Separation Agreement – Cherny submitted a request to Aspiration for reimbursement
of $10,040 in legal fees, along with an invoice from counsel evidencing such fees.

44.     Despite the fact that Cherny incurred legal fees in excess of $10,000 in
negotiating the Separation Agreement, requested reimbursement within 60 days of execution of
the Separation Agreement, and submitted documentation evidencing the fees, Aspiration has not
reimbursed Cherny for his fees.

45.    In Aspiration's Answer, it agreed to pay Cherny $10,000 in attorneys' fees.  *See* Aspiration Answer ¶ 4.  Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in dispute.

## 5.    Aspiration's Failure to Provide Continuing Health Insurance

46.    For the year following Cherny's October 12, 2022 resignation (or until October 12, 2023), the Separation Agreement required Aspiration to provide Cherny and his eligible dependents "with coverage under [Aspiration's] group health plans at the same levels and the same cost to [Cherny] as would have applied if [Cherny]'s employment had not been terminated."  Separation Agreement § 2(b)(ii).

47.    Notwithstanding this provision, Aspiration has failed to provide Cherny and his eligible dependents with health coverage on the terms set forth in the Separation Agreement.

48.    In Aspiration's Answer, it agreed to reimburse Cherny for the cost of Cherny's COBRA payments at a rate of $576 per month from October 12, 2022 through the end of the year, and $667 per month from January 1, 2023 to October 12, 2023.  *See* Aspiration Answer ¶ 5. Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in dispute.

## 6.    Aspiration's Failure to Confirm Cherny's Right to Exercise Stock Options

49.    The Separation Agreement expressly authorized Cherny to retain all stock options vested prior to his resignation, and to exercise those options for an extended period of time:

> [A]ll [Aspiration] stock options held by [Cherny] outstanding as of the Separation Date (each a "Company Equity Award") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth

anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "Exercise Period Extension"); provided that [Cherny] acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that [Cherny] (and not [Aspiration]) shall be solely responsible for any tax consequences relating to such reclassification.

Separation Agreement § 1(d).

50.    At the time of his resignation, Cherny held a number of stock options that were outstanding, vested, and exercisable and, thus, under Section 1(d) of the Separation Agreement, these stock options remain outstanding and exercisable.

51.    By letters dated October 21, 2022, October 27, 2022, and November 8, 2022 Cherny requested that Aspiration confirm that his stock options remain outstanding and exercisable, but Aspiration has refused to do so.  Aspiration simply ignored Cherny's first two letters, and in response to his third letter Aspiration merely referred Cherny to the terms of Section 1(d) of the Separation Agreement, without confirming whether his options are outstanding and exercisable.

52.    In Aspiration's Answer, it confirmed that Cherny "has 2,810,611 fully-vested, outstanding Aspiration stock options, including 2,276,461 issued to his BPCC, Inc., LLC, with the remaining 534,150 issued directly to [Cherny]."  *See* Aspiration Answer ¶ 6.  Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in dispute.

III.    **Cherny Is Entitled to Recover His Costs and Fees – Including His Attorney's Fees – Incurred in Enforcing the Separation Agreement Under Section 1717(a) of the California Civil Code**

53.    The Separation Agreement provided that the "arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law." Separation Agreement, § 9(d).

54.    The Separation Agreement and the releases thereto are governed by California law.  Separation Agreement § 12, Aspiration Release § 7, Cherny Release § 8.

55.    The Cherny Release contained a provision stating that, if Cherny asserts a claim against Aspiration, then Cherny will be required to pay Aspiration's attorney's fees.  Cherny Release § 5.

56.    The Aspiration Release contained a provision stating that, if Aspiration asserts a claim against Cherny, then Aspiration will be required to pay Cherny's attorney's fees. Aspiration Release § 4.

57.    Under California law, if a contract provides for attorney's fees only to one party, the other party shall be awarded attorney's fees if the other party prevails on a claim under the contract.  *See* Cal. Civ. Code § 1717(a).  Section 1717(a) "was designed to establish mutuality of remedy when a contractual provision makes recovery of attorney fees available to only one party, and to prevent the oppressive use of one-sided attorney fee provisions." *Carpenter & Zuckerman, LLP v. Cohen*, 195 Cal. App. 4th 373, 379-80 (2011).[10]  Section 1717(a) constitutes

---

[10] Unless otherwise indicated, all internal citations and quotation marks have been removed from the cases cited herein.

a "fundamental policy concerning the reciprocity of attorney fee provisions in contracts," *ABF Cap. Corp. v. Grove Properties Co.*, 126 Cal. App. 4th 204, 217 (2005), and courts construe the statute "liberally," *Carmel Fin., LLC v. Schoenmann*, 622 F. Supp. 3d 830, 847 (N.D. Cal. 2022).

58.     The California Supreme Court has held that, once Section 1717(a) has been triggered, "equitable considerations must prevail over both the bargaining power of the parties and the technical rules of contractual construction."  *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1090–91 (2000).  "Courts have consistently held that an award of attorney fees pursuant to section 1717 is governed by equitable principles."  *Baleme v. Comeaux*, No. C044177, 2004 WL 2601790, at *4 (Cal. Ct. App. Nov. 15, 2004).

59.     Here, because the Cherny Release and the Aspiration Release only required one party to reimburse attorney's fees, Section 1717(a) of the California Civil Code applies to Cherny's claims for breach of the Separation Agreement and supplies the "applicable law" that permits the Arbitrator to award Cherny attorneys' fees.[11]

60.     Once Section 1717(a) has been triggered, "equitable considerations *must prevail* over . . . the technical rules of contractual construction."  *PLCM Grp. v. Drexler*, 22 Cal. 4th at 1090–91 (emphasis added).  Here, the equitable considerations that underlie Section 1717(a) weigh decisively in favor of awarding attorneys' fees to Cherny.

---

[11] The California Supreme Court has held that, "in determining whether a contract contains an applicable attorney fees provision[,] courts have construe[d] together several documents concerning the same subject and made as part of the same transaction even though the documents were not executed contemporaneously and do not refer to each other."  *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 759 (2017).  Thus, the fact that the unilateral attorney's fee provision was contained in the releases executed after the Separation Agreement does not alter Cherny's entitlement to attorney's fees if he prevails in this action.

61.     Despite Aspiration's clear and unambiguous obligations under the Separation Agreement, Aspiration purposefully set upon a course of conduct to disregard its contractual obligations and thereby force Cherny to expend significant resources – including nearly $200,000 in attorneys' fees to date – to force such compliance.  By refusing to reimburse Cherny for these costs and fees, Aspiration is using the attorneys' fees provision in precisely the type of "oppressive" manner Section 1717(a) was designed to prevent, *see Carpenter*, 195 Cal. App. 4th at 379-80.

62.     The Arbitrator should not countenance Aspiration's bad-faith conduct, and should award Cherny all costs and fees – including attorneys' fees – he incurred in forcing Aspiration to comply with its contractual obligations in the interests of fairness and justice.  To date, Cherny has incurred legal fees of approximately $197,090.

## CLAIM I:  BREACH OF CONTRACT

63.     Cherny repeats and realleges the foregoing allegations as if fully set forth herein.

64.     The Separation Agreement is a valid and enforceable contract.

65.     Aspiration breached Section 2 of the Separation Agreement by refusing to pay Cherny $25,000 per month for consulting services, despite the fact that Cherny has performed the consulting services as required.  As noted above, Aspiration has agreed to pay Cherny $150,000 in consulting fees.  *See* Aspiration Answer ¶ 1.  Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in dispute.

66.     Aspiration breached Section 1(c) of the Separation Agreement by failing to execute the release negotiated by the parties and attached as Exhibit B to the Separation Agreement.  As noted above, Aspiration has agreed to "re-execute its release under the

Separation Agreement, Exhibit B, so that it is effective through October 20, 2022." *See*
Aspiration Answer ¶ 2.  Accordingly, as required by the Scheduling Order, Cherny states that
this issue is no longer in dispute.

67.    Aspiration breached Section 2(d) of the Separation Agreement by refusing to
permit Cherny access to his Aspiration-issued computer and email account.  As required by the
Scheduling Order, Cherny states that he is no longer seeking to have access to his Aspiration-
issued computer and email account restored, and he is no longer seeking damages as a result of
Aspiration's breach of Section 2(d).

68.    Aspiration breached Section 20 of the Separation Agreement by failing to
reimburse Cherny for legal fees incurred in negotiating the Separation Agreement.  As noted
above, Aspiration has agreed to pay Cherny $10,000 in attorneys' fees.  *See* Aspiration Answer ¶
4.  Accordingly, as required by the Scheduling Order, Cherny states that this issue is no longer in
dispute.

69.    Aspiration breached Section § 2(b)(ii) of the Separation Agreement by failing to
provide Cherny with continuing health insurance.  As noted above, Aspiration has agreed to
reimburse Cherny for the cost of Cherny's COBRA payments at a rate of $576 per month from
October 12, 2022 through the end of the year, and $667 per month from January 1, 2023 to
October 12, 2023.  *See* Aspiration Answer ¶ 5.  Accordingly, as required by the Scheduling
Order, Cherny states that this issue is no longer in dispute.

70.    As a direct result of foregoing breaches of the Separation Agreement, Cherny has
sustained damages in an amount to be determined at trial.

71.    As a direct result of these breaches of the Separation Agreement, Cherny has incurred costs and fees – including attorney's fees – to which he is entitled to payment by Aspiration under Section 1717(a) of the California Civil Code.  To date, Cherny has incurred legal fees of approximately $197,090.

## PRAYER FOR RELIEF

WHEREFORE, Cherny respectfully requests that the Arbitrator enter judgment in favor of Cherny and against Aspiration, and award Cherny the following relief:

1.    Order Aspiration to pay Cherny $25,000 per month in consulting fees for the period from October 12, 2022 through April 12, 2023, as required by Section 2 of the Separation Agreement, and as agreed to by Aspiration in paragraph 1 of the Aspiration Answer.

2.    Order Aspiration to execute the release attached as Exhibit B to the Separation Agreement, as required by Section 1(c) of the Separation Agreement, and as agreed to by Aspiration in paragraph 2 of the Aspiration Answer.

3.    Order Aspiration to pay Cherny $10,000 to reimburse Cherny for legal fees incurred in connection with the negotiation and execution of the Separation Agreement, as required by Section 20 of the Separation Agreement, and as agreed to by Aspiration in paragraph 4 of the Aspiration Answer.

4.    Order Aspiration to provide Cherny and his eligible dependents with continuing health insurance coverage, as required by Section § 2(b)(ii) of the Separation Agreement, and as agreed to by Aspiration in paragraph 5 of the Aspiration Answer.

5.    Order Aspiration to pay Cherny all costs and fees – including attorney's fees – Cherny has incurred in enforcing the Separation Agreement, as required by Section 9(d) of the

Separation Agreement and Section 1717(a) of the California Civil Code.  To date, Cherny has

incurred legal fees of approximately $197,090.

6.  Order Aspiration to pay Cherny pre- and post-judgment interest.

7.  Any other relief the Arbitrator deems just and proper.

Dated:  Washington, D.C.
        October 31, 2023

MITCHELL SANDLER LLC

By:  _/s/ Christopher L. McCall_

Andrew L Sandler
Christopher L. McCall
1120 20th Street N.W., Suite 725
Washington, D.C.  20036
Primary email:  cmccall@mitchellsandler.com
Primary telephone:  (202) 886-5292

*Attorneys for Claimant Andrei Cherny*

# EXHIBIT A

## TRANSITION AND EMPLOYMENT SEPARATION AGREEMENT

This Transition and Employment Separation Agreement (the "***Agreement***") is made and entered into by and between Andrei Cherny ("***Executive***") and Aspiration Partners, Inc. (the "***Company***"), as of October 12, 2022.

1.    Separation of Employment.

(a)    *Separation of Employment; Termination of Employment Agreement*. Effective as of October 12, 2022 (the "***Separation Date***"), (i) Executive shall resign his employment with the Company and all of its affiliates, Executive shall resign as a member of the Company's Board of Directors (the "***Board***") and Executive shall cease to be an employee and director of all of the foregoing, and (ii) the employment agreement between the Company and Executive (the "***Employment Agreement***"), dated October 1, 2013 as amended and restated in August 2021, shall, except to the extent provisions of the Employment Agreement are specifically referenced herein, terminate, and neither the Company nor Executive shall have any further obligations thereunder.

(b)    *Accrued Obligations*. Upon the Separation Date, the Company will pay to Executive (i) all accrued salary and all accrued, unused vacation / paid time off through the Separation Date, and (ii) any unreimbursed business expenses incurred by Executive, in accordance with Company policy, prior to the Separation Date (collectively, the "***Accrued Obligations***").

(c)    *Separation Pay*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants (as defined below) and Section 6 and (ii) Executive's execution and delivery to the Company of an effective release of claims in substantially the form attached hereto as Exhibit A (the "***Release***") on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, the Company shall pay to Executive an amount equal to $535,000, which represents 12 months of Executive's annual base salary as in effect on the Separation Date (the "***Severance***"). The Severance shall be paid in a single lump sum payment on the business day immediately following the date on which the Release becomes irrevocable. In addition, no later than one business day following the expiration of the revocation period for Executive's Release, the Company shall execute a general release claims against Executive in the form attached hereto as Exhibit B (provided that Executive has not revoked the Release).

(d)    *Extension of Exercise Period*. Subject to and conditioned upon (i) Executive's continued compliance with the Restrictive Covenants and Section 6 and (ii) Executive's execution and delivery to the Company of the Release on or within 21 days following the Separation Date, and the non-revocation of the Release during the seven day period following the date on which the Release is executed, all Company stock options held by Executive outstanding as of the Separation Date (each a "***Company Equity Award***") that remained outstanding, vested and unexercised as of the Separation Date, shall remain outstanding and exercisable until (and through) the earlier of the tenth anniversary of the Separation Date and the maximum expiration date of the Company Equity Award (the "***Exercise Period Extension***"); provided that Executive acknowledges and agrees that the Exercise Period Extension may cause an incentive stock option to be reclassified as a non-qualified stock option, and that Executive (and not the Company) shall be solely responsible for any tax consequences relating to such reclassification.

2.    Consulting Services.

(a)    *Consulting Services*. During the period commencing on the Separation Date and ending on the date on which the consulting relationship established hereby is terminated in accordance with Section 2(c) (the "***Consulting Period***"), Executive shall provide the following agreed-upon consulting

1

services with regard to the business and operations of the Company, its subsidiaries and its affiliates as requested by the Company expects to average approximately 10 - 15 hours per week (i) consultation and participation with Company matters as reasonably requested by the Company; and (ii) consultation and assistance with respect to services performed during the course of Executive's employment with the Company (collectively, the "***Services***"). Executive shall perform such Services from Phoenix, Arizona and shall not be required to travel to perform such Services. In addition, in performing the Services, Executive agrees to cooperate reasonably with the Company in accomplishing a smooth and orderly transition of (x) Executive's prior employment responsibilities to other employees of the Company, particularly including pending matters of which Executive has the principal knowledge and background information, and (y) the Company's relationship with an independent auditing firm.

      (b)    *Compensation for Consulting Services*.

      (i)    During the Consulting Period, the Company shall pay Executive a fee (the "***Consulting Fee***") of $25,000 per month as cash consideration for the Services pro-rated for any partial month of Services.  The monthly Consulting Fee shall be paid to Executive in arrears within ten days following the end of the calendar month in which such monthly Consulting Fee was earned.

      (ii)    Subject to Executive's execution and non-revocation of the Release and to Executive's valid election to continue healthcare coverage under Section 4980B of the Code, the Company shall continue to provide, during the period beginning on the Separation Date and ending on the earlier of (i) the 12-month anniversary thereof or (ii) the date on which Executive becomes eligible to receive benefits under a "group health plan" (within the meaning of Section 4980B of the Code) of a subsequent employer of Executive (the "***COBRA Period***"), Executive and Executive's eligible dependents with coverage under its group health plans at the same levels and the same cost to Executive as would have applied if Executive's employment had not been terminated based on Executive's elections in effect on the Separation Date, provided, however, that (A) if any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the period of continuation coverage to be, exempt from the application of Section 409A under Treasury Regulation Section 1.409A-1(a)(5), or (B) the Company is otherwise unable to continue to cover Executive under its group health plans without incurring penalties (including without limitation, pursuant to Section 2716 of the Public Health Service Act or the Patient Protection and Affordable Care Act), then, in either case, an amount equal to each remaining Company subsidy shall thereafter be paid to Executive in substantially equal monthly installments over the COBRA Period (or the remaining portion thereof) (in any event, the "***COBRA Payments***").

      (c)  *Termination of Consulting Services.*

      (i)    The Consulting Period shall terminate on the six-month anniversary of the Separation Date (the "***Anniversary Date***"); provided, however, that the Company or Executive may terminate the Consulting Period and the Services hereunder at any time prior to the Anniversary Date, for any reason, upon 60-days written notice to the other party (or immediately by the Company in the event of a termination for Cause (as defined in the Employment Agreement)).  If the Consulting Period and the Services hereunder are terminated for any reason, then (i) the Company shall pay to Executive any portion of the Consulting Fee that has been earned but unpaid through the termination date and (ii) except as provided in Section 2(c)(ii) below, Executive shall forfeit all Consulting Fees payable with respect to periods of service following the termination date (if any).

      (ii)    If the Consulting Period and the Services hereunder are terminated prior to the Anniversary Date by reason of Executive's death or Disability (as defined in the Employment Agreement), then, subject to and conditioned upon (i) Executive's continued compliance with the terms and conditions of Section 9 of this Agreement and the Restrictive Covenants and (ii) Executive's execution

US-DOCS\135645189.15

of a Release, on or within 21 days following the final date of the Consulting Period, and non-revocation of such Release during the seven day period following the date on which such Release is executed the Company shall pay to Executive the Consulting Fee that would have been payable during the remainder of the Consulting Period had the Consulting Period ended on the Anniversary Date, in accordance with the payment timing set forth in Section 2(b).  For the avoidance of doubt, if Executive terminates the Consulting Period and the Services hereunder prior to the Anniversary Date, Executive shall forfeit any entitlement to the payments and benefits set forth in this Section 2(c)(ii).

(d)    *Return of Company Property*.  Executive represents and warrants that he shall, prior to the termination date, return to the Company any and all property and equipment of the Company, including (i) all keys, files, lists, books and records (and copies thereof) of, or in connection with, the Company's business, equipment (including, but not limited to, computer hardware, software and printers, wireless handheld devices, cellular phones and pagers), access or credit cards, Company identification, and all other property belonging to the Company in Executive's possession or control, and (ii) all documents and copies, including hard and electronic copies, of documents in Executive's possession relating to any Confidential Information (as defined in the Employment Agreement), including without limitation, internal and external business forms, manuals, correspondence, notes and computer programs, and that Executive has not made or retained, and shall not make or retain, any copy or extract of any of the foregoing; provided, however, that Executive may retain (i) any and all property, equipment, and Confidential Information reasonably necessary to provide the Services, (ii) Executive's telephone and address book, and (iii) copies of Executive's own personnel, payroll and benefit documents (provided that such personnel, payroll and benefits documents do not contain any Confidential Information and that the Company has the prior opportunity to review, redact and/or retain any such documents containing Confidential Information).  For the avoidance of doubt, during the Consulting Period, Executive shall be allowed to retain and use (a) Executive's Company issued computer and (b) Executive's Company email and email address, all of which for use in Executive's capacity as a Board member or to provide Services.

3.    Withholdings and Other Deductions.  All compensation payable to Executive hereunder shall be subject to such withholdings and deductions as the Company is from time to time required to make pursuant to law, governmental regulation or order.

4.    Warranty.  Executive acknowledges that all payments and benefits under Section 2 of this Agreement and the Company Release constitute additional compensation to which Executive would not be entitled except for Executive's decision to sign this Agreement and to abide by the terms of this Agreement.  With the exception of any equity in the Company or Company provided health and welfare benefits, Executive acknowledges that, upon receipt of the Accrued Obligations, Executive has (i) received all monies and other benefits due to Executive as a result of his employment with and separation from the Company, and (ii) no right, title, or interest in or entitlement to any other payments or benefits other than as set forth in this Agreement.  Executive further represents that he has not sustained a work-related injury or illness which he has not previously reported to the Company.

5.    Restrictive Covenants. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that (i) Executive previously made certain representations, including with respect to confidential information, intellectual property, non-competition and non-solicitation obligations, as set forth in Sections 7, 8 and 9 of the Employment Agreement, and (ii) Sections 7 - 11 of the Employment Agreement shall remain in full force and effect in accordance with their terms and Executive shall be bound by their terms; provided, however, that notwithstanding anything to the contrary contained in the Employment Agreement, the "Restricted Period" shall end on the Separation Date for purposes of Section 9(a) and 9(b) (iii) of the Employment Agreement (collectively, the "***Restrictive Covenants***").

3

6.      <u>Non-Disparagement</u>. Subject to Section 8, Executive agrees not to publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on any of the Company or any of its affiliates, or that are otherwise disparaging of any of the Company's, its affiliates or any of their past or present officers, directors, employees, advisors, agents, policies, procedures, practices, decision-making, conduct, professionalism or compliance with standards. Each of the individuals or entities covered by the foregoing agreement on behalf of Executive shall be third party beneficiaries of this Section, entitled to enforce it against Executive and/or seeks damages for its violation. The Company agrees that the Company's Board members, major shareholders and officers shall not publish or disseminate, directly or indirectly, any statements, whether written or oral, that are or could be harmful to or reflect negatively on Executive. The Company agrees that Executive's separation is a resignation by Executive and that the Company, the Company's Board members, major shareholders and officers will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation, whether written or oral, that contradict the statement attached hereto as <u>Exhibit C</u>. The Company acknowledges and agrees that it shall promptly advise the Company's Board members, major shareholders and officers of the foregoing obligation.

7.      <u>Ongoing Cooperation</u>. Executive agrees that Executive will reasonably assist and cooperate with the Company and its affiliates (i) concerning reasonable requests for information about the business of the Company or its affiliates or Executive's involvement and participation therein, (ii) in connection with the defense, prosecution or investigation of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or its subsidiaries or affiliates, including any proceeding before any arbitral, administrative, judicial, legislative, or other body or agency, including testifying in any proceeding to the extent such claims, actions, investigations or proceedings relate to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive, and (iii) and in connection with any investigation or review by any federal, state or local regulatory, quasi- or self-regulatory or self-governing authority or organization (including, without limitation, the SEC and FINRA) as any such investigation or review relates to services performed or required to be performed by Executive, pertinent knowledge possessed by Executive, or any act or omission by Executive. Executive's reasonable cooperation shall include, but not be limited to, being reasonably available to meet and speak with officers or employees of the Company, its affiliates and/or their advisors (including auditors and any accounting or tax advisors) or counsel at reasonable times and locations, executing accurate and truthful documents, appearing at the Company's request as a witness at depositions, trials or other proceedings without the necessity of a subpoena, and taking such other actions as may reasonably be requested by the Company, its affiliates and/or their advisors or counsel to effectuate the foregoing. In requesting such services, the Company will consider other commitments that Executive may have at the time of the request. Executive shall be entitled to indemnification and/or advancement of expenses in accordance with the terms and condition set forth in that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021.

8.      <u>Exceptions</u>

(a)      Notwithstanding anything in this Agreement to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Agreement shall prohibit Executive (or Executive's attorney) from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with the U.S. Securities and Exchange Commission ("**SEC**"), the Financial Industry Regulatory Authority ("**FINRA**"), the EEOC, the NLRB, the Occupational Safety and Health Administration, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice or any other securities regulatory agency, self-regulatory authority or federal, state or local regulatory authority (collectively, "**Government Agencies**"), or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation, (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to any Government

4

Agencies for the purpose of reporting or investigating a suspected violation of law, or from providing such information to Executive's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding, and/or (iii) receiving an award for information provided to any Government Agency; (B) pursuant to 18 USC Section 1833(b), Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Agreement is intended to or shall preclude Executive from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if Executive is required to provide testimony, then unless otherwise directed or requested by a Governmental Agency or law enforcement, Executive shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Agreement prevents Executive from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

(b)     Executive represents and warrants to the Company that as of the date of this Agreement, Executive is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

9.     <u>Arbitration</u>.

(a)     Executive and the Company agree that any dispute, controversy or claim, however significant, arising out of or in any way relating to Executive's employment with or termination of employment from the Company, including without limitation any dispute, controversy or claim arising out of or in any way relating to any provision of this Agreement (including the validity, scope and enforceability of this arbitration clause), to the fullest extent authorized by applicable law, shall be submitted to final and binding arbitration before a single neutral arbitrator in accordance with the rules of JAMS pursuant to its Employment Arbitration Rules and Procedures, which are available at http://www.jamsadr.com/rules-employment-arbitration/, and the Company will provide a copy upon Executive's request, as the exclusive remedy for resolving any and all such disputes.

(b)     The arbitration shall be conducted by a single neutral arbitrator selected by mutual agreement of the parties (or, absent such mutual agreement, in accordance with the rules of JAMS) and the place of arbitration will be in Los Angeles, California.  Each party shall be entitled to all types of remedies and relief otherwise available in court (subject to the limitations set forth herein).  The parties agree that any arbitration pursuant to this Agreement shall be brought on an individual, rather than class, collective, or representative basis, and waive the right to pursue any claim subject to arbitration on a class, collective, or representative basis.

(c)     The parties to this Agreement hereby expressly and irrevocably submit themselves to the personal jurisdiction of the United States District Court for the Central District of California or, if subject matter jurisdiction does not exist, the Superior Court of the State of California (the "***Court***") for the purpose of compelling arbitration pursuant to this Agreement and for the purpose of any judicial proceedings seeking to confirm, modify or vacate any arbitration award.

(d)     The fees of the arbitrator and all other costs that are unique to arbitration shall be paid by the Company initially, but if Executive initiates a claim subject to arbitration, Executive

5

shall pay any filing fee up to the amount that Executive would be required to pay if Executive initiated such claim in the Court. Each party shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' fees and/or its own witnesses' fees. The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party where authorized by applicable law.

(e)    WAIVER OF TRIAL BY JURY OR COURT. EXECUTIVE AND THE COMPANY UNDERSTAND THAT BY AGREEING TO ARBITRATE ANY ARBITRATION CLAIM, THEY WILL NOT HAVE THE RIGHT TO HAVE ANY ARBITRATION CLAIM DECIDED BY A JURY OR A COURT, BUT SHALL INSTEAD HAVE ANY ARBITRATION CLAIM DECIDED THROUGH ARBITRATION.

(f)    WAIVER OF OTHER RIGHTS. EXECUTIVE AND THE COMPANY WAIVE ANY CONSTITUTIONAL OR OTHER RIGHT TO BRING CLAIMS COVERED BY THIS AGREEMENT OTHER THAN IN THEIR INDIVIDUAL CAPACITIES. EXCEPT AS MAY BE PROHIBITED BY LAW, THIS WAIVER INCLUDES THE ABILITY TO ASSERT CLAIMS AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(g)    The parties acknowledge that they are entering into this arbitration provision voluntarily, and are represented by counsel. If any part of this arbitration provision is deemed unenforceable, it is entirely severable from the rest and shall not affect or limit the validity or enforceability of the remainder of the provision, or the Agreement.

10.    Code Section 409A.

(a)    To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other such guidance that may be issued after the Effective Date (collectively, "***Section 409A***"). Notwithstanding any provision of this Agreement to the contrary, in the event that following the Effective Date, the Company determines that any compensation or benefits payable under this Agreement may be subject to Section 409A, the Company may adopt such amendments to this Agreement or adopt other policies or procedures (including amendments, policies and procedures with retroactive effect), or take any other actions that the Company determines are necessary or appropriate to preserve the intended tax treatment of the compensation and benefits payable hereunder, including without limitation actions intended to (i) exempt the compensation and benefits payable under this Agreement from Section 409A, and/or (ii) comply with the requirements of Section 409A, provided, however, that this Section 10 does not, and shall not be construed so as to, create any obligation on the part of the Company to adopt any such amendments, policies or procedures or to take any other such actions. In no event shall the Company, its affiliates or any of their respective officers, directors or advisors be liable for any taxes, interest or penalties imposed under Section 409A or any corresponding provision of state or local law.

(b)    Any right under this Agreement to a series of installment payments shall be treated as a right to a series of separate payments. Notwithstanding anything to the contrary in this Agreement, no compensation or benefits shall be paid to Executive during the six-month period following Executive's "separation from service" with the Company (within the meaning of Section 409A) if the Company determines that paying such amounts at the time or times indicated in this Agreement would be a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code. If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of such six-month period (or such earlier date upon which such amount can be paid under Section 409A without resulting in a prohibited distribution, including as a result of Executive's death), the Company shall pay

6

Executive a lump-sum amount equal to the cumulative amount that would have otherwise been payable to Executive during such period (without interest).

(c)    To the extent any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" to which Treasury Regulation Section 1.409A-3(i)(1)(iv) would apply, any such reimbursements or in-kind benefits shall be paid or reimbursed reasonably promptly, but in no event later than December 31st of the year following the year in which the expense was incurred.  The amount of any such payments eligible for reimbursement in one year shall not affect the payments or expenses that are eligible for payment or reimbursement in any other taxable year, and Executive's right to such payments or reimbursements of any such expenses shall not be subject to liquidation or exchange for any other benefit.

11.    <u>Breach</u>.  In the event Executive breaches Sections 2(a), 5 or 6 (including a breach of the Restrictive Covenants), any outstanding obligations of the Company to pay Consulting Fees and COBRA Payments shall immediately terminate.  Executive acknowledges and agrees that Executive's rights to receive the Severance is conditioned on continued compliance with the Restrictive Covenants and Sections 2(a) and 6.

12.    <u>Governing Law</u>.  This Agreement shall be construed under the laws of the State of California, both procedural and substantive.

13.    <u>Waiver</u>.  The failure to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of any party to enforce this Agreement.

14.    <u>Headings</u>.  The headings in this Agreement are provided solely for convenience, and are not intended to be part of, nor to affect or alter the interpretation or meaning of, this Agreement.

15.    <u>Severability</u>.  If any sentence, phrase, section, subsection or portion of this Agreement is found to be illegal or unenforceable, such action shall not affect the validity or enforceability of the remaining sentences, phrases, sections, subsections or portions of this Agreement, which shall remain fully valid and enforceable.

16.    <u>Assignment</u>.  This Agreement is personal to Executive and shall not be assignable by Executive.  The rights of the Company under this Agreement may be assigned by the Company, in its sole discretion, including to any of its affiliates or any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly, acquires all or substantially all of the assets or business of the Company.  This Agreement shall inure to the benefit of, and be binding on, the Company and its successors and assigns.

17.    <u>Ambiguities</u>.  Both parties have participated in the negotiation of this Agreement and, thus, it is understood and agreed that the general rule that ambiguities are to be construed against the drafter shall not apply to this Agreement.  In the event that any language of this Agreement is found to be ambiguous, each party shall have an opportunity to present evidence as to the actual intent of the parties with respect to any such ambiguous language.

18.    <u>Entire Agreement / Amendments</u>.  This Agreement, that certain Fourth Amended and Restated Voting Agreement, dated as of September 14, 2021 as amended effective October 12, 2022, by and among the Company and certain other parties as described therein and the documents referred to herein constitute the entire agreement between Executive and the Company concerning the subject matter hereof.  No covenants, agreements, representations, or warranties of any kind, other than those set forth

7

herein, have been made to any party hereto with respect to this Agreement. All prior discussions and negotiations have been and are merged and integrated into, and are superseded by, this Agreement, including, but not limited to, the Employment Agreement (except as expressly provided herein with respect to Sections 7 - 11 of the Employment Agreement, as amended by Section 5 herein). Notwithstanding the foregoing, Executive shall continue to be entitled to Executive's vested benefits and all right related thereto, rights as a shareholder, and indemnification rights (including but not limited to rights under that certain Indemnification Agreement by and between the Company and Executive, dated June 11, 2021). No amendments to this Agreement will be valid unless written and signed by Executive and an authorized representative of the Company.

19.    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

20.    Consultation with Counsel. Executive acknowledges (i) that Executive has thoroughly read and considered all aspects of this Agreement, that Executive understands all its provisions and that Executive is voluntarily entering into this Agreement, (ii) that he has been represented by, or had the opportunity to be represented by independent counsel of his own choice in connection with the negotiation and execution of this Agreement and has been advised to do so by the Company, and (iii) that he has read and understands the Agreement, is fully aware of its legal effect, and has entered into it freely based on his own judgment. Without limiting the generality of the foregoing, Executive acknowledges that he has had the opportunity to consult with his own independent tax advisors with respect to the tax consequences to him of this Agreement, and that he is relying solely on the advice of his independent advisors for such purposes. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. The Company agrees that it shall reimburse Executive for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement, subject to Executive's delivery to the Company of documentation evidencing such fees within 60 days after the Effective Date.

21.    Notices. All notices, requests and other communications hereunder shall be in writing and shall be delivered by courier or other means of personal service (including by means of a nationally recognized courier service or professional messenger service), or sent by email or facsimile and also mailed first class, postage prepaid, by certified mail, return receipt requested, in all cases addressed to:

If to Executive:

At Executive's last known address evidenced on the Company's payroll records.

If to the Company:

Aspiration Partners, Inc.
4551 Glencoe Ave.
Suite 300
Marina del Rey, CA 90292
Attention: Legal Department

All notices, requests and other communications shall be deemed given on the date of actual receipt or delivery as evidenced by written receipt, acknowledgement or other evidence of actual receipt or delivery to the address. In case of service by telecopy, a copy of such notice shall be personally delivered or sent by registered or certified mail, in the manner set forth above, within three business days thereafter. Any party hereto may from time to time by notice in writing served as set forth above designate a different

8

address or a different or additional person to which all such notices or communications thereafter are to be given.

*[Signature page follows]*

9

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

DocuSigned by:

*Andrei Cherny*

157C23F4275F4C5...

_____

Andrei Cherny


_____

Aspiration Partners, Inc.
Name:  Nate Redmond
Title:  Chairperson of the Board of Directors

10

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name on its behalf, all as of the day and year set forth above.

_____

Andrei Cherny

DocuSigned by:

*Nate Redmond*

D87378D0F896426...

_____

Aspiration Partners, Inc.

Name:  Nate Redmond

Title:  Chairperson of the Board of Directors

**EXHIBIT A**
**GENERAL RELEASE**

1.    <u>Release</u>. For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned does hereby release and forever discharge the "***Releasees***" hereunder, consisting of Aspiration Partners, Inc. (the "***Company***"), and the Company's affiliated, related, parent and subsidiary corporations, as well as their respective past and present parents, subsidiaries, associates, affiliates, successors, heirs, assigns, agents, directors, officers, employees, representatives, lawyers, insurers, and all persons acting by, through, under or in concert with them or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the undersigned now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.  The Claims released herein include, without limiting the generality of the foregoing, any Claims in any way arising out of, based upon, or related to the employment, the terms and conditions of employment or termination of employment of the undersigned by the Releasees, or any of them (including, but not limited to, any alleged discrimination, harassment or retaliation); any alleged breach of any express or implied contract of employment; any alleged torts, or other alleged legal restrictions on Releasees' right to terminate the employment of the undersigned; any alleged wrongful discharge, whistleblowing, detrimental reliance, defamation, slander, libel, intentional and negligent emotional distress or compensatory and/or punitive damages; common law, including but not limited to any alleged wrongful or retaliatory discharge in violation of public policy, breach of the covenant of good faith and fair dealing, interference with contractual relations or prospective business advantage, invasion of privacy, false imprisonment, and/or fraud; rights to attorneys' fees, costs, disbursements and/or the like; and any alleged violation of any federal, state or local statute or ordinance including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, Sections 1981 through 1988 of Title 42 of the United States Code, the National Labor Relations Act, the Employee Retirement Income Security Act, all claims under the Family and Medical Leave Act and Worker Adjustment and Retraining Notification Act, and all other federal, state and local leave and/or WARN laws; and any federal, state or local laws of similar effect.

2.    <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the undersigned (i) to payments or benefits under Section 1(c) of the Transition and Employment Separation Agreement, dated October 12, 2022, between the Company and the undersigned, with respect to the payments and benefits provided in exchange for this Release, (ii) to payments or benefits under any equity award agreement between the undersigned and the Company, (iii) to accrued or vested benefits the undersigned may have, if any, as of the date hereof under any applicable plan, policy, practice, program, contract or agreement with the Company, (iv) to any Claims, including claims for indemnification and/or advancement of expenses arising under any indemnification agreement between the undersigned and the Company or under the bylaws, certificate of incorporation or other similar governing document of the Company, (v) to any Claims which cannot be waived by an employee under applicable law, or (vi) with respect to the undersigned's right to communicate directly with, cooperate with, or provide information to, any federal, state or local government regulator.

THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR

HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE UNDERSIGNED, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS HE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.    <u>Exceptions</u>.  Notwithstanding anything in this Release to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Release shall prohibit the undersigned from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation and/or (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to, any federal, state or local government regulator (including, but not limited to, the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, or the U.S. Department of Justice) for the purpose of reporting or investigating a suspected violation of law, or from providing such information to the undersigned's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding; (B) pursuant to 18 USC Section 1833(b), the undersigned acknowledges that (1) the undersigned will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Release is intended to or shall preclude the undersigned from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if the undersigned is required to provide testimony, then unless otherwise directed or requested by a governmental agency or law enforcement, the undersigned shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Release prevents the undersigned from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

4.    <u>Representations</u>.  The undersigned represents and warrants that there has been no assignment or other transfer of any interest in any Claim which the undersigned may have against Releasees, or any of them, and the undersigned agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the undersigned under this indemnity.  The undersigned further represents and warrants that as of the date of this Release, he is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

5.    <u>No Action</u>.  The undersigned agrees that if the undersigned hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the undersigned agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

A-2

6.      No Admission.  The undersigned further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the undersigned.

7.      OWBPA.  The undersigned agrees and acknowledges that this Release constitutes a knowing and voluntary waiver and release of all Claims the undersigned has or may have against the Company and/or any of the other Releasees as set forth herein, including, but not limited to, all Claims arising under the Older Worker's Benefit Protection Act and the Age Discrimination in Employment Act. In accordance with the Older Worker's Benefit Protection Act, the undersigned is hereby advised as follows:

(i)      the undersigned has read the terms of this Release, and understands its terms and effects, including the fact that the undersigned agreed to release and forever discharge the Company and each of the Releasees, from any Claims released in this Release;

(ii)     the undersigned understands that, by entering into this Release, the undersigned does not waive any Claims that may arise after the date of the undersigned's execution of this Release, including without limitation any rights or claims that the undersigned may have to secure enforcement of the terms and conditions of this Release;

(iii)    the undersigned has signed this Release voluntarily and knowingly in exchange for the consideration described in this Release, which the undersigned acknowledges is adequate and satisfactory to the undersigned and which the undersigned acknowledges is in addition to any other benefits to which the undersigned is otherwise entitled;

(iv)     the Company advised the undersigned to consult with an attorney prior to executing this Release;

(v)      the undersigned has been given at least 21 days in which to review and consider this Release.  To the extent that the undersigned chooses to sign this Release prior to the expiration of such period, the undersigned acknowledges that the undersigned has done so voluntarily, had sufficient time to consider the Release, to consult with counsel and that the undersigned does not desire additional time and hereby waives the remainder of the 21-day period; and

(vi)     the undersigned may revoke this Release within seven days from the date the undersigned signs this Release and this Release will become effective upon the expiration of that revocation period.  If the undersigned revokes this Release during such seven-day period, this Release will be null and void and of no force or effect on either the Company or the undersigned and the undersigned will not be entitled to any of the payments or benefits, or the Company Release, each of which is expressly conditioned upon the execution and non-revocation of this Release.  Any revocation must be in writing and sent to Cecilia Saez, at csaez@aspiration.com, on or before 11:59 p.m. PT on the seventh day after this Release is executed by the undersigned.

8.      Governing Law. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

A-3

IN WITNESS WHEREOF, the undersigned has executed this Release this _____ day of _____, 20___.

_____
Andrei Cherny

A-4

**EXHIBIT B**
**COMPANY RELEASE**

1.    <u>Release</u>. In exchange for the consideration set forth in that certain Transition and Employment Separation Agreement, dated October 12, 2022, between Aspiration Partners, Inc., a Delaware corporation (the "***Company***") and Andrei Cherny (the "***Executive***"), the receipt and adequacy of which are hereby acknowledged, the Company does hereby release and forever discharge the "***Releasees***" hereunder, consisting of the Executive and his heirs and assigns of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the Company and its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them, now have or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.   The Company has authority to release Claims on behalf of its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them.

2.    <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the Company or its subsidiaries to the Executive's fraud or breach of fiduciary duty (the "***Unreleased Claims***").

THE COMPANY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE COMPANY, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.    <u>Representations</u>.  The Company represents and warrants that there has been no assignment or other transfer of any interest in any Claim (other than any Unreleased Claim) which the Company may have against Releasees, or any of them, and the Company agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the Company under this indemnity.

4.    <u>No Action</u>.  The Company agrees that if the Company hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the Company agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

5.    <u>No Admission</u>.  The Company further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any

B-1

liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the Company.

6.       <u>Acknowledgement</u>.  The Company acknowledges that different or additional facts may be discovered in addition to what is now known or believed to be true by the Company with respect to the matters released in this Release, and the Company agrees that this Release shall be and remain in effect in all respects as a complete and final release of the matters released, notwithstanding any different or additional facts.

7.       <u>Governing Law</u>. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

* * * * *

B-2

IN WITNESS WHEREOF, the Company has executed this Release this _____ day of _____, 2022.

ASPIRATION PARTNERS, INC.

By: _____
Name:
Title:

**EXHIBIT C**
**STATEMENT**

Andrei has resigned from the Company.

The Company, the Company's Board members, major shareholders and officers (the "Company") will not publish or disseminate, directly or indirectly, any statements regarding Executive's separation being due to Executive's performance or misconduct. Insofar as the Company is asked to respond to a question regarding whether Mr. Cherny's departure was in any way related to performance or misconduct, the Company must respond that it was not.

# EXHIBIT B

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-310-712-6600
FACSIMILE: 1-310-712-8800
WWW.SULLCROM.COM

*1888 Century Park East*
*Los Angeles, California 90067-1725*

NEW YORK • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 13, 2022

<u>Via E-mail</u>

Andrew Sandler, Esq.,
Liana Prieto, Esq.,
      Mitchell Sandler,
            1120 20th Street, N.W.,
                  Suite 725,
                        Washington, D.C. 20036.

Re:    <u>Andrei Cherny</u>

Dear Mr. Sandler and Ms. Prieto:

We represent Joe Sanberg.  We understand you represent Andrei Cherny. Please treat this as notice that Mr. Cherny, and all persons who may have acted on behalf of Mr. Cherny, including your firm, should retain in anticipation of potential litigation all documents reflecting communications concerning Aspiration, Mr. Sanberg, and any entities associated with Mr. Sanberg, including but not limited to all documents constituting or reflecting such communications with Bloomberg, Laurel Communications, or other third parties.  This retention notice includes texts, emails, instant messages, voicemails and communications in any other form.

Sincerely,

Robert A. Sacks

cc:    Joe Sanberg
       Alison Ressler

# EXHIBIT C

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-310-712-6600
FACSIMILE: 1-310-712-8800
WWW.SULLCROM.COM

*1888 Century Park East*
*Los Angeles, California 90067-1725*

NEW YORK • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 14, 2022

<u>Via E-mail</u>

Andrew Sandler, Esq.,
Liana Prieto, Esq.,
    Mitchell Sandler,
        1120 20th Street, N.W.,
            Suite 725,
                Washington, D.C. 20036.

Re:     <u>Andrei Cherny</u>

Dear Mr. Sandler and Ms. Prieto:

Further to my letter of yesterday, as Mr. Sanberg evaluates his rights and claims against Mr. Cherny, please identify all communications that Mr. Cherney had with any Aspiration employee or outside party at any time following his execution of his Transition and Separation Agreement during which he discussed Aspiration, his departure from Aspiration or Mr. Sanberg, including communications with Sonali Basak at Bloomberg. For each such communication, identify the time, persons involved, and substance of what Mr. Cherny said. If Mr. Cherny denies that he or anyone acting on his behalf communicated with Sonali Basak, please provide an unequivocal statement to that effect.

Sincerely,

Robert A. Sacks

cc:     Joe Sanberg
        Alison Ressler

# EXHIBIT D



October 21, 2022

**VIA ELECTRONIC MAIL ONLY**

Michelle L.C. Carpenter
Latham & Watkins LLP
335 S. Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Michelle.Carpenter@lw.com

Nima J. Movahedi
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Nima.movahedi@lw.com

      RE:    Transition and Employment Separation Agreement

Dear Michelle and Nima:

The Transition and Employment Separation Agreement (the "Agreement") between Mr. Andrei Cherny and Aspiration Partners, Inc. (the "Company"), executed on October 12, 2022, requires that "no later than one business day following the expiration of the revocation period for Executive's Release, the Company shall execute a general release claims against Executive ***in the form attached hereto as Exhibit B***." The release delivered by the Company is unacceptable.

The release provided, as compared to the release form attached to the Agreement, releases claims "from the beginning of time to October 12, 2022," rather than "from the beginning of time to the date hereof." As noted in your email transmitting the Company's release, "they requested the company release claims as of the same date." We presume that "they" is the Board of Directors of the Company. Mr. Cherny did not consent to this change and the Company has no right to unilaterally modify the release or any other part of the Agreement. The time for negotiating the language of Exhibit B ended with the execution of the Agreement. The Company must execute and provide an unmodified Exhibit B.

Beyond the fact that our client is entitled to strict compliance with the terms of the Agreement, which includes a release "from the beginning of time to the date hereof," the unilateral modification in conjunction with the threatening letters sent by Mr. Sandberg's counsel suggest possible bad faith on the part of the Company. As we are sure you are aware, in the days after signing the Agreement, Mr. Cherny received the attached letters from Mr. Sandberg's counsel.

**MITCHELL SANDLER LLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

Ms. Carpenter and Mr. Movahedi
October 21, 2022
Page  2

Mr. Sandberg has made clear through his conduct that he intends to harass, threaten, and disparage Mr. Cherny, notwithstanding the execution of the Agreement.

Mr. Cherny demands that the Company provide the release in the form attached to the Agreement as Exhibit B before the end of the day. Failure to do so will constitute a breach of the agreement by the Company and Mr. Cherny reserves all rights with respect to that breach.

Additionally, we request a copy of the Board resolution evidencing extension of the exercise period for Mr. Cherny's options and confirmation that the extension has been recorded in Carta.

Very truly yours,

Liana R. Prieto

Encl.

# EXHIBIT E



October 27, 2022

**VIA ELECTRONIC MAIL ONLY**

Michelle L.C. Carpenter
Latham & Watkins LLP
335 S. Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Michelle.Carpenter@lw.com

Nima J. Movahedi
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Nima.movahedi@lw.com

     RE:    Breach of Agreements with Mr. Cherny

Dear Ms. Carpenter and Mr. Movahedi:

On October 21, 2022, we sent a letter to you regarding the breach of the Transition and Employment Separation Agreement (the "Transition Agreement") between Mr. Andrei Cherny and Aspiration Partners, Inc. (the "Company") by the Company. As detailed in that letter, the Company's unilateral modification of the release after the Transition Agreement's execution is impermissible. In our letter we demanded that the Company execute the release in the form attached to the Transition Agreement as Exhibit B. We also requested that the Company provide a copy of the Board resolution evidencing extension of the exercise period for Mr. Cherny's options and confirmation that the extension has been recorded in Carta. As of the date of this letter, we have not received a release in the required form executed by the Company, evidence Board action extending Mr. Cherny's exercise period, or any substantive response to our letter.

In the meanwhile, the Company has also breached the Fourth Amended and Restated Voting Agreement, as amended (the "Voting Agreement"). Pursuant to Section 1.2(c) of the Voting Agreement, Mr. Cherny has the right to designate the Common Director "subject to the reasonable approval of the then serving Chairperson of the Board." On October 14, 2022, Mr. Cherny designated Mr. Todd Baker to serve as the Common Director pursuant to Section 1.2(c) of the Voting Agreement. Mr. Baker has decades of experience working at the intersection of technology and financial services. He has worked as a Chief Strategy and Development Officer at three large financial institutions, law firm partner, consultant, academic, researcher, speaker, and commentator. Mr. Baker is more than qualified to fulfill the obligations of a director of the Company given the Company's value, industry, and reputation. Mr. Baker spoke with the Chair

**MITCHELL SANDLER LLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

Ms. Carpenter and Mr. Movahedi
October 27, 2022
Page 2

of the Board, Mr. Nate Redmond, on October 18, 2022. Nevertheless, 13 days after his designation by Mr. Cherny, Mr. Baker has yet to be appointed to the Board.

Prior to Mr. Cherny signing the Transition Agreement and agreeing to amend the Voting Rights Agreement, Mr. Redmond and Mr. Movahedi repeatedly assured Mr. Cherny that Mr. Redmond would exercise his power of "reasonable approval" in good faith and that, provided the designee was neither Mr. Cherny himself or what they termed a "Trojan Horse" designed to frustrate the smooth operations of the Board, the designee would be acceptable. Mr. Cherny relied on that promise in his decision to sign the agreements. Given Mr. Baker's experience and background, there is no basis for Mr. Redmond to withhold approval of Mr. Baker. The Company's refusal to appoint Mr. Baker is in violation of Mr. Cherny's shareholder rights and the Voting Agreement. As a result of the Company excluding Mr. Cherny from Board meetings and communications prior to his separation from the Company, the Common Director seat has been effectively vacant since September - and formally vacant since October 13th. Mr. Cherny and all shareholders, including the common shareholders, are being irreparably harmed by the lack of representation on the Board and exclusion from the Board's deliberative process during this crucial time for the Company. Mr. Cherny demands that, by October 28, 2022, Mr. Redmond grant his approval to the designation of Mr. Baker to the Board and that Mr. Baker then be immediately seated on the Board. Be further advised that we reserve our rights to challenge any actions taken by the Board during this period of illegal exclusion of the Common Director.

The Company could resolve the issues raised in this letter by simply complying with its obligations under both the Transition Agreement and the Voting Agreement. In the event that these actions are not resolved expeditiously, further legal action will be taken.

Very sincerely yours,

Liana R. Prieto

# EXHIBIT F



November 8, 2022

**VIA ELECTRONIC MAIL ONLY**

Nima J. Movahedi
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Nima.movahedi@lw.com

      RE:    Breach of Agreements with Mr. Cherny

Dear Mr. Movahedi:

On October 21, 2022, we sent a letter to you regarding the breach of the Transition and Employment Separation Agreement (the "Transition Agreement") between Mr. Andrei Cherny and Aspiration Partners, Inc. (the "Company") by the Company related to the Company's unilateral alteration of the release language and refusal, after numerous requests, to provide confirmation of compliance with Section 1(d). On October 27, 2022, we sent a letter regarding the breach of the Fourth Amended and Restated Voting Agreement, as amended (the "Voting Agreement"), due to Mr. Nate Redmond's unreasonable refusal to approve Mr. Cherny's designee to the Board of Directors. In the weeks since, Mr. Cherny has personally reached out to Mr. Redmond to implore him to address these issues without the need to resort to legal action and to ask that the Company live up to its agreements. To date, we have not received a substantive response to any of our communications.

Unfortunately, we have reached the point where the Company's breaches of the Transition Agreement and the Voting Agreement cannot continue unaddressed. Mr. Cherny will have no option but to pursue appropriate remedies including, but not limited to, seeking an order for specific performance of the Voting Agreement in Delaware state court through the immediate appointment of Mr. Todd Baker to the Company's Board of Directors as the Common Director.

Furthermore, Mr. Cherny may also seek to set aside any actions taken by the Board during the time of illegal exclusion of the Common Director from the Board. The Board's exclusion of the Common Director constitutes a breach of duty, a failure to act in good faith, and intentional misconduct, all of which create personal liability for the Company's directors. As such, we request that a copy of this letter be provided to each of the directors to make them aware of their potential individual liability. We will also be sharing a copy of this letter with the Board Observers of the Company given their information rights.

**MITCHELL SANDLER LLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

Mr. Movahedi
November 8, 2022
Page 2

As you know, Board Chair Redmond demanded Mr. Cherny resign from the Board of the Company he co-founded and ran for nearly a decade during the negotiation of the Transition Agreement so as to create an opportunity for less contentious Board relations. Mr. Cherny had and has rights and duties under the Voting Agreement to represent the common shareholders on the Board, rights that are in no way connected to his service as Chief Executive Officer. Mr. Cherny has the right under the Voting Agreement to designate a director of his choosing for the Common Director seat. During the negotiations, the Company proposed language to insert a right for the Board Chair to reasonably approve Mr. Cherny's designee. You and Mr. Redmond repeatedly assured Mr. Cherny that Mr. Redmond would exercise his power of "reasonable approval" in good faith. Mr. Redmond represented that provided the designee was neither Mr. Cherny himself nor what Mr. Redmond termed a "Trojan Horse" designed to frustrate the smooth operations of the Board, any qualified designee would be accepted. Mr. Cherny relied on Mr. Redmond's representations in his decision to resign from the Board and sign the agreements.

On October 14, 2022, Mr. Cherny designated Mr. Todd Baker to serve as the Common Director pursuant to Section 1.2(c) of the Voting Agreement. Mr. Baker has decades of experience working at the intersection of technology and financial services. He has worked as a Chief Strategy and Development Officer at three large financial institutions, major law firm partner, consultant, academic, researcher, speaker, and commentator. Mr. Baker is more than qualified to fulfill the obligations of a director of the Company. However, for nearly four weeks, Mr. Redmond has refused to approve Mr. Baker's designation. Since that time, one additional hurdle after another has been introduced, in a slow motion "process" that is nothing more than a transparent, bad faith attempt to deny the common shareholders representation on the Board during a critical time for the Company. That the Board has gone through so much trouble and created this much legal risk for the Company to frustrate Mr. Cherney's designation allows, in our opinion, for no other conclusion than that this is designed to prevent addressing critical finance and accounting questions previously raised by past officers of the Company. It cannot be permitted.

Mr. Cherny also wishes to put the Company on notice that he is considering initiation of an arbitration proceedings based on the Company's multiple breaches of the Transition Agreement if these breaches are not promptly addressed. These include the attempt to unilaterally change the terms of the Company's release, refusal to confirm the extension of Mr. Cherny's options, and shutting off Mr. Cherny's access to his computer.

We wish to be clear that Mr. Cherny has waited as long as possible to pursue such remedies because he is committed to supporting the continued success of Aspiration. There is no reason that Mr. Cherny and the Company should be at odds. All he is asking is for the Company to live up to the simple steps in the agreements it has made. It is time for the Company to take these actions as required under both the Transition Agreement and the Voting Agreement. Specifically, Mr. Cherny demands that the Company:

Mr. Movahedi
November 8, 2022
Page 3

- Appoint Mr. Baker to the Board of Directors;
- Execute the release in the form attached to the Transition Agreement as Exhibit B;
- Provide documentary confirmation of the extension of the exercise period for Mr. Cherny's options as provided for in Section 1(d) of the Transition Agreement; and,
- Reinstate Mr. Cherny's Company laptop and email address as required by Section 2(d) of the Transition Agreement.

The Company's failure to comply with its agreements despite numerous entreaties that it do so leaves Mr. Cherny with no real option but to pursue his available remedies, including those outlined above, to enforce the agreements and his rights thereunder.

Very sincerely yours,

Liana R. Prieto

cc:    Brian Laibow (blaibow@oaktreecapital.com)
Dan Carroll (Dan@inherentgroup.com)
Charles Tollinche (ctollinche@dnscap.com)
Frank Yeary (frank@darwincapitalgroup.com)
Joe Chen (joe.chen@renren-inc.com)
Mark Klein (mklein@surocap.com)

# EXHIBIT G

## MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.*
TERRY E. SANCHEZ
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. M°DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.*
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
KYLE W. MACH
HEATHER E. TAKAHASHI

ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.*
GINGER D. ANDERS P.C.*
MARGARET G. MARASCHINO
ADAM B. GILDERSLEEVE
ADAM B. WEISS
KELLY L. C. HIRES
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS*
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL
VICTORIA A. DEGTYAREVA
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
JOHN B. MAJOR
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
STEPHANIE G. HERRERA
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ANNE K. CONLEY

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

—————

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

—————

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

DAVID W. MORESHEAD
ANDRE W. BREWSTER III
ROWLEY J. RICE
DAHLIA MIGNOUNA*
BRANDON R. TEACHOUT
USHA CHILUKURI VANCE
ALEXANDER S. GORIN
ZARA BARI
BRENDAN B. GANTS*
LAUREN E. ROSS*
BENJAMIN O. BAROKH
ABE DYK
MICHELE C. NIELSEN
APRIL YOUPEE-ROLL
MEGAN MCCREADIE
STEPHEN HYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU*
NATALIE KARL
BRANDON MARTINEZ
ERINMA E. MAN
CARRIE C. LITTEN
RUBY J. GARRETT*
JAMES R. SALZMANN
SAMIR MALAWI
ROBIN S. GRAY
MICA L. MOORE
JOSEPH MOSES
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
OLIVER BROWN
PAUL E. MARTIN
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI RELMAN OVED
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK
CALEB W. PEFFER
GREGORY T.S. BISCHOPING*
SHANE B. LUGURI
STEVEN B. R. LEVICK
SARA H. WORTH
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER

ROSIO FLORES
JESSICA O. LAIRD
ERICA C. TOOCH
EVELYN DANFORTH-SCOTT
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MIRANDA E. REHAUT
TIANA S. BAHERI
STEPHANY REAVES*
LAUREN E. KUHN
MINKEE K. SOHN
GARRETT SOLBERG
TED KANG
ADAM W. KWON
JOSEPH N. GLYNN

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM R. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE
FAYE PAUL TELLER
BOBBY MALHOTRA

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN D.C.
ALL OTHERS ADMITTED IN CA

Writer's Direct Contact
(213) 683-9540
(213) 683-4040 FAX
robert.dellangelo@mto.com

November 9, 2022

**VIA E-MAIL**

Liana R. Prieto, Esq.
Mitchell Sandler LLC
1120 20th Street, NW, Suite 725
Washington, DC 20036
lprieto@mitchellsandler.com

Re:    Consideration of Mr. Cherny's Board Designee

Dear Ms. Prieto:

I write on behalf of the Board of Directors of Aspiration Partners, Inc. ("Aspiration") in response to your November 8, 2022 letter on behalf of Andrei Cherny.

Mr. Cherny's assertions that Aspiration has breached agreements with him are baseless, and his continued antagonism after resigning as Aspiration's CEO disserves Aspiration's interests. If, as he claims, Mr. Cherny "is committed to supporting the continued success of Aspiration," he should honor the agreements that he signed and allow his designee to the Board to be considered and seated in accordance with the agreed-upon and customary process.

### **Reasonable Approval of Mr. Cherny's Board Designee**

Mr. Cherny claims that Aspiration breached the Fourth Amended and Restated Voting Agreement, as last amended on October 12, 2022 ("Voting Agreement"), because his Board designee was not seated with instantaneous effect. But the Voting Agreement does not entitle Mr. Cherny to cause his designee to become a director immediately. Section 1.2(c) provides that Mr. Cherny may designate an individual, "which designated individual shall until October 12, 2024 be subject to the reasonable approval of the then serving Chairperson of the Board." Mr. Cherny's efforts to short-circuit the "reasonable approval" required by Section 1.2(c) are improper.

MUNGER, TOLLES & OLSON LLP

Liana R. Prieto, Esq.
November 9, 2022
Page 2

On Friday, October 14, 2022, Mr. Cherny identified Todd Baker as his designee under Section 1.2(c).  In doing so, he acknowledged "the right next step" would be to connect Mr. Baker and the Chairperson, Mr. Redmond.  Mr. Redmond responded to Mr. Cherny the same day, stating that he "would be happy to meet with Todd."  That night, however, Mr. Cherny seemed to cast Section 1.2(c) aside, calling it "flabbergasting" that Mr. Redmond would want to speak with Mr. Baker; referring to "my appointment of Todd to the seat, which I had expected would take place today"; and insisting that the seat cannot "be treated as if it were empty despite having designated Todd."  Mr. Redmond replied on Saturday, October 15, reiterating that he was "looking forward to meeting Todd."  Mr. Cherny then wrote:  "I expect that Todd is on the Board and has been since 9:26am PT on Friday."

Far from refusing to grant reasonable approval of Mr. Cherny's designee, Mr. Redmond has discussed this matter with Mr. Cherny repeatedly by email, phone, and text, and has explained that the required "reasonable approval" process would occur.  It is customary for a potential new director to meet with key stakeholders, including other directors and a company's chief executive officer.  (As Mr. Cherny knows, Mr. Jealous participated in similar meetings before he joined Aspiration's Board.)  The purpose is to assess a potential director's qualifications as well as whether he or she will be able to develop productive working relationships for the good of the company.  Mr. Cherny has not disagreed that such steps are typical and appropriate.  Neither does your letter, which claims only that "hurdles" are making the process too "slow."  Yet it is Mr. Cherny's own disruptive conduct in recent weeks that has made it all the more important to ensure that his designee can work constructively with his or her fellow directors and management.

The "reasonable approval" process is continuing.  For example, we understand that on November 4, Mr. Cherny's designee met with Mr. AlHusseini, a current director.  We also understand that at that meeting, Mr. Baker expressed possible reluctance about joining the Board.  Nonetheless, the Chairperson requests that Mr. Baker (or if Mr. Baker has withdrawn, another designee) complete the enclosed customary director questionnaire.  Once the questionnaire is returned, final meetings have occurred, and any other relevant requested information is obtained, Mr. Cherny's designee will be considered promptly and if appropriate, approved.

Your letter's suggestion that Board action taken before Mr. Baker is seated is invalid is incorrect, as it rests on Mr. Cherny's unsupported theory of instantaneous effect, that is, that Mr. Baker "is on the Board and has been since 9:26am PT on" October 14.

Finally, although your letter refers to purported statements by Mr. Redmond before the Voting Agreement was amended on October 12, 2022, Section 7.11 of the Voting Agreement provides that the written agreements "constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled."  In any event, stating that any "qualified designee" who would not "frustrate the smooth operations of the Board" would be approved is fully consistent with the "reasonable approval" process to which Mr. Cherny agreed but now apparently objects.

MUNGER, TOLLES & OLSON LLP

Liana R. Prieto, Esq.
November 9, 2022
Page 3

### **Other Issues Raised by Mr. Cherny**

Mr. Cherny's assertions about purported breaches by Aspiration of his Transition and Employment Separation Agreement ("Separation Agreement") are baseless as well.

As to the release, no provision of the Separation Agreement states that the time periods covered by Mr. Cherny's release and Aspiration's release would not be coterminous, as is typical when mutual releases are given. Mr. Cherny's efforts now to secure a more extensive release by Aspiration, perhaps reflecting concern about potential liability for his conduct during the week after resigning, are meritless. In any event, even if Aspiration had released claims through October 20, 2022 (rather than through October 12, 2022, as Mr. Cherny did), Aspiration would not be bound to extend the exercise period for Mr. Cherny's options under Section 1(d) of the Separation Agreement if the conditions for such extension—including "continued compliance with the Restrictive Covenants and Section 6" of the Separation Agreement—were not met.

Relatedly, Mr. Cherny's request for "documentary confirmation of the extension of the exercise period" misreads Section 1(d). The Board approved and ratified Aspiration's entry into the Separation Agreement, including Section 1(d), so that provision currently is in effect in accordance with its terms. If Mr. Cherny attempts to exercise the options, the extent to which the options are "exercisable" will be determined pursuant to (and subject to) Section 1(d), including the "continued compliance" condition.

As to Mr. Cherny's "Company laptop and email address," Mr. Cherny is no longer an officer, director, or employee of Aspiration. He is a consultant, with rights defined by the Separation Agreement. Section 2(d) of the Separation Agreement, to which your letter refers, does not grant him unrestricted rights to any Company property or email. On the contrary, it specifies what Mr. Cherny "may retain": his "telephone and address book"; his "own personnel, payroll and benefit documents"; and any property or information "reasonably necessary to provide the Services." It likewise specifies that any retention and use of a "Company issued computer" or "Company email and email address" would be "for use in [his] capacity as a Board member or to provide Services." Mr. Cherny is not a Board member, and as to providing Services, Aspiration determines what Services to request and therefore what Mr. Cherny needs to provide them.

* * *

The Board encourages Mr. Baker (or any other designee of Mr. Cherny) to complete the director questionnaire promptly and to continue to meet with key stakeholders, so that the "reasonable approval" process can conclude and a designee can be seated.

Very truly yours,

*/s/ Robert L. Dell Angelo*

Robert L. Dell Angelo

Encl.

MUNGER, TOLLES & OLSON LLP

Liana R. Prieto, Esq.
November 9, 2022
Page 4


cc:     Nate Redmond

# EXHIBIT H

**GENERAL RELEASE**

1.  <u>Release</u>. For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned does hereby release and forever discharge the "***Releasees***" hereunder, consisting of Aspiration Partners, Inc. (the "***Company***"), and the Company's affiliated, related, parent and subsidiary corporations, as well as their respective past and present parents, subsidiaries, associates, affiliates, successors, heirs, assigns, agents, directors, officers, employees, representatives, lawyers, insurers, and all persons acting by, through, under or in concert with them or any of them, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the undersigned now has or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof.  The Claims released herein include, without limiting the generality of the foregoing, any Claims in any way arising out of, based upon, or related to the employment, the terms and conditions of employment or termination of employment of the undersigned by the Releasees, or any of them (including, but not limited to, any alleged discrimination, harassment or retaliation); any alleged breach of any express or implied contract of employment; any alleged torts, or other alleged legal restrictions on Releasees' right to terminate the employment of the undersigned; any alleged wrongful discharge, whistleblowing, detrimental reliance, defamation, slander, libel, intentional and negligent emotional distress or compensatory and/or punitive damages; common law, including but not limited to any alleged wrongful or retaliatory discharge in violation of public policy, breach of the covenant of good faith and fair dealing, interference with contractual relations or prospective business advantage, invasion of privacy, false imprisonment, and/or fraud; rights to attorneys' fees, costs, disbursements and/or the like; and any alleged violation of any federal, state or local statute or ordinance including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, Sections 1981 through 1988 of Title 42 of the United States Code, the National Labor Relations Act, the Employee Retirement Income Security Act, all claims under the Family and Medical Leave Act and Worker Adjustment and Retraining Notification Act, and all other federal, state and local leave and/or WARN laws; and any federal, state or local laws of similar effect.

2.  <u>Claims Not Released</u>.  Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the undersigned (i) to payments or benefits under Section 1(c) of the Transition and Employment Separation Agreement, dated October 12, 2022, between the Company and the undersigned, with respect to the payments and benefits provided in exchange for this Release, (ii) to payments or benefits under any equity award agreement between the undersigned and the Company, (iii) to accrued or vested benefits the undersigned may have, if any, as of the date hereof under any applicable plan, policy, practice, program, contract or agreement with the Company, (iv) to any Claims, including claims for indemnification and/or advancement of expenses arising under any indemnification agreement between the undersigned and the Company or under the bylaws, certificate of incorporation or other similar governing document of the Company, (v) to any Claims which cannot be waived by an employee under applicable law, or (vi) with respect to the undersigned's right to communicate directly with, cooperate with, or provide information to, any federal, state or local government regulator.

THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF

A-1

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE UNDERSIGNED, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS HE MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3.    Exceptions.  Notwithstanding anything in this Release to the contrary, and solely to the extent required by applicable law, (A) nothing contained in this Release shall prohibit the undersigned from (i) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation and/or (ii) communicating directly with, cooperating with, or providing information (including trade secrets) in confidence to, any federal, state or local government regulator (including, but not limited to, the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, or the U.S. Department of Justice) for the purpose of reporting or investigating a suspected violation of law, or from providing such information to the undersigned's attorney or in a sealed complaint or other document filed in a lawsuit or other governmental proceeding; (B) pursuant to 18 USC Section 1833(b), the undersigned acknowledges that (1) the undersigned will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (y) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; (C) nothing in this Release is intended to or shall preclude the undersigned from providing truthful testimony in response to a valid subpoena, court order, regulatory request or other judicial, administrative or legal process or otherwise as required by law; and, if the undersigned is required to provide testimony, then unless otherwise directed or requested by a governmental agency or law enforcement, the undersigned shall notify the Company in writing as promptly as practicable after receiving any such request of the anticipated testimony and at least ten (10) days prior to providing such testimony (or, if such notice is not possible under the circumstances, with as much prior notice as is possible) to afford the Company a reasonable opportunity to challenge the subpoena, court order or similar legal process; and (D) nothing in this Release prevents the undersigned from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the undersigned has reason to believe is unlawful.

4.    Representations.  The undersigned represents and warrants that there has been no assignment or other transfer of any interest in any Claim which the undersigned may have against Releasees, or any of them, and the undersigned agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer.  It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the undersigned under this indemnity.  The undersigned further represents and warrants that as of the date of this Release, he is not aware of any violation of federal, state or local law by the Company or any officer or director of the Company.

5.    No Action.  The undersigned agrees that if the undersigned hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the undersigned agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

A-2

6.      No Admission.  The undersigned further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the undersigned.

7.      OWBPA.  The undersigned agrees and acknowledges that this Release constitutes a knowing and voluntary waiver and release of all Claims the undersigned has or may have against the Company and/or any of the other Releasees as set forth herein, including, but not limited to, all Claims arising under the Older Worker's Benefit Protection Act and the Age Discrimination in Employment Act. In accordance with the Older Worker's Benefit Protection Act, the undersigned is hereby advised as follows:

(i)      the undersigned has read the terms of this Release, and understands its terms and effects, including the fact that the undersigned agreed to release and forever discharge the Company and each of the Releasees, from any Claims released in this Release;

(ii)     the undersigned understands that, by entering into this Release, the undersigned does not waive any Claims that may arise after the date of the undersigned's execution of this Release, including without limitation any rights or claims that the undersigned may have to secure enforcement of the terms and conditions of this Release;

(iii)    the undersigned has signed this Release voluntarily and knowingly in exchange for the consideration described in this Release, which the undersigned acknowledges is adequate and satisfactory to the undersigned and which the undersigned acknowledges is in addition to any other benefits to which the undersigned is otherwise entitled;

(iv)     the Company advised the undersigned to consult with an attorney prior to executing this Release;

(v)      the undersigned has been given at least 21 days in which to review and consider this Release.  To the extent that the undersigned chooses to sign this Release prior to the expiration of such period, the undersigned acknowledges that the undersigned has done so voluntarily, had sufficient time to consider the Release, to consult with counsel and that the undersigned does not desire additional time and hereby waives the remainder of the 21-day period; and

(vi)     the undersigned may revoke this Release within seven days from the date the undersigned signs this Release and this Release will become effective upon the expiration of that revocation period.  If the undersigned revokes this Release during such seven-day period, this Release will be null and void and of no force or effect on either the Company or the undersigned and the undersigned will not be entitled to any of the payments or benefits, or the Company Release, each of which is expressly conditioned upon the execution and non-revocation of this Release.  Any revocation must be in writing and sent to Cecilia Saez, at csaez@aspiration.com, on or before 11:59 p.m. PT on the seventh day after this Release is executed by the undersigned.

8.      Governing Law. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

A-3

IN WITNESS WHEREOF, the undersigned has executed this Release this 12th day of October, 2022.

DocuSigned by:

*Andrei Cherny*

157C23F4275F4C5...

Andrei Cherny

# EXHIBIT I

# COMPANY RELEASE

1. <u>Release</u>. In exchange for the consideration set forth in that certain Transition and Employment Separation Agreement (the "***Separation Agreement***"), dated October 12, 2022, between Aspiration Partners, Inc., a Delaware corporation (the "***Company***") and Andrei Cherny (the "***Executive***"), the receipt and adequacy of which are hereby acknowledged, the Company does hereby release and forever discharge the "***Releasees***" hereunder, consisting of the Executive and his heirs and assigns of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent (hereinafter called "***Claims***"), which the Company and its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them, now have or may hereafter have against the Releasees, or any of them, by reason of any matter, cause, or thing whatsoever from the beginning of time to October 12, 2022. The Company has authority to release Claims on behalf of its partners, subsidiaries, successors, directors, officers, employees, lawyers, insurers, or any of them.

2. <u>Claims Not Released</u>. Notwithstanding the foregoing, this general release (the "***Release***") shall not operate to release any rights or claims of the Company or its subsidiaries to the Executive's fraud or breach of fiduciary duty or any claim for breach of the Separation Agreement (the "***Unreleased Claims***").

THE COMPANY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

THE COMPANY, BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

3. <u>Representations</u>. The Company represents and warrants that there has been no assignment or other transfer of any interest in any Claim (other than any Unreleased Claim) which the Company may have against Releasees, or any of them, and the Company agrees to indemnify and hold Releasees, and each of them, harmless from any liability, Claims, demands, damages, costs, expenses and attorneys' fees incurred by Releasees, or any of them, as the result of any such assignment or transfer or any rights or Claims under any such assignment or transfer. It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the Releasees against the Company under this indemnity.

4. <u>No Action</u>. The Company agrees that if the Company hereafter commences any suit arising out of, based upon, or relating to any of the Claims released hereunder or in any manner asserts against Releasees, or any of them, any of the Claims released hereunder, then the Company agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim.

5. <u>No Admission</u>. The Company further understands and agrees that neither the payment of any sum of money nor the execution of this Release shall constitute or be construed as an admission of any

1

liability whatsoever by the Releasees, or any of them, who have consistently taken the position that they have no liability whatsoever to the Company.

6.    <u>Acknowledgement</u>. The Company acknowledges that different or additional facts may be discovered in addition to what is now known or believed to be true by the Company with respect to the matters released in this Release, and the Company agrees that this Release shall be and remain in effect in all respects as a complete and final release of the matters released, notwithstanding any different or additional facts.

7.    <u>Governing Law</u>. This Release is deemed made and entered into in the State of California, and in all respects shall be interpreted, enforced and governed under the internal laws of the State of California, to the extent not preempted by federal law.

* * * * *

2

IN WITNESS WHEREOF, the Company has executed this Release this 20th day of October, 2022.

ASPIRATION PARTNERS, INC.

By:

Name: Nate Redmond

Title: Chair of the board

# EXHIBIT F

## JAMS CASE REFERENCE NO. 5220002918

**Cherny, Andrei,**

     **Claimant(s),**

       **v.**

**Aspiration Partners, Inc.,**

     **Respondent(s).**

_____

### Ruling and Order on Rule 18 Motion Regarding Attorneys' Fees Issue

### The Demand

In his Demand, claimant (Cherny) seeks an Award in his favor and against Respondent Aspiration Partners, INC. (Aspiration) for an Order that:

1. Aspiration pay Cherny $25,000 per month consulting fees under section 2 of the Separation Agreement for the period October 12, 2022 through the present;

2. Aspiration provide Cherny with immediate access to his aspiration issued computer and email account;

3. Aspiration pay Cherny $10,000 to reimburse Cherny for legal fees incurred in connection with the negotiation and execution of the Separation Agreement;

4. Aspiration provide Cherny and his eligible dependents with continuing health insurance coverage;

5. Aspiration confirm in writing that Cherny's stock option awards remain valid and outstanding;

6. Aspiration pay Cherny pre-and post-award interest. The parties now agree on the amount of pre-award interest owed as of December 15, 2023. (See email correspondence of December 15, 2023 between counsel and **Exhibit A hereto** containing a spreadsheet in which the pre-award interest is set forth);

1

7. Aspiration pay Cherny all costs and attorneys' fees incurred in seeking enforcement of his rights under the Separation Agreement, including all costs and attorneys' fees for bringing the arbitration;

8. The arbitrator declare Aspiration is obligated to reimburse Cherny for certain arbitration filing fee costs.  The parties have now agreed that the amount owed for such costs is $50. (See December 15, 2023 email correspondence, and Exhibit A hereto.)

After the filing of the Demand the parties resolved most of the claims in the Demand except the claim that is the subject matter of this motion.  There is also still a dispute concerning the question whether certain computers in Cherny's possession should be returned to Aspiration. Those computers are identified in the December 15, 2023 email correspondence between the parties as (1) MacBook Pro 13-inch| SN: C02CW4UKML7J, and (2) MacBook Pro 13-inch|SN: C02T3MTRHF1P.

### The Rule 18 Motion and Governing Law

Pursuant to Rule 18 of the JAMS Employment Arbitration Rules and with the authorization of the Arbitrator (Report and Scheduling Order No.  2), Aspiration moved for Summary Disposition of Cherny's claim for attorneys' fees and costs in excess of $10,000. Demand paras. 26 through 28.

### Attorneys' Fees Provisions in the Separation Agreement and the Releases

The Separation Agreement (Agreement) contains 2 provisions regarding the recovery of attorneys' fees.  First, under **Section 20**, the Agreement provides: "The Company agrees that it shall reimburse Executive for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement, subject to Executive's delivery to the Company of documentation evidencing such fees within 60 days of the Effective Date."  The parties agree that this $10,000 has not yet been paid and that Cherny has submitted adequate documentation of the expenditure.  Aspiration has agreed to pay $10,000 in attorneys' fees for the negotiation and execution of the Separation Agreement.

The second attorneys' fee provision is contained in **Section 9 (d)** of the Agreement.  That

section controls recovery of attorneys' fees incurred in the arbitration.  It provides that:

>  "[t]he fees of the arbitrator and all other costs … unique to arbitration shall be paid by the Company initially, but if Executive initiates a claim subject to arbitration, Executive shall pay any filing fee up to the amount that Executive would be required to pay if Executive initiated such claim in the Court.  Each party *shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' Fees*….[.]  The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party *where authorized by applicable law."*  Emphasis added.

Two Releases are attached to the Agreement.  One Release is signed by Cherny and the other by Nate Redmond, Chair of the Board, on behalf of Aspiration.  There is no dispute as to the authenticity of the Agreement or the Releases.  Each of the Releases contains paragraphs describing the claims being released, the claims not being released, and a paragraph entitled "No Action."  (Para 5 in Cherny's Release and paragraph 4 in Aspiration's Release).   The "No Action" provision is substantively identical in each of the Releases.  It provides that:

> "The [signatory, i.e. Cherny or Aspiration] agrees that if the signatory hereafter commences any suit arising out of, based upon, or relating *to any of the claims **released** hereunder*, then the [signatory] agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim."  (Emphasis added.)

To rule on the issue presented, the arbitrator must interpret the Agreement read together with the Releases.  Section 12 of the Separation Agreement provides that the Agreement "shall be construed under the laws of the State of California.  Sections 7 and 8 of the Cherny and Aspiration Releases respectively also provide for the application of California law.

Under California law the mutual intention of the parties at the time the contract is formed governs interpretation (Civ. Code, section 1636.)  Such intent is to be inferred, if possible, solely from the written provisions of the contract (*Id*., section 1639.)  The clear and explicit meaning of the written provisions must be judicially interpreted in their ordinary and popular sense unless they are used by the parties in a technical manner or are given a special meaning by the parties (*Id*., Sections 1644 and 1638.)  Thus, if the meaning a layperson would ascribe to contractual

language is not ambiguous, the layperson's meaning must be applied. *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.  Civil Code section 1638 also provides: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

The language of the attorneys' fees provisions in paragraph 9 of the Separation Agreement is clear and explicit and does not involve an absurdity.   Cherny is entitled to reimbursement for $10,000 for the "negotiation and execution" of the Separation Agreement (Agreement, para. 20) but he is "*solely* responsible for paying" his own attorneys' fees "for the arbitration."  (Agreement, para. 9 (d).) The Separation Agreement does not go on to contain a "prevailing party fees" clause  -- a clause which must be "specifically" included and one which is frequently negotiated and made part of an agreement. Civ. Code 1717.

Under Civil Code section 1717 (a) "[i]n any action on a contract, where the contract *specifically* provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded… then the party who is determined to be the party prevailing on the contract, shall be entitled to reasonable attorney's fees…[.]" No such clause was negotiated and incorporated into the Separation Agreement.  If it had been, then Civil Code section 1717 (a) would apply, and the last sentence of paragraph 9 (d) would come into play because that sentence provides that a prevailing party may be awarded fees and costs "where authorized by applicable law".  Attorneys' fees may be authorized by law under a statute or by contract under Civil Code 1717 where that contract specifically provides that the prevailing party shall be entitled to an award of attorney's fees.  There is no statute providing for attorneys' fees here and the parties did not agree that the prevailing party would be entitled to an attorneys' fees award in an action arising out of a breach of the Separation Agreement.  Civil Code 1717 merely stands for the proposition that *if* the contract provides that a party is entitled to attorneys' fees under a contract, then all contracting parties must be afforded the same right even if the provision was afforded to only one party.  Here there is no provision in the Agreement for *any* party to receive a prevailing party attorneys' fee award.  And there is no statute authorizing an award of attorneys' fees to the prevailing party here.  In short, an attorneys' fees award for fees incurred in

connection with the arbitration is not "authorized by applicable law" and so section 9 (d) does not come into play.

The arbitrator notes that Cherny acknowledged in paragraph 20 of the Agreement that he was represented by, or had the opportunity to be represented by, independent counsel of his own choice in connection with the negotiation and execution of the Agreement. Cherny correctly notes that he has been forced to incur attorneys' fees to seek relief that Aspiration now concedes he is entitled to. He argues that he should not have been required to incur attorneys' fees to enforce his now admitted rights. Mr. Cherny could, however, have negotiated a prevailing party attorneys' fees clause. He did not. And the arbitrator has no power to award fees based upon the equities. When Courts of Appeal consider equity in analyzing Civil Code section 1717, it is always in the context of ensuring that if one party to a contract is entitled to prevailing party fees, then all parties to that contract must be entitled to them. There is no general equitable power pursuant to which the arbitrator can award attorneys' fees.

Turning to the Releases, Claimant argues that the "No Action" provision in the Releases does contain an attorneys' fees provision entitling the signatory to attorneys' fees. He contends that this one-sided prevailing party attorneys' fee provision must under Civil Code section 1717 be interpreted to apply to both parties. This is so because, as discussed above, under Civil Code 1717 if a contract provides for one party to be awarded prevailing party attorneys' fees, all other parties must be afforded the same right. It is true, that each of the Releases has what is arguably a one-sided prevailing party fees provision but the provision is restricted to suits "arising out of, based upon, or relating to any of the Claims *released hereunder…"[.]* This arbitration does not, however, arise out of or relate to any of the "released claims" as described in paragraph 1 of each of the Releases. Instead, this arbitration arises out of *un*released claims, namely those based upon the enforceable terms of the Separation Agreement which logically have not been released.

Cherny has brought claims based on the Separation Agreement, asserting that Aspiration breached the post-October 12, 2022 contractual obligations. Cherny does not assert a claim released under the applicable Release. Neither has Aspiration brought any such claims. In other

words, the attorneys' fee provisions in the Releases do not apply here since no one is asserting a released claim.  *See Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708 (fee award "turns on the language of the contractual attorneys' fee provision, i.e., … whether the type of claim is within the scope of the provision;" rejecting application of attorneys' fee clause since fraud and fiduciary duty claims did not seek "to enforce the terms" of the contract); *Gil v. Mansano* (2004) 121 Cal.App.4th 739, 741-45.  The cases cited by Claimant including *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal. 5th 744 and *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal. App. 4th 373 are not on point.  They dealt with different circumstances than those at bar.

Pursuant to JAMS Rule 18 and California rules of contract interpretation, Aspiration's Motion for Summary Disposition of Cherny's claim for attorneys' fees in excess of $10,000 is granted.  Put differently, the arbitrator hereby rules and orders that Cherny is not entitled to attorneys' fees incurred in connection with the enforcement of his rights under the Agreement, including those incurred in connection with the filing and prosecution of this arbitration.

Because there are still certain issues outstanding that may require further adjudication, the Arbitrator will not enter any Award until those issues have been discussed at a further hearing hereby scheduled for **January 4, 2024 at 2:30 PM via Zoom.**


Dated: December 21, 2023

_____

    Hon. Glenda Sanders(Ret.)

# EXHIBIT A



1120 20th Street, NW, Suite 725
Washington, DC 20036
202-886-5260
info@mitchellsandler.com

|  | Amount | Interest Accrual Begin Date | Interest Accrual End Date | Number of Days | Daily Interest Accrued at 7% | Total Interest |
|---|---|---|---|---|---|---|
| Month 1 Consulting Fee | $25,000.00 | 11/10/2022 | 6/6/2023 | 208 | $4.79 | $996.32 |
| Month 2 Consulting Fee | $25,000.00 | 12/10/2022 | 6/6/2023 | 178 | $4.79 | $852.62 |
| Month 3 Consulting Fee | $25,000.00 | 1/10/2023 | 6/6/2023 | 147 | $4.79 | $704.13 |
| Month 4 Consulting Fee | $25,000.00 | 2/10/2023 | 6/6/2023 | 116 | $4.79 | $555.64 |
| Month 5 Consulting Fee | $25,000.00 | 3/10/2023 | 6/6/2023 | 88 | $4.79 | $421.52 |
| Month 6 Consulting Fee | $25,000.00 | 4/10/2023 | 6/6/2023 | 57 | $4.79 | $273.03 |
| Legal fees to negotiate separation agreement | $10,000.00 | 11/17/2022 | 6/6/2023 | 201 | $1.92 | $385.92 |
| Remaining arbitration filing fee | $50.00 | | | | | |
| 2022 COBRA coverage | $1,152.00 | | | | | |
| 2023 COBRA coverage | $6,673.10 | | | | | |

**TOTAL PAYMENTS:**   $167,875.10

**TOTAL INTEREST:**   $4,189.18

**INTEREST PLUS PAYMENTS:**   $172,064.28

# EXHIBIT G

**JAMS CASE REFERENCE NO. 5220002918**


**Cherny, Andrei,**

      **Claimant(s),**

          **v.**

**Aspiration Partners, Inc.,**

      **Respondent(s).**

---

**FINAL AWARD**

On December 21, 2023 the arbitrator issued a ruling ("Ruling") on a motion brought by Aspiration against Cherny pursuant to Rule 18.  The arbitrator granted Aspiration's motion for summary disposition of Cherny's claim for attorneys' fees and costs in excess of $10,000.  Put differently, the arbitrator ruled that Cherny is not entitled to attorneys' fees incurred in connection with the enforcement of his rights under the Agreement, including those incurred in connection with the filing and prosecution of this arbitration.  The **Ruling** is attached hereto as **Exhibit 1**.

After the issuance of the Ruling, the parties resolved all the remaining claims in the Demand ("Other Claims"). For the reasons set forth in the Ruling and based on the parties' agreement as to the Other Claims, the arbitrator now makes the following Award:

1. Cherny is **not entitled to an award of attorneys' fees incurred in connection with the enforcement of rights under the Agreement,** including those incurred in connection with the filing and prosecution of this arbitration.  This part of the Award is based on the reasoning set forth in the Ruling which is incorporated herein.

2. Cherny **is entitled to payment of the sum of $172,064.28** comprised of the amounts set forth in **Exhibit 2** hereto.  That same document is also attached to the Ruling as an exhibit.  This part of the Award is based upon the parties' agreement as to the Other Claims.

Dated: February 9, 2024

Hon. Glenda Sanders (Ret.)

2

EXHIBIT 1

3

**JAMS CASE REFERENCE NO. 5220002918**


**Cherny, Andrei,**

      **Claimant(s),**

        **v.**

**Aspiration Partners, Inc.,**

      **Respondent(s).**

_____


**Ruling and Order on Rule 18 Motion Regarding Attorneys' Fees Issue**


**The Demand**

In his Demand, claimant (Cherny) seeks an Award in his favor and against Respondent Aspiration Partners, INC. (Aspiration) for an Order that:

1. Aspiration pay Cherny $25,000 per month consulting fees under section 2 of the Separation Agreement for the period October 12, 2022 through the present;

2. Aspiration provide Cherny with immediate access to his aspiration issued computer and email account;

3. Aspiration pay Cherny $10,000 to reimburse Cherny for legal fees incurred in connection with the negotiation and execution of the Separation Agreement;

4.  Aspiration provide Cherny and his eligible dependents with continuing health insurance coverage;

5. Aspiration confirm in writing that Cherny's stock option awards remain valid and outstanding;

6. Aspiration pay Cherny pre-and post-award interest. The parties now agree on the amount of pre-award interest owed as of December 15, 2023. (See email correspondence of December 15, 2023 between counsel and **Exhibit A hereto** containing a spreadsheet in which the pre-award interest is set forth);

1

7. Aspiration pay Cherny all costs and attorneys' fees incurred in seeking enforcement of his rights under the Separation Agreement, including all costs and attorneys' fees for bringing the arbitration;

8. The arbitrator declare Aspiration is obligated to reimburse Cherny for certain arbitration filing fee costs. The parties have now agreed that the amount owed for such costs is $50. (See December 15, 2023 email correspondence, and Exhibit A hereto.)

After the filing of the Demand the parties resolved most of the claims in the Demand except the claim that is the subject matter of this motion. There is also still a dispute concerning the question whether certain computers in Cherny's possession should be returned to Aspiration. Those computers are identified in the December 15, 2023 email correspondence between the parties as (1) MacBook Pro 13-inch| SN: C02CW4UKML7J, and (2) MacBook Pro 13-inch|SN: C02T3MTRHF1P.

### The Rule 18 Motion and Governing Law

Pursuant to Rule 18 of the JAMS Employment Arbitration Rules and with the authorization of the Arbitrator (Report and Scheduling Order No. 2), Aspiration moved for Summary Disposition of Cherny's claim for attorneys' fees and costs in excess of $10,000. Demand paras. 26 through 28.

### Attorneys' Fees Provisions in the Separation Agreement and the Releases

The Separation Agreement (Agreement) contains 2 provisions regarding the recovery of attorneys' fees. First, under **Section 20**, the Agreement provides: "The Company agrees that it shall reimburse Executive for up to $10,000 in attorneys' fees actually incurred in connection with the negotiation and execution of this Agreement, subject to Executive's delivery to the Company of documentation evidencing such fees within 60 days of the Effective Date." The parties agree that this $10,000 has not yet been paid and that Cherny has submitted adequate documentation of the expenditure. Aspiration has agreed to pay $10,000 in attorneys' fees for the negotiation and execution of the Separation Agreement.

The second attorneys' fee provision is contained in **Section 9 (d)** of the Agreement. That

2

section controls recovery of attorneys' fees incurred in the arbitration.  It provides that:

> "[t]he fees of the arbitrator and all other costs … unique to arbitration shall be paid by the Company initially, but if Executive initiates a claim subject to arbitration, Executive shall pay any filing fee up to the amount that Executive would be required to pay if Executive initiated such claim in the Court.  Each party *shall be solely responsible for paying its own further costs for the arbitration, including, but not limited to, its own attorneys' Fees*….[.]  The arbitrator may award fees and costs (including attorneys' fees) to the prevailing party *where authorized by applicable law."*  Emphasis added.

Two Releases are attached to the Agreement.  One Release is signed by Cherny and the other by Nate Redmond, Chair of the Board, on behalf of Aspiration.  There is no dispute as to the authenticity of the Agreement or the Releases.  Each of the Releases contains paragraphs describing the claims being released, the claims not being released, and a paragraph entitled "No Action."  (Para 5 in Cherny's Release and paragraph 4 in Aspiration's Release).   The "No Action" provision is substantively identical in each of the Releases.  It provides that:

> "The [signatory, i.e. Cherny or Aspiration] agrees that if the signatory hereafter commences any suit arising out of, based upon, or relating *to any of the claims **released** hereunder*, then the [signatory] agrees to pay to Releasees, and each of them, in addition to any other damages caused to Releasees thereby, all attorneys' fees incurred by Releasees in defending or otherwise responding to said suit or Claim."  (Emphasis added.)

To rule on the issue presented, the arbitrator must interpret the Agreement read together with the Releases.  Section 12 of the Separation Agreement provides that the Agreement "shall be construed under the laws of the State of California.  Sections 7 and 8 of the Cherny and Aspiration Releases respectively also provide for the application of California law.

Under California law the mutual intention of the parties at the time the contract is formed governs interpretation (Civ. Code, section 1636.)  Such intent is to be inferred, if possible, solely from the written provisions of the contract (*Id*., section 1639.)  The clear and explicit meaning of the written provisions must be judicially interpreted in their ordinary and popular sense unless they are used by the parties in a technical manner or are given a special meaning by the parties (*Id*., Sections 1644 and 1638.)  Thus, if the meaning a layperson would ascribe to contractual

3

language is not ambiguous, the layperson's meaning must be applied. *Santisas v. Goodin* (1998)
17 Cal.4th 599, 608.  Civil Code section 1638 also provides: "The language of a contract is to
govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

The language of the attorneys' fees provisions in paragraph 9 of the Separation
Agreement is clear and explicit and does not involve an absurdity.   Cherny is entitled to
reimbursement for $10,000 for the "negotiation and execution" of the Separation Agreement
(Agreement, para. 20) but he is "*solely* responsible for paying" his own attorneys' fees "for the
arbitration."  (Agreement, para. 9 (d).) The Separation Agreement does not go on to contain a
"prevailing party fees" clause  -- a clause which must be "specifically" included and one which is
frequently negotiated and made part of an agreement. Civ. Code 1717.

Under Civil Code section 1717 (a) "[i]n any action on a contract, where the contract
*specifically* provides that attorney's fees and costs, which are incurred to enforce that contract,
shall be awarded… then the party who is determined to be the party prevailing on the contract,
shall be entitled to reasonable attorney's fees…[.]" No such clause was negotiated and
incorporated into the Separation Agreement.  If it had been, then Civil Code section 1717 (a)
would apply, and the last sentence of paragraph 9 (d) would come into play because that
sentence provides that a prevailing party may be awarded fees and costs "where authorized by
applicable law".  Attorneys' fees may be authorized by law under a statute or by contract under
Civil Code 1717 where that contract specifically provides that the prevailing party shall be
entitled to an award of attorney's fees.  There is no statute providing for attorneys' fees here and
the parties did not agree that the prevailing party would be entitled to an attorneys' fees award in
an action arising out of a breach of the Separation Agreement.  Civil Code 1717 merely stands
for the proposition that *if* the contract provides that a party is entitled to attorneys' fees under a
contract, then all contracting parties must be afforded the same right even if the provision was
afforded to only one party.  Here there is no provision in the Agreement for *any* party to receive
a prevailing party attorneys' fee award.  And there is no statute authorizing an award of
attorneys' fees to the prevailing party here.  In short, an attorneys' fees award for fees incurred in

connection with the arbitration is not "authorized by applicable law" and so section 9 (d) does not come into play.

The arbitrator notes that Cherny acknowledged in paragraph 20 of the Agreement that he was represented by, or had the opportunity to be represented by, independent counsel of his own choice in connection with the negotiation and execution of the Agreement. Cherny correctly notes that he has been forced to incur attorneys' fees to seek relief that Aspiration now concedes he is entitled to. He argues that he should not have been required to incur attorneys' fees to enforce his now admitted rights. Mr. Cherny could, however, have negotiated a prevailing party attorneys' fees clause. He did not. And the arbitrator has no power to award fees based upon the equities. When Courts of Appeal consider equity in analyzing Civil Code section 1717, it is always in the context of ensuring that if one party to a contract is entitled to prevailing party fees, then all parties to that contract must be entitled to them. There is no general equitable power pursuant to which the arbitrator can award attorneys' fees.

Turning to the Releases, Claimant argues that the "No Action" provision in the Releases does contain an attorneys' fees provision entitling the signatory to attorneys' fees. He contends that this one-sided prevailing party attorneys' fee provision must under Civil Code section 1717 be interpreted to apply to both parties. This is so because, as discussed above, under Civil Code 1717 if a contract provides for one party to be awarded prevailing party attorneys' fees, all other parties must be afforded the same right. It is true, that each of the Releases has what is arguably a one-sided prevailing party fees provision but the provision is restricted to suits "arising out of, based upon, or relating to any of the Claims *released hereunder…"[.]* This arbitration does not, however, arise out of or relate to any of the "released claims" as described in paragraph 1 of each of the Releases. Instead, this arbitration arises out of *un*released claims, namely those based upon the enforceable terms of the Separation Agreement which logically have not been released.

Cherny has brought claims based on the Separation Agreement, asserting that Aspiration breached the post-October 12, 2022 contractual obligations. Cherny does not assert a claim released under the applicable Release. Neither has Aspiration brought any such claims. In other

words, the attorneys' fee provisions in the Releases do not apply here since no one is asserting a released claim. *See Exxess Electronixx v. Heger Realty Corp*. (1998) 64 Cal.App.4th 698, 708 (fee award "turns on the language of the contractual attorneys' fee provision, i.e., … whether the type of claim is within the scope of the provision;" rejecting application of attorneys' fee clause since fraud and fiduciary duty claims did not seek "to enforce the terms" of the contract); *Gil v. Mansano* (2004) 121 Cal.App.4th 739, 741-45. The cases cited by Claimant including *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal. 5th 744 and *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal. App. 4th 373 are not on point. They dealt with different circumstances than those at bar.

Pursuant to JAMS Rule 18 and California rules of contract interpretation, Aspiration's Motion for Summary Disposition of Cherny's claim for attorneys' fees in excess of $10,000 is granted. Put differently, the arbitrator hereby rules and orders that Cherny is not entitled to attorneys' fees incurred in connection with the enforcement of his rights under the Agreement, including those incurred in connection with the filing and prosecution of this arbitration.

Because there are still certain issues outstanding that may require further adjudication, the Arbitrator will not enter any Award until those issues have been discussed at a further hearing hereby scheduled for **January 4, 2024 at 2:30 PM via Zoom.**

Dated: December 21, 2023

_____

Hon. Glenda Sanders(Ret.)

# EXHIBIT A



1120 20th Street, NW, Suite 725
Washington, DC 20036
202-886-5260
info@mitchellsandler.com

| | Amount | Interest Accrual Begin Date | Interest Accrual End Date | Number of Days | Daily Interest Accrued at 7% | Total Interest |
|---|---|---|---|---|---|---|
| Month 1 Consulting Fee | $25,000.00 | 11/10/2022 | 6/6/2023 | 208 | $4.79 | $996.32 |
| Month 2 Consulting Fee | $25,000.00 | 12/10/2022 | 6/6/2023 | 178 | $4.79 | $852.62 |
| Month 3 Consulting Fee | $25,000.00 | 1/10/2023 | 6/6/2023 | 147 | $4.79 | $704.13 |
| Month 4 Consulting Fee | $25,000.00 | 2/10/2023 | 6/6/2023 | 116 | $4.79 | $555.64 |
| Month 5 Consulting Fee | $25,000.00 | 3/10/2023 | 6/6/2023 | 88 | $4.79 | $421.52 |
| Month 6 Consulting Fee | $25,000.00 | 4/10/2023 | 6/6/2023 | 57 | $4.79 | $273.03 |
| Legal fees to negotiate separation agreement | $10,000.00 | 11/17/2022 | 6/6/2023 | 201 | $1.92 | $385.92 |
| Remaining arbitration filing fee | $50.00 | | | | | |
| 2022 COBRA coverage | $1,152.00 | | | | | |
| 2023 COBRA coverage | $6,673.10 | | | | | |

**TOTAL PAYMENTS:**  $167,875.10

**TOTAL INTEREST:**  $4,189.18

**INTEREST PLUS PAYMENTS:**  $172,064.28

# EXHIBIT 2



1120 20th Street, NW, Suite 725
Washington, DC 20036
202-886-5260
info@mitchellsandler.com

| | Amount | Interest Accrual Begin Date | Interest Accrual End Date | Number of Days | Daily Interest Accrued at 7% | Total Interest |
|---|---|---|---|---|---|---|
| Month 1 Consulting Fee | $25,000.00 | 11/10/2022 | 6/6/2023 | 208 | $4.79 | $996.32 |
| Month 2 Consulting Fee | $25,000.00 | 12/10/2022 | 6/6/2023 | 178 | $4.79 | $852.62 |
| Month 3 Consulting Fee | $25,000.00 | 1/10/2023 | 6/6/2023 | 147 | $4.79 | $704.13 |
| Month 4 Consulting Fee | $25,000.00 | 2/10/2023 | 6/6/2023 | 116 | $4.79 | $555.64 |
| Month 5 Consulting Fee | $25,000.00 | 3/10/2023 | 6/6/2023 | 88 | $4.79 | $421.52 |
| Month 6 Consulting Fee | $25,000.00 | 4/10/2023 | 6/6/2023 | 57 | $4.79 | $273.03 |
| Legal fees to negotiate separation agreement | $10,000.00 | 11/17/2022 | 6/6/2023 | 201 | $1.92 | $385.92 |
| Remaining arbitration filing fee | $50.00 | | | | | |
| 2022 COBRA coverage | $1,152.00 | | | | | |
| 2023 COBRA coverage | $6,673.10 | | | | | |

**TOTAL PAYMENTS:**     $167,875.10

**TOTAL INTEREST:**     $4,189.18

**INTEREST PLUS PAYMENTS:**     $172,064.28

# EXHIBIT H

**From:** NoReply-Notification@jamsaccess.com <NoReply-Notification@jamsaccess.com>
**Sent:** Wednesday, February 14, 2024 12:33 PM
**To:** Chris McCall <cmccall@mitchellsandler.com>
**Subject:** JAMS Access New Notifications

**Dear Christopher** ,

Here are all of the new Notifications within JAMS Access.
Click here to login to JAMS Access to see the Notifications.

| Log Notification | Time |
|---|---|
| FINAL AWARD.pdf is uploaded to case Cherny, Andrei vs. Aspiration Partners, Inc. #5220002918 by Hanna Ahn | 12:32 PM (ET) |

Thanks,
JAMS Access Team



JAMS Access

Please do not reply directly to this email as you will not receive a response. For assistance, please visit our Contact Us center at jamsadr.com/contact or call your Case Manager.

# EXHIBIT I

**MITCHELL SANDLER**

April 17, 2024

**VIA EMAIL**

Benjamin K. Riley
Bartko LLP
One Embarcadero Center, Suite 800
San Francisco, California  94111
briley@bartkolaw.com

       **Re:**    ***Andrei Cherny v. Aspiration Partners, Inc.*,
                           JAMS Ref. No. 5220002918**

Dear Ben:

       As you know, we represent claimant Andrei Cherny ("Cherny") in the above-referenced arbitration proceeding against respondent Aspiration Partners, Inc. ("Aspiration").  On February 14, 2024, the arbitrator issued a final award requiring Aspiration to pay Cherny the sum of $172,064.28, with the full payment due on or before February 23, 2024.  Despite repeated promises from Aspiration that payment will be forthcoming, and despite the fact that Aspiration has not raised any objection to the final award or defense to its enforcement, to date Cherny has not received any portion of the final award.

       We write to inform Aspiration that, if it does not pay Cherny the amount due of $172,064.28 by 5:00 p.m. on April 19, 2024, Cherny intends to seek confirmation of the final award.  As provided by Section 9(c) of the Separation Agreement, Cherny will commence the confirmation proceeding in the United States District Court for the Central District of California. In that proceeding, Cherny will detail Aspiration's willful and bad-faith refusal to pay Cherny the amount required by the final award, as well as its past refusal to comply with its clear contractual obligations as retaliation for Cherny's unsuccessful efforts while CEO to end potentially illegal activities by Board members.  Cherny will seek the full amount awarded in the arbitration, pre- and post-judgement interest, and attorneys' fees for Aspiration's bad-faith, vexatious, wanton, and oppressive conduct in refusing to abide by the terms of the final award based on Aspiration's desire to retaliate against Cherny.  *See Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1104 (9th Cir. 2011).

       If you would like to discuss this matter further, please do not hesitate to contact me at 202-886-5260 or cmccall@mitchellsandler.com prior to 5:00 p.m. on April 19, 2024.

                Sincerely,

                */s/ Christopher L. McCall*

                Christopher L. McCall

**MITCHELL SANDLER PLLC**
1120 20th Street, NW
Suite 725
Washington, DC 20036
T. 202.886.5260
mitchellsandler.com

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and am not a party to the within action; my business address is 1055 West 7th Street, Los Angeles, CA 90017. My electronic service address is elegaspi@sandersroberts.com.

On December 2, 2024, I served the following document(s) described as **NOTICE OF PETITION AND PETITION TO CONFIRM ARBITRATION AWARD; DECLARATION OF JUSTIN H. SANDERS** on the interested parties in this action as follows:

Benjamin K. Riley                  ***Attorneys for Respondent,***
Bartko LLP                         ***Aspiration Partners, Inc.***
One Embarcadero Center, Suite 800
San Francisco, CA 94111
briley@bartkolaw.com

☒    **VIA ECF:** I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 2, 2024, at Los Angeles, California.

_____         _____
      Elliott Legaspi                   */s/ELLIOTT LEGASPI*
   (Type or print name)                    (Signature)

SANDERS
ROBERTS
1055 W. 7TH STREET
SUITE 3200
LOS ANGELES, CA 90017